## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **LINDA J. STENGLE,** | : | **JURY TRIAL DEMANDED** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **No. 4:CV-06-1913** |
| | : | |
| **OFFICE FOR DISPUTE** | : | **(Judge Jones)** |
| **RESOLUTION,** *et al.*, | : | |
| **Defendants** | : | **Electronically Filed** |

### PDE DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Local Rule 56.1, the following statements of material facts as to which PDE Defendants contend there are no genuine issues to be tried are submitted in support of their motion for summary judgment:

1.    Linda Stengle is the plaintiff in this action.    (Second Amended Complaint, ¶1).

2.    The Pennsylvania Department of Education (PDE), Linda Rhen, Abigail Tierney, John Tommasini, Diane Castelbuono, Ernest Helling and Patricia Fullerton (hereinafter PDE defendants), are defendants.  PDE Defendants Rhen, Tierney, Tommasini, Castelbuono, Helling, and  Fullerton are all employees of PDE.  (Second Amended Complaint, ¶¶ 9-14).[1]

---

[1]   Office of Dispute Resolution, Kerry Smith and Lancaster-Lebanon IU-13 are also defendants who are separately represented.

3.      Earnest Helling was acting Chief Counsel of the Department of Education during the time relevant to this lawsuit.  (July 1, 2005- June 30, 2006) (**Exhibit A**-Deposition of Ernest Helling, p. 6).

4.      Diane Castelbuono is the Deputy Secretary for elementary and secondary education at the Department of Education at all times relevant and she has hundreds of individuals who report to her.  (**Exhibit B**-Deposition of Diane Castelbuono at pp. 26-27).

5.      Linda Rhen was Director of the Bureau of Special Education for the Department of Education during the period relevant to this litigation. (**Exhibit C**-Deposition of Linda Rhen at p. 5).

6.      Abigail Tierney was employed as Assistant Counsel with the Pennsylvania Department to Education.  (**Exhibit D-**Deposition of Abigail Tierney at p. 5).

7.      Patricia Fullerton is employed as the Assistant Chief Counsel for the Department of Education at all times relevant.  (**Exhibit E-**Deposition of Patricia Fullerton at p. 5).

8.      John Tommasini is employed as the Assistant Director of the Bureau of Special Education at times most relevant to the pending litigation. (**Exhibit F**-Deposition of John Tommasini at p. 5).

9.     Plaintiff served as an Office of Dispute Resolution ("ODR") special education due process hearing officer under consecutive one-year contracts with various Pennsylvania intermediate units from July 1, 1998, through June 30, 2006. (Second Amended Complaint, ¶¶ 17, 19; **Exhibit G** –Deposition of Linda Stengle, p. 28, 33;  **Exhibit H** – Contract between Stengle and IU-13 for the period July 2005-June 2006).

10.     Plaintiff's final contract, with a term of July 1, 2005, through June 30, 2006, was with Intermediate Unit 13 (IU 13).  (Second Amended Complaint, ¶ 14).

11.     The contract that plaintiff signed with IU-13 to work for ODR enumerates one of the responsibilities as a hearing officer as maintaining status as an impartial hearing officer as required by federal law. (Second Amended Complaint, ¶¶ 22, 19; Stengle Dep., at pp. 34-35; Exhibit H -contract). According to Section 1801 of ODR's Special Education Dispute Resolution Manual, Hearing Officers are responsible for:    1) hearing testimony, receiving documentary evidence, and guiding the hearing process so as to conform to applicable state and federal laws and regulations; and 2) deciding issues in the due process hearing and writing a decision.  (Second Amended Complaint, ¶ 18).

12.     The contract also stated that Plaintiff's subsequent reappointment as a hearing officer was contingent on satisfactory performance of all hearing officer

duties, with satisfaction to be determined by the Director of ODR. (Second Amended Complaint, ¶ 14; Exhibit H -contract).

13.     The Director of ODR is Co-Defendant, Kerry Smith.   (Second Amended Complaint, ¶ 8; **Exhibit I**- Deposition of Kerry Smith at p. 4).

14.     As Director of ODR, Co-defendant Smith has administrative oversight of the due process system and the hearing officers, which are part of that system. (Smith Dep. at pp. 5, 124, 125). Co-defendant Smith's role vis a vis hearing officers was administrating the process, timelines, competence, attendance of hearing officers as hearing officers do not report to anyone in the traditional sense, because they are impartial officers deciding their cases independent of anyone.(Smith Dep. at pp. 123-125).  As part of this role, Co-Defendant Smith's duties included evaluating the performance of hearing officers and determining whether to renew their contracts and all hearing officers were evaluated for renewal under the standard of "satisfactory performance" of their duties.  (Smith Dep. at pp. 45, 46).

15.     ODR is an office tasked with coordinating and managing the statewide special education dispute resolution system and is administered fiscally, and a program of the IU-13.  (Second Amended Complaint, ¶¶ 6, 17, 19; Smith Dep. at pp. 5-6, 124, 125).

16.     As Director of ODR, Co-defendant Smith had the sole authority to renew or not renew the contracts to act as hearing officers. (Smith Dep. at p. 139; Second Amended Complaint, ¶8).

17.     Both ODR and IU-13 are separate and independent from the PDE. (Second Amended Complaint, ¶ 6; Smith Dep. at pp. 126, 127).

18.     Although PDE is separate from ODR, PDE, specifically the Bureau of Special Education and ODR have a fiscal based relationship. PDE was responsible to ensure that the Pennsylvania Training and Technical Assistance Network (PATTAN), of which ODR was a component, had the necessary funding through PDE to complete its programs. However, PDE and the Bureau of Special Education did not have any other administrative or managerial oversight into ODR. (Tomassinni Dep. at pp. 23-24, 30, 31; Smith Dep. at pp. 127-128, 138).

19.     The money that runs the ODR program comes from the PDE, but no one at ODR reports to the department or runs the system. (Smith Dep. at p. 121, 125- 126).

20.     *Gaskin v. Commonwealth* was a class action lawsuit filed in the United States District Court for the Eastern District of Pennsylvania which alleged that PDE failed to enforce compliance with the least restrictive environment aspects of Individuals with Disabilities Education Act, the Rehabilitation Act of 1973, and the Americans with Disabilities Act. The Gaskin Advisory Panel was

created as the result of a settlement of the class action lawsuit. The Panel was assembled at the direction of the District Court to implement a class action settlement that requires all Pennsylvania school districts to "mainstream" their special education students into a "LRE" classroom, and increase the capacity of school district to include students with disabilities in regular education classrooms. (Second Amended Complaint, ¶¶ 39, 41).

**Gaskin Advisory Panel**

21.     In late October or November 2005, plaintiff was appointed to the Gaskin Panel Advisory Board. (Stengle Dep. at p. 373). Mrs. Stengle was one of two due process hearing officers appointed to serve on the Gaskin Advisory Panel. (Second Amended Complaint, ¶ 44).

22.     The Gaskin Panel Advisory Board was meant to work with PDE, specifically, the Bureau of Special Education and its Director, defendant Linda Rhen, to implement the Gaskin Settlement Agreement. (Rhen Dep. at pp. 55-56).

23.     On November 18, 2005, Judy Gran, the attorney for the Gaskin plaintiffs notified defendants Rhen and Fullerton of the Gaskin panel members and plaintiff was included in this list. (**Exhibit J-**Email Stream Fullerton 0093-0100).

24.     After receiving that email, there was an email exchange between Rhen, Fullerton and Jeanine Brinkley, the administrative individual assigned to help with the Gaskin panel, which raised a concern about hearing officers serving

on the advisory panel. Specifically, Brinkley stated "Do we need to have a conversation with Kerry Smith related to Hearing Officers serving on this advisory panel?" (*Id.*).

25. Rhen responded "You read my mind on the hearing officer issue" and Fullerton, her PDE attorney, stated "Let me think about how we want to handle this. I don't want us to be perceived as interfering." (*Id.*).

26. Rhen replied to Fullerton "I understand-thought about staying out of it totally, but we will be questioned on this issue by someone, I am sure, and we should feel comfortable that all panel members meet the standard of the settlement agreement. (*Id.*).

27. On November 21, 2005, Stengle informed the Director of ODR, co-defendant Smith, that she had been selected to serve as one of the panel members. (**Exhibit K** – Email Stream Rhen 0010).

28. The next day Kerry lodged her concern with Rhen and Fullerton, the PDE employees tasked with helping to administer the Gaskin Settlement Agreement. (*Id.*).

29. On November 30, 2008, Co-Defendant Smith sent an email to Defendant Rhen in which she copied Defendant Abigail Tierney and Defendant Ernest Helling in which she informed Dr. Rhen that she had spoken to Abby on the issue of the two hearing officers being selected to the advisory panel and that she

agreed to draft a letter to the hearing officers about her concerns. (**Exhibit L** –
Email re Gaskin panel members- Rhen 0011).

30. Co-defendant Smith sent the email to Helling and Tierney because she
was formerly an attorney with PDE Chief Counsel's office and when she left to
take the ODR position, Helling told her that she should copy the attorneys who
represent PDE when communicating with PDE officials. (Smith Dep. at pp. 8,
125).

31. The first Gaskin panel meeting was in mid-December, approximately
December 14-15, 2006. (Stengle Dep. at p. 164).

32. Plaintiff attended the first Gaskin panel meeting as did Defendants
Rhen and Fullerton. (Stengle Dep. at p. 374). Defendants Helling, Tommasini,
Tierney, Castelbuono did not attend the Gaskin meeting in December 2005.
(Stengle Dep. at pp. 391-392).

33. Plaintiff alleges that at the Gaskin panel meeting in mid-December
2005, she spoke out at the meeting and expressed the belief that the Gaskin
Settlement Agreement should be fully implemented, obtained and circulated a copy
of PDE's OSEP corrections plan, pointed out problems with the implementation of
Section 504 and the neighborhood school aspect of the least restrictive
environment. Stengle had specific problems with the meeting process: 1)
intemperate attitude of the moderator, Rhonda Tyree, which she believed impeded

discussion; 2) Dr. Rhen's disagreement regarding advisory panels and disagreed with Dr. Rhen's assertion about the existence of policies governing advisory panels and pointed out that there were no state policies; and 3) Dr. Rhen's controlling the agenda which prevented the panel from fulfilling its obligations under the settlement agreement; (Stengle Dep. at pp. 385-386; Second Amended Complaint, ¶ 46).

34.    Stengle stated that her "report" under the Pennsylvania Whistleblower Law was to the IU 13 and PDE "because they were the ones who were present when these discussions took place."   Nonetheless, Stengle was unable to identify which "one or two" IU 13 personnel were present, or what they looked like. Stengle identified Linda Rhen and Pat Fullerton as the individuals from PDE that she allegedly "reported to" just by their mere attendance during her "speaking out". (Stengle Dep. at pp. 158-161).

35.    Stengle believed that although Rhen did not voice her displeasure with Stengle being outspoken during the meeting, she showed her displeasure by frowning and her (Rhen) face getting red.   (Stengle Dep. at p. 386).

36.    Stengle was aware that prior to the first Gaskin meeting in December during the appointment process in October or November, 2005, Defendant Fullerton had raised a concern about hearing officers serving on the panel and that that concern was abandoned.   (Stengle Dep. at pp. 378-379).

37.     Defendant Rhen was also concerned about whether it was appropriate to have hearing officers on the panel and wanted to make sure that everything was being handled in conformity with the Gaskin Settlement Agreement.  (Rhen Dep. at p. 40).

38.     After the first Gaskin panel meeting in mid-December 2005, Stengle was appointed Vice-chair and when that appointment was announced, on December 19, 2005, Co-defendant Smith sent an email to defendants Tierney and Helling telling them that she would be sending a letter to both Stengle and Peg Drayden, the other hearing officer appointed to the Gaskin panel, regarding possible conflicts.  (**Exhibit M-** E-mail Stream Tierney 0009).

39.     Co-defendant Smith then spoke with defendant Rhen and wrote a draft letter to the hearing officers.  She forwarded an email stating this with a copy of the draft to defendants Tierney and Helling. (**Exhibit N**-E-mail Tierney 0010 and draft letter).

40.     Defendant Fullerton did not discuss the issue of hearing officers being on the Gaskin panel with Co-defendant Smith as she believed there was no reason to discuss it with Co-defendant Smith.  (Fullerton Dep. at pp. 21-22).

**Blog**

41.     In February 2006, Plaintiff started an Internet blog in which she allegedly educated readers about various special education issues.   (Second Amended Complaint, ¶ 50; Stengle Dep. at p. 379).

42.     Stengle started the blog to get her opinions and information out about the Gaskin Settlement Agreement.  (Stengle Dep. at p. 380).

43.     Stengle relied on her experience as a hearing officer and in the special education industry when writing her blog and the content of the blog included Gaskin issues, as well as legal issues and subject matter that she dealt with as a hearing officer.  (Stengle Dep. at p. 381).

44.     Sometime in the spring of 2006, Defendant Pat Fullerton was informed that Stengle had a blog and Fullerton regularly looked at the blog to read the updates  (Fullerton Dep. at pp. 8-9).

45.     Fullerton informed both Linda Rhen and Jeanine Brinkley as the blog involved the Gaskin litigation and they were all working on implementing the Gaskin Settlement Agreement.  (Fullerton Dep. at p. 8).

46.     Fullerton and Rhen perceived plaintiff's blog as bashing the PDE. (Fullerton Dep. at pp. 12, 13; Rhen Dep. at p. 32).

47.     On April 13, 2006, Defendant Rhen, the then-Director of the Department's Bureau of Special Education, wrote plaintiff a letter asking that she

correct misinformation posted on her blog regarding inclusion of 3-5 year olds because it was "causing confusion in the education community." (**Exhibit O**– 4/13/06 letter to Stengle).

48.     In her blog, Stengle took very strong positions in favor of LRE/inclusion and invited commentary and complaint by parents with students who may not have been properly included.  Stengle advocated full inclusion and other LRE issues, and made recommendations to individuals about filing complaints, due process, and in private communications.  (Smith Dep. at p. 51; **Exhibit P-**Linda Stengle Blog).

49.     Stengle agreed that stating that Pennsylvania "seems to be pretty devoted to this segregation of children on the basis of disability" was her opinion and was advocacy.  (Stengle Dep. at pp. 98-99).

## Complaints

50.     In April 2004, Co-defendant Smith received a complaint from Anne Hendricks of the Levin Legal Group stating that she had read Stengle's blog and was aware of her appointment to the Gaskin panel and that she believes, given Stengle's statements against school districts, Stengle was not able to be impartial as required of due process hearing officers.  (**Exhibit Q**- E-mail Stream Tierney 22-25).

51.     Co-defendant Smith forwarded Hendricks complaint email to Tommasini, Helling, Tierney and Ed Titterton because Titterton suggested that these were issues that should be brought to the attention of the Department. Tommasini replied to Co-defendant Smith's forwarded email that he was not sure how much longer her activities could be ignored.  (*Id*; Smith Dep. at pp. 20, 135.).

52.     Tommasini also responded that Hendricks makes a valid point and his meaning was that the point referred to Stengle's ability to sit as an impartial hearing officer.  (Tommasini Dep. at p. 14).

53.     A parent litigant in the *L.G. v. Wissahickon* case stated that she reviewed plaintiff's blog and did not want her as a hearing officer because she did not believe Stengle could be impartial on issues of LRE.  (Smith Dep. at pp. 52, 147).

54.     On April 3, 2006, Andrew Faust complained to co-defendant Smith about Stengle's blog and her inability to remain impartial in light of  her advocacy in the blog and asked that the matter be investigated or terminated. (**Exhibit R-**Email Stream Fullerton 0077-0081; **Exhibit S-**Deposition of Andrew Faust at pp.13-14, 20-21).

55.     Several days later, co-defendant Smith forwarded Faust's email to defendants Helling, Tierney and Tommasini in order to keep the Department informed. (*Id.*; Smith Dep. at p. 25).

56.     On May 8, 2006, co-defendant Smith sent an email to Defendants Rhen, Tommasini, Helling and Tierney that Judy Gran, a child advocate and Scott Wolpert, a school district counsel were both trying to get Stengle to recuse herself because of their concerns over her ability to be impartial. **(Exhibit T**-Email Stream Fullerton 0064-0065)

57.     Gran and Wolpert's recusal requests were denied. (**Exhibit U-**Order denying; Stengle Dep. at p. 62)

## Smith Seeks Legal Counsel

58.     After reading plaintiff's blog, co-defendant Smith expressed concerns to Ed Titterton, an attorney who provided consulting services to ODR, and to Robert Frankhouser to whom Co-defendant Smith sought legal counsel concerning Stengle and her blog. (Smith Dep. at p. 13; **Exhibit V-**Deposition of Robert Frankhouser at pp. 10, 12).

59.     Co-defendant Smith's concerns involved whether it was appropriate for a hearing officer who was required to be impartial to advocate issues of LRE in a blog when those same issues were part of the cases that she was determining. (Smith Dep. at p. 14; 51-52; Frankhouser Dep. at pp. 14-15).

60.     Because Co-defendant Smith believed that there could be legal ramifications and political fallout from her decision to not renew Stengle's contract, Co-defendant Smith consulted an attorney, Robert Frankhouser, from the

IU-13 for guidance on her options regarding Stengle, and because she was struggling with not renewing her contract. (Smith Dep. at pp. 109-110, 139; 140-142).

61.     After being hospitalized for a serious illness and released, Co-defendant Smith contacted Attorney Frankhouser in early May 2006. (Frankhouser Dep. at p. 13).

62.     Attorney Frankhouser's role was to determine if Stengle's writings, "however correct or incorrect, however clear or unclear, were appropriate for a hearing officer under contract with IU 13 and whether the content of the blog was such that her ability to be perceived as impartial had been impaired." (Frankhouser Dep. at pp. 15, 18). In particular, Attorney Frankhouser was expected to provide legal advice on the decision of whether to renew or not renew the contract, and if the decision was made to end the relationship, how that was to be accomplished. (Frankhouser Dep. at p. 10).

63.     Attorney Frankhouser gave his legal opinion that Stengle was advocating in the blog and that she could not advocate on LRE issues while serving as an impartial due process hearing officer contracted with a public entity. (Frankhouser Dep. at pp. 15-16). Frankhouser's legal advice was conclusive on the legal issues before him with respect to Stengle's non-renewal in the circumstances described. The opinion agreed that Stengle's statements made in the

web blogs were clear evidence of Stengle's breach of her obligation to be impartial and neutral. (*Id.*).

64.     Co-defendant Smith sent information to Attorney Frankhouser regarding Stengle and Frankhouser gave her a legal opinion recommending the non renewal of Stengle's contract. (Smith Dep. at pp. 148-157; Frankhouser Dep. at p. 13, 27, 30).

65.     Plaintiff alleges that in the spring of 2006, Defendants Rhen and the Department encouraged Co-Defendants Smith and ODR to not reappoint Plaintiff as a hearing officer. (Second Amended Complaint, ¶ 64).

**Nonrenewal Letter**

66.     By letter dated June 2, 2006, Co-defendant Smith notified Plaintiff that she had decided not to renew Plaintiff's contract as a hearing officer. (**Exhibit W** –June 2, 2006 Nonrenewal letter; Stengle Dep. at pp. 47-48).

67.     Co-defendant Smith set forth three reasons for her decision not to reappoint Plaintiff: "(a) the content of her "blog" was deemed to be advocacy which ensured that one or both parties would legitimately question her impartiality; (b) refusing to recuse herself in one matter and using intemperate and inappropriate language; and (c) being out of timeliness compliance on a number of decisions." (*Id*).

68.     Co-defendant Smith did not consult attorneys from PDE regarding legal advise on the nonrenewal of Stengle's contract.  (Smith Dep. at p. 142).  Nor did anyone from PDE ever suggested that Ms. Smith not renew Stengle's contract.. (Smith Dep. at pp. 42, 145).

69.     Smith struggled in her determination to not renew Stengle's contract, as she felt the strong political relationship between Stengle's husband (Paul) and the special education community and legislators would result in severe recourse against her.   Smith fully expected to be sued for not renewing the contract. (Frankhouser Dep at pp. 30, 31)  Smith told her legal counsel, Mr. Frankhouser, that she felt as if she was on "an island" with this decision and had no one to whom she could turn for advice.  (Frankhouser Dep. at p. 14).

70.     The decision to non-renew Stengle's contract was Ms. Smith's alone and any of the reactions/opinions expressed by a few members of PDE were just that, reactions having no effect on Smiths' decision-making.  Ms. Smith sought legal counsel to affect her decision-making, and that was not PDE.  (Smith Dep. at pp. 139-142).  Although the PDE defendants did not participate in the decision to not renew Stengle's contract, after consultation from her attorney, Robert Frankhouser, Co-defendant Smith, as a heads up, did inform some of the defendants that she would not be renewing Stengle's contract.  (**Exhibit X**-E-mail Stream Rhen 0048-0050; Frankhouser Dep. at p. 38).

71.    On May 26, 2006, Mr. Frankhouser sent Ms. Smith a draft letter of non-renewal.  (Frankhouser Dep. at pp. 30, 33).

72.    Attorney Frankhouser's believed that PDE had no role in making a decision with respect to Stengle's hearing officer contract because the contractual relationship was with the IU13, and it was their decision to renew or not renew. (Frankhouser Dep. at pp. 43-44).

73.    Attorney Frankhouser advised Ms. Smith to notify PDE in advance of the decision, and the bases for the decision, so that they were not surprised and could deal with any public relation dimension to the decision that was made. (Frankhouser Dep. at pp. 38-39).

74.    On the advice of counsel, Co-defendant Smith forwarded a draft of the letter of nonrenewal, which her attorney drafted, to some people in PDE as a courtesy and in order to give them a heads up regarding her reasons for not renewing Stengle's contract.  (Smith Dep. at p. 113).

75.    Defendant Helling saw the draft nonrenewal letter and he discussed it with defendant Tierney and either he or Tierney told Co-defendant Smith that they believed a certain paragraph was out of context with the rest of the letter.  (Helling Dep. at pp. 11-13).

76.    Co-defendant Smith thinks defendant Rhen may have called her about removing paragraph two from her nonrenewal letter.  Rhen told her that PDE did

not consider Gaskin to be a factor. Co-defendant Smith then contacted her attorney, Robert Frankhouser, about paragraph two. Co-defendant Smith had been initially uncomfortable with the Gaskin paragraph and she asked him if removing paragraph two changed his legal analysis and Frankhouser said no. (Smith Dep. at p.144).

77.	Helling also sent an email to Co-defendant Smith telling her "I'm glad you and the IU are doing the right thing. I thought the termination letter was very well done. This may be difficult and I wish you all the best as this matter proceeds." (**Exhibit Y-**E-mail dated May 30, 2006).

78.	After Co-defendant Smith made it clear that she was sending the nonrenewal letter to Stengle, Helling sent an email saying "So the die is about to be cast" meaning that Co-defendant Smith decided to send the letter of which Helling had received the draft. (**Exhibit Z-** E-mail dated June 1, 2006; Helling Dep. at p. 14).

79.	Co-defendant Smith informed the PDE of the non-renewal of Stengle's contract because the PDE funds her program, because of the political ramifications present in such a non-renewal, because Stengle was a hearing officer who was also serving on the Gaskin Panel, which was overseen by PDE, such that the PDE and ODR had an issue "in common" with respect to the panel, and

because of Stengle's involvement in the *LG v. Wissahickon* lawsuit where both PDE and ODR were involved. (Smith Dep. at pp. 127-130).

80. After the decision was made by Co-defendant Smith to not renew Stengle's contract, defendant Rhen informed her superior, Diane Castelbuono, that ODR was not going to renew the contract. With information from Rhen, as an alert of a sensitive issue, Castelbuono then informed the press and legislative people at the Department of Education that Stengle was not being renewed and that there could be some fallout from ODR's decision. Specifically, Castelbuono stated

> "Linda Rhen has advised me of a situation that I want each of you to be aware of.
>
> The Office of Dispute Resolution, which acts independently from PDE, is responsible for assigning and training hearing officers for special ed due process hearings. Individuals serve as hearing officers via a personal contract with ODR.
>
> Within the next day or so, ODR will be sending a nonrenewal letter (meaning she will no longer have a contract) to a woman named Linda Stengle, who is currently a hearing officer, and also a member of the Gaskin LRE panel. She is also the parent of a child with a disability in Boyertown SD, and is married to Paul Stengle, who is on many many special ed committees, is very active in the spec ed world, and is an advocate in Montgomery County and Director of programs at Montgomery County ARC.
>
> ODR received independent legal advice on this nonrenewal issue, separate and apart from PDE – we had no input into their decision.
>
> Because of Paul's involvement in every aspect of advocacy (sic) in special ed, and Linda's visibility, this action will likely trigger political and other issues.
>
> ODR is citing some real problems with Linda's work product, as well as some serious concerns about her ability to be impartial (essential to the role of hearing officer) given her clear advocacy

efforts. Among other things, she runs a daily blog on the web about spec ed issues that would cause many to question her impartiality.

Based on what I know, I do not think ODR's action is inappropriate, as her behavior has been a problem for schools and for parent advocates (for example, Judy Gran, PILCOP counsel in the Gaskins (sic) case asked her to recuse herself from a case and she would not).

Media and legislators may call in support of Linda: I think our response should be that ODR is independent and we are not going to comment on/get involved in their personnel issues, although I am open to a discussion on this if each of you things we need a different response."

(**Exhibit AA-**E-mail Re: Alert; Rhen Dep. at p. 35)

81.    After the nonrenewal, Stengle contacted multiple legislators and used political influence against the Department.  (**Exhibit EE** –Letter to Senator Leh).

**Defendant Castelbuono**

82.    Defendant Castelbuono has no input into the Gaskin Panel's members or to whom ODR will contract with, or retain, to be a due process hearing officer. (Castelbuono Dep. at p. 27).

83.    When Castelbuono reviewed the email sent from Co-Defendant Smith to certain people at the Department advising them that she was not renewing Stengle's contract, Castelbuono's only reaction was to ask about what the Gaskin panel had to do with the non-renewal, and to notify the press office that they had gotten this information as a "professional courtesy."  (Castelbuono Dep. at pp. 20-21).

84.     Castelbuono reported to the executive deputy secretary Thomas Gluck that the Department and ODR are separate and that ODR made the decision to not renew Stengle.  (**Exhibit BB-**E-mail Stream Castelbuono 0034-0035).

85.     Castelbuono has never had any communication regarding whether a special education due process hearing officer, including Linda Stengle, should be reappointed and she would not be part of such decision-making conversations. (Castebuono's Answers to Plaintiff's First Set of Interrogatories, ¶1; Castelbuono Dep. at p. 27; Smith Dep. at p. 145).

**Defendant Fullerton**

86.     The only conversations that Defendant Fullerton was a party to involving the reappointment of hearing officer was in a notification from Co-Defendant Smith that was an informal sharing of information. (Fullerton Dep. at pp. 6-7).   Fullerton acknowledged overhearing a conversation about whether Stengle's contract would be renewed between Mr. Helling, Ms. Rhen and Ms. Tierney, when none of these individuals expressed an opinion as to whether Stengle's contract should be renewed.  (Fullerton Dep. at p. 6). Fullerton never spoke with Co-Defendant Smith regarding Stengle or provided any revisions to the non-renewal letter.  (Fullerton Dep. at p. 21).

87.     Fullerton has never had any communication regarding whether a special education due process hearing officer, including Linda Stengle, should be

reappointed and she would not be part of such decision-making conversations. (Fullerton's Answers to Plaintiff's First Set of Interrogatories, ¶1).

**Defendant Tommasini**

88.     Defendant Tommasini never suggested that the letter of non-renewal that Co-Defendant Smith sent to him be changed in any way, or discussed the letter with anyone.  (Tommasini Dep. at pp. 19-20).  He had no say or input into the decision as to whether due process hearing officers would be offered a renewed contract, or be terminated.  (Tommasini Dep. p. 30).

89.     As the assistant director of the Bureau of Special Education at that point in time, it was "customary" for Tommasini to be copied on "e-mails from many, many people."  He never perceived that any email he received or was copied on that related to Stengle's role as hearing officer to be emails that required a decision from him.  (Tommasini Dep. at pp. 33-34).

90.     PDE and Co-Defendant Smith never convened a meeting to discuss specifically Stengle, but if her name was referenced at a meeting it was not as to the non-renewal of her contract.  (Tommasini Dep. at pp. 32-33).

91.     Defendant Tommasini believed that the director of ODR had decision-making authority as to whether or not to offer a contract to a hearing officer. (Tommasini Dep. at pp. 31-32).

92.     Although Tommasini received emails from various sources at both PDE and ODR regarding Stengle, Tommasini never had any communication in which it was stated that Linda Stengle, should not be reappointed and he would not be part of such decision-making conversations.   (Tommasini's Answers to Plaintiff's First Set of Interrogatories, ¶1; Tommasini Dep. p. 33; Smith Dep. at p. 144).

93.     Tommasini had no input into whether Stengle would be reappointed not did he have any power into whether Stengle's contract would be terminated. (Tommasini Dep. at p. 30; Smith Dep. at p. 144).

**Defendant Helling**

94.     Although Defendant Helling received emails from various sources at both PDE and ODR regarding Stengle, Helling never had any communication in which it was stated that Linda Stengle, should not be reappointed and he did not have authority to renew or not renew Stengle's contract nor did he have input in the actual decisionmaking  to not renew Stengle's contract.  (Helling's Answers to Plaintiff's First Set of Interrogatories, ¶1; Helling Dep. at pp. 33, 39; Smith Dep. at p. 143).

95.     Helling discussed with Smith a couple of hearing officers who were engaged in activity that appeared to demonstrate that they were biased.  In the case of Stengle "it related to her blog and her, apparently, strong feelings about

inclusion, which would not necessarily be proper for a hearing officer who is supposed to, in an unbiased way, handle their cases." (Helling Dep. at p 19). Helling relied upon Ms. Smith's analysis of the situation and her presentation of the facts. (Helling Dep. at p. 20).

## Defendant Rhen

96.     Although Defendant Rhen received emails from various sources at both PDE and ODR regarding Stengle, Rhen did not have a communication in which it was stated that Linda Stengle, should not be reappointed and she did not have authority to renew or not renew Stengle's contract.  (Rhen's Answers to Plaintiff's First Set of Interrogatories, ¶9; Rhen Dep. at p. 60).

97.     Rhen was not involved in any conversations where Smith discussed the non-renewal of Stengle's contracts, other than the informational email sent to her with the non-renewal letter.  (Rhen Dep. at pp. 20-22).  Rhen understood that it was Smith's decision, under the operation of ODR, to not renew the contract, as ODR makes its own decision regarding appointment and contracts of hearing officers.  (Rhen Dep. at p. 26-28).

## Defendant Tierney

98.     Although Defendant Tierney received emails from various sources at both PDE and ODR regarding Stengle, Tierney did not have a communication in which it was stated that Linda Stengle, should not be reappointed and she did not

have authority to renew or not renew Stengle's contract. (Tierney's Answers to Plaintiff's First Set of Interrogatories, ¶1; Tierney Dep. at pp. 33- 35; Smith Dep. at p. 143).

99.    Abigail Tierney was contacted by Smith on occasion to raise the awareness of the legal department at PDE to certain events or issues that overlapped with issues Smith dealt with as the ODR director.  For example, when Stengle was appointed to Gaskin, along with another hearing officer, Co-Defendant Smith advised Defendant Tierney because of the concern with visibility in the event that could be of concern.  (Tierney Dep. at pp. 7-8).  It was not usual for Smith to contact the Office of Counsel at PDE to "keep them apprised of things that re going on  with – at ODR just kind of giving us a heads-up so no one was ever surprised by things that could raise a concern."  (Tierney Dep. at p. 9).  While normally hearing officers were not discussed between PDE and ODR, the situation with plaintiff Stengle was unique because issues involving her overlapped between the offices, relating to Gaskin.  Because "there were so many worlds overlapping in this one, that Kerry wanted to be sure we were aware of everything that was going on in the event that I had implications of other areas."  (Tierney Dep. at pp. 49-50).

100.   When complaints were received with respect to Stengle's ability to serve as a hearing officer and on the Gaskin panel because of her apparent bias in

favor of LRE, Tierney was not asked to take any action with respect to these concerns, because the responsibility rested with Co-Defendant Smith. (Tierney Dep. at pp. 16-18). However, Smith kept Tierney informed about difficulties with Stengle, complaints of people in special education, conversations occurring at ODR, and her frustration and dissatisfaction with her performance.

101. In response to an email from defendant Co-defendant Smith stating that she is worried about being sued by Stengle if fired and Smith was thinking of terminating the contract, defendant Tierney suggested that it would be easier to not renew the contract rather than terminate. Tierney said if "we simply refuse to renew." (**Exhibit CC** –E-mail Stream Tierney 0053-0055; Tierney Dep. at p. 33-35).

102. Defendant Tierney explained that she used the word "we" in reference to Smith and herself, out of habit and because for many years Co-Defendant Smith had been at the PDE with Tierney and they worked as colleagues, and they had mutual professional respect, and for years had been on the same team. (*Id.*; Smith Dep. at p. 143).

103. Although Tierney had one discussion with Co-defendant Smith regarding the contract renewal, Tierney was not giving Co-defendant Smith legal advise and did not participate in the decision to renew or not renew Stengle's

contract. (Tierney's Answers to Plaintiff's First Set of Interrogatories, ¶1; Tierney Dep. at pp. 33- 35).

**Kevin Casey**

104.   Kevin Casey is the Deputy Secretary for the Office of Developmental Programs in the Department of Public Welfare, working as the chief manager of services for people with mental retardation and autism in the Commonwealth of Pennsylvania.  (**Exhibit DD -**Deposition of Kevin Casey at pp. 6; 7).  Prior to that employment, he was the CEO of the organization Pennsylvania Protection and Advocacy, as federal law mandated that each state had a protection and advocacy system for people with disabilities.  (Casey Dep. at p. 7).

105.   Kevin Casey knew both Paul and Linda Stengle for many years. (Casey Dep. at p. 33-36).

106.   Kevin Casey believed that Stengle's blog took an advocacy position and he saw that there could be potential conflicts given her blog, her Gaskin advisory panel membership and her role as a hearing officer.  (Casey Dep. at p. 22-25).

107.   Kevin Casey did not tell Paul Stengle or anyone else that members of the PDE were out to get Linda Stengle, nor did he discuss her nonrenewal with her or her husband . (Casey Dep. pp. 22 -25, 40-41).

## Stengle's Assumptions/Beliefs

108.   Stengle believes that "PDE maintained a close relationship with Kerry Voss Smith and managerially called a lot of the shots."  Stengle's evidence of this alleged "conspiracy" is: 1) Smith referencing PDE in meetings as the source of "funding," or referencing "checking with legal;" 2) John Tommasini's explanation of their fiscal relationship; 3) PDE's review of the non-renewal letter; 4) Rhen's suggestion to eliminate one part of the non-renewal letter involving the Gaskin Panel of which Rhen was tasked with oversight; 5) the circulation of the non-renewal letter to PDE personnel; 6) the mere presence of emails from Ms. Smith notifying PDE defendants of her actions in not renewing the contract; and 7) Mr. Helling's moral support for the letter.  (Stengle Dep. at pp. 114-117).

109.   Stengle believes there was a conspiracy among the defendants for the following reasons:  1) being contacted by Rhen regarding her blog, the fact that Dr. Rhen supervised Co-Defendant Smith when Dr. Rhen was at the IU 14, and that Smith had worked at PDE; 2) her observation of Smith and Fullerton looking angry and talking despite not knowing the subject of their conversation; 3) the overall "behavior" of PDE defendants; 4) the fact that PDE stated that they would not hire full-time hearing officer because of budget constraints and 5) 'well, gee, the e-mails and things like that."  (Stengle Dep. at pp. 135-136; 137; 397).

110. When asked to identify support for her allegation that ODR and PDE conspired to not renew her contract, Stengle identified the following: 1) a series of email and document exchanges regarding her "termination letter;" 2) the "behavior" of the individuals; 3) the "proximity" of the alleged retaliatory actions to the Gaskin activities; 4) the "anger" she believe Dr. Rhen and Co-Defendant Smith expressed; 5) referrals to PDE and "legal"; 6) her "perceptions of the way they acted toward me; ie, body language, position." (Stengle Dep. at pp. 140; 168).

111. Stengle has no direct knowledge of any PDE defendant stating that PDE has a controlling influence over ODR. (Stengle Dep. at p. 371-373). Stengle believes that the fact that John Tommasini allegedly said to Mr. Titterton "now that we have hired you to be the writing consultant, I guess you're going to have to come down from the a lofty position" that the use of the word "we" means that PDE has influence over ODR. (*Id.*)

112. Stengle is not aware of any direct exchanges or nonverbal exchange involving Pat Fullerton, Ernie Helling, John Tommasini, Diane Castelbuono or Abigail Tierney and the alleged role they played in her non-renewal, other than what was stated in the emails produced by PDE. (Stengle Dep. at p. 398-399).

113. No one at PDE was involved in the decision to renew the contracts of any hearing officer. (Tierney Dep. at pp. 29-30).

Respectfully submitted,

THOMAS W. CORBETT, JR.
Attorney General

By:     *s/ Sarah C. Yerger*
        SARAH C. YERGER
        Senior Deputy Attorney General
        Attorney ID 70357     ECF: Yes

Office of Attorney General
15th Floor, Strawberry Square
Harrisburg, PA 17120
Phone: (717) 705-2503                    SUSAN J. FORNEY
Fax:     (717) 772-4526                   Chief Deputy Attorney General
syerger@attorneygeneral.gov               Chief, Civil Litigation Section

Date:  October 10, 2008                   Counsel for Defendants

# CERTIFICATE OF SERVICE

I, **Sarah C. Yerger**, Senior Deputy Attorney General, hereby certify that on this date I caused to be served a copy of the foregoing document titled **PDE DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS** was served via electronic filing to the following:


Jana R. Barnett, Esquire
1238 Cleveland Avenue
Wyomissing, PA 19610-2012
*Counsel for Plaintiff*

Brooke E.D. Say, Esquire
Stephen S. Russell, Esquire
STOCK AND LEADER
Susquehanna Commerce Center East
221 W. Philadelphia St., Suite 600
York, PA 17401
*Counsel for Defendants ODR, Voss Smith,*
 *And Lancaster-Lebanon IU 13*

Sharon M. O'Donnell, Esquire
Marshall Dennehey Warner Coleman and Goggin
4200 Crums Mill Road, Suite B
Harrisburg, PA 17112
*Counsel for Defendants ODR, Voss Smith,*
 *And Lancaster-Lebanon IU 13*


*s/Sarah C. Yerger*
**Sarah C. Yerger**
**Senior Deputy Attorney General**

**DATE: October 10, 2008**