# *Stengle v. Office for Dispute Resolution, et al.*
## No. 4:CV-06-1913

# EXHIBIT A

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
2

3    LINDA J. STENGLE,        :CIVIL ACTION NO.: 4:06-CV-01913
              Plaintiff     :
4                            :HON. JOHN E. JONES, III
         vs.                 :
5                            :
     OFFICE OF DISPUTE       :
6    RESOLUTION, COMMONWEALTH:
     OF PENNSYLVANIA         :(COMPLAINT FILED SEPT. 27, 2006)
7    DEPARTMENT OF EDUCATION,:
     KERRY VOSS SMITH (in her:
8    individual and official :
     capacity), LINDA O. RHEN:          **RECEIVED**
9    (in her individual      :
     capacity), ABIGAIL      :           MAR 1 9 2008
10   TIERNEY (in her         :
     individual capacity),   :        **Office of Attorney General**
11   JOHN TOMMASINI (in his  :           **Litigation Section**
     individual capacity),   :
12   DIANE CASTELBUONO (in   :
     her individual capacity):
13   ERNEST HELLING (in his  :
     individual capacity),   :
14   M. PATRICIA FULLERTON   :
     (in her individual      :
15   capacity) and LANCASTER-:
     LEBANON INTERMEDIATE    :
16   UNIT 13,                :JURY TRIAL DEMANDED
              Defendants     :
17                           _____

18                 Oral Deposition of
                   ERNEST HELLING
19                           _____

20

21

          COMPUTERIZED REPORTING SERVICES, INC.
22              By:  Holly G. Rhodes, RPR
                   3449 Penn Avenue
23              Sinking Spring, PA  19608
                 Phone:  (610) 678-6652
24

25                                        COPY

                              1

1     Q     Could you describe your duties during that
2     period of time?

3          A     During that period of time, I was actually
4     serving as the acting chief counsel of the department.

5          Q     Would you describe your duties as acting
6     chief counsel?

7          A     To manage the office and supervise all the
8     attorneys in the office, to represent the secretary and
9     the bureau directors and division chiefs.

10          Q     Would you look at Helling 7?  During the
11     period, July 1, '05 to June 30, '06, did any of the
12     people on this org chart report to you?

13          A     To the extent that they were still employed
14     in the department, they all would have reported to me.

15          Q     Which were still employed by the department
16     at that time?

17          A     M. Patricia Fullerton, Virginia Breighner for
18     a period of time, Karen Feuchtenberger, Joseph Miller,
19     Abby Tierney.  And do you want the support staff, too,
20     that are on the other side?

21          Q     That's not necessary.  Thank you.

22                Are there any individuals who are not listed
23     on Helling 7 who reported directly to you during that
24     period of time?

25          A     The other attorneys who were in the office at

```
 1          A       Not exactly.  I mean, I assume sometime after

 2   it was drafted, but I don't know when.

 3          Q       Do you recall how many versions?

 4          A       No.

 5          Q       Do you recall discussing the draft letters

 6   with anyone?

 7                   MS. FOERSTER:  Object to the form.  Letters

 8   is what I'm objecting to.  There has been no establishing

 9   that there were more than one letter that would have been

10   shared with PDE.

11   BY MS. BARNETT:

12          Q       Do you recall discussing any draft of the

13   letter from Ms. Smith to Mrs. Stengle?

14          A       I believe that I may have discussed it with

15   Ms. Tierney.

16          Q       Do you recall whether PDE proposed that ODR

17   make any changes to the letter?

18          A       I don't believe PDE made any proposal.

19          Q       Do you recall whether PDE made any comments

20   about the draft letter?

21                   MS. FOERSTER:  Object to your use of PDE.

22   PDE as an entity isn't going to be commenting on

23   anything.  If you have specific individuals that you want

24   to inquire about, it might be clearer for the record.

25   BY MS. BARNETT:
```

```
 1          Q    Do you know whether any employees of PDE

 2    commented on ODR's draft letter to Mrs. Stengle notifying

 3    her that her contract would not be renewed?

 4          A    I believe some employees did.

 5          Q    Which employees?

 6          A    I am not certain.  I am not certain if I

 7    spoke to Kerry about it or if Abby did.

 8          Q    If Abby spoke with --

 9          A    -- with Kerry Smith.

10          Q    -- with Kerry, would it have been at your

11    request?

12          A    Not necessarily.

13          Q    If she -- if Abby had spoken with Kerry

14    Smith, would it have been with your consent?

15               MS. FOERSTER:  Objection.  First of all, it

16    calls for speculation.  He indicated he doesn't know

17    whether Abby talked to Ms. Smith.

18               You can answer if you are able.

19               THE WITNESS:  I don't recall for certain who

20    called.  I just recall that Abby and I discussed the

21    letter.  We had some thoughts about it.  And those

22    thoughts were shared.  Who shared them, I don't know.

23    BY MS. BARNETT:

24          Q    Please tell me what thoughts were shared.

25          A    That whatever -- and I don't recall offhand
```

                                   12

1 | anymore what the paragraph was about, but a certain
2 | paragraph, we just thought, was out of context with the
3 | rest of the letter. That's all. Or I thought.
4 | Q Do you recall seeing the E-mail which Abby
5 | Tierney sent to Kerry Smith which is at the top of this
6 | page, near the top of this page, dated June 1, 2006,
7 | which was sent at 9:22 a.m.?
8 | MS. FOERSTER: I'm going to object to the
9 | form. It misrepresents the E-mail. It indicates
10 | Mr. Helling may have been copied on the E-mail.
11 | MS. BARNETT: I didn't say it was copied. I
12 | just asked whether he read it.
13 | MS. FOERSTER: You said, Do you recall seeing
14 | it, is actually what you asked.
15 | MS. O'DONNELL: Which E-mail are you talking
16 | about?
17 | MS. BARNETT: People can see things without
18 | being copied on them.
19 | BY MS. BARNETT:
20 | Q So have you seen this E-mail before today?
21 | MS. FOERSTER: That's a different question,
22 | and that's fine.
23 | MS. BARNETT: I understand that.
24 | MS. O'DONNELL: Jana, would you, please,
25 | articulate for the record which E-mail you are referring

13

```
 1   to?

 2   BY MS. BARNETT:

 3        Q    Sir, before today, have you seen the E-mail

 4   from Abigail Tierney to Kerry Smith sent Thursday, June

 5   1, 2006 at 9:22 a.m.?

 6        A    Yes.

 7        Q    When did you see it?

 8        A    The only vivid recollection I have of seeing

 9   it is during review of documents in preparation for the

10   litigation and in preparing the answers and those

11   things.  I don't recall seeing it before that.

12        Q    Would you look at the document which is 4 of

13   19, in the upper-right-hand corner of the same packet?

14        A    Did you say 419?

15        Q    4 of 19.

16        A    Yes.

17        Q    Do you recognize the E-mail which purports to

18   be sent from you to Kerry Smith copying others on

19   Thursday, June 1, 2006, at 8:58 a.m.?

20        A    Yes, I see it.

21        Q    Could you explain what you meant when you

22   wrote, quote, So the die is about to be cast, unquote?

23        A    I believe I was referring to the fact that

24   Ms. Smith had determined to send the letter that she had

25   sent to us earlier.
```

14

```
 1                     THE WITNESS:  I believe so.

 2   BY MS. BARNETT:

 3        Q    Please tell me what you recall about what was

 4   said during this discussion.

 5        A    What I recall is that we had the discussion

 6   because Kerry was concerned about a couple of hearing

 7   officers who were engaged in activity that appeared to

 8   demonstrate that they were biased in some fashion.

 9        Q    Do you recall what that activity was?

10        A    I mean, I think in the case of Ms. Stengle,

11   it related to her blog and her, apparently, strong

12   feelings about inclusion, which would not necessarily be

13   proper for a hearing officer who is supposed to in an

14   unbiased way handle their cases.  I don't recall what the

15   issue was with the other person or if it was the same.

16        Q    When you said it was improper, would you

17   explain why you reached that conclusion?

18             MS. FOERSTER:  I'm going to object.  I don't

19   think his testimony was that he concluded anything was

20   improper.  I think his testimony was that Ms. Smith was

21   bringing certain issues to his attention.

22             MS. BARNETT:  Could I have the answer read

23   back, please?

24                  (Whereupon, the Reporter read back the

25                  referred-to testimony.)
```

                                19

1    BY MS. BARNETT:

2         Q    Did you, yourself, determine whether

3    Mrs. Stengle was engaged in activities which were

4    inappropriate for a due process hearing officer?

5         A    I relied on Ms. Smith's analysis of the

6    ·situation and her presentation of the facts.

7         Q    Do you recall anything more about what was

8    said during that discussion?

9         A    Only that because of her concerns, Ms. Smith

10   was considering preparing correspondence to send to the

11   two hearing officers to alert them to the issue and, I

12   guess, just to ask them to be mindful of the parameters

13   of their roles.

14        Q    Did you ask to review that letter before it

15   was sent?

16        A    I don't recall.  But I wouldn't necessarily

17   have, no.

18        Q    Do you know -- do you recall whether you did

19   review the draft of the letter which was sent by

20   Ms. Smith to Mrs. Stengle concerning her service on the

21   Gaskin Advisory Panel while she was a due process hearing

22   officer?

23        A    I am not absolutely certain, but I don't

24   believe that I did.

25        Q    Would you turn to Tierney 18, which is on the

20

```
 1        Q      Would you estimate that you spoke with her a
 2   couple times a month?
 3        A      I would say not regularly.
 4        Q      Did you speak with her less than a couple
 5   times a month on a regular basis?
 6                MS. FOERSTER:   I'll object to the form.
 7                But you can answer.
 8                THE WITNESS:   The problem is there is no
 9   regular basis.
10                MS. BARNETT:   We have no further questions.
11   Thank you.
12                THE WITNESS:   Thank you.
13   BY MS. O'DONNELL:
14        Q      Mr. Helling, I just have a couple of
15   questions.  You may know that I represent Kerry Smith and
16   ODR as Defendants in this lawsuit.
17                And there were some notes that I took that I
18   think I messed up or may have messed up and I need some
19   clarification.
20        A      Okay.
21        Q      If you would not mind, please turn to Tierney
22   8, 9, 10, and 11.
23                MS. FOERSTER:   It's definitely not in the
24   binder.
25                THE WITNESS:   Tierney --
```

33

1  are all the questions I have.

2            THE WITNESS: You are welcome.

3            MS. FOERSTER: I have one or two questions

4  for you, Mr. Helling.

5  BY MS. FOERSTER:

6       Q    In your role during that time period as,

7  apparently, acting chief counsel for the Department of

8  Education, did you have any input into decisions as to

9  whether due process hearing officers would be offered a

10 contract?

11      A    No.

12      Q    Whether an existing contract would be

13 renewed?

14      A    No.

15      Q    Whether a due process hearing officer would

16 be terminated?

17      A    No.

18            MS. FOERSTER: No further questions. Thank

19 you.

20            MS. BARNETT: None. Thank you.

21            MS. FOERSTER: You are done.

22            (Whereupon, a discussion was held off the

23            record.)

24            MS. FOERSTER: I do want to go back on the

25 record real quick.

# *Stengle v. Office for Dispute Resolution, et al.*
## No. 4:CV-06-1913

# EXHIBIT B

1              IN THE UNITED STATES DISTRICT COURT
          FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
2

3  LINDA J. STENGLE,        :CIVIL ACTION NO.: 4:06-CV-01913
                Plaintiff   :
4                           :HON. JOHN E. JONES, III
        vs.                 :
5                           :
   OFFICE OF DISPUTE        :
6  RESOLUTION, COMMONWEALTH :
   OF PENNSYLVANIA          :(COMPLAINT FILED SEPT. 27, 2006)
7  DEPARTMENT OF EDUCATION, :
   KERRY VOSS SMITH (in her :
8  individual and official  :
   capacity), LINDA O. RHEN :
9  (in her individual       :
   capacity), ABIGAIL       :
10 TIERNEY (in her          :
   individual capacity),    :
11 JOHN TOMMASINI (in his   :
   individual capacity),    :
12 DIANE CASTELBUONO (in    :
   her individual capacity) :
13 ERNEST HELLING (in his   :
   individual capacity),    :
14 M. PATRICIA FULLERTON    :
   (in her individual       :
15 capacity) and LANCASTER- :
   LEBANON INTERMEDIATE     :
16 UNIT 13,                 :JURY TRIAL DEMANDED
                Defendants  :
17                          ------------

18                    Oral Deposition of
                     DIANE CASTELBUONO
19                        ------------

20

21
              COMPUTERIZED REPORTING SERVICES, INC.
22                  By:  Holly G. Rhodes, RPR
                        3449 Penn Avenue
23                 Sinking Spring, PA  19608
                    Phone:  (610) 678-6652
24

25
                                        ORIGINAL

1

object to the question as lacking foundation, because
this -- from what I can tell from the copy, it says,
Direct. So this letter has no indication that it was
sent to Ms. Stengle and, therefore, lacks any foundation
that it, in fact, notified her of anything.

MS. O'DONNELL: I'm going to have to make the
same objection. Because the copies that we were provided
have some type of stamping over the letter and don't
appear to be an original. It's not a signed copy, and it
may be a draft. It may be something else.

MS. FOERSTER: I'm not objecting to her being
asked about this letter. I'm simply objecting to the
characterization that this was a letter sent to
Ms. Stengle. That's what I'm objecting to, at the time
that this witness saw it. I just want to be clear.

BY MS. BARNETT:

Q    Would you turn to Castelbuono 17, please? Do
you recognize that document?

A    Yes.

Q    Can you tell me what, if anything, you did in
light of -- as a result of reading this E-mail, the
5:09 p.m. E-mail?

A    To the best of my recollection, I recall
asking someone what her work on the Gaskin's Panel had to
do with this. And I recall alerting our press office

1  that as a professional courtesy, we had gotten an

2  indication that ODR was terminating Linda and that there

3  might be questions or concerns.

4       Q    I believe at the beginning of your answer,

5  you said you talked with someone.  Can you be more

6  specific?

7       A    I don't know if I talked to someone.  I think

8  I sent an E-mail, but I'm not sure if it was an E-mail or

9  a conversation.  But I do remember asking what Paragraph

10 2 meant.

11      Q    Why did Paragraph 2 have significance to you?

12      A    Because my understanding is that the Gaskin's

13 Panel is the advisory panel to the bureau director, which

14 is something that the department would be -- have a

15 closer relationship over what Linda's role was in that

16 versus ODR, which would have no role in that.

17      Q    So when you said Paragraph 2, you are

18 referring to the letter which was attached to this

19 E-mail?

20      A    The draft letter which was attached to the

21 E-mail, yes, Paragraph 2.

22      Q    You said you alerted the press office.  Did

23 you speak with someone?

24      A    I may have, but I am pretty sure I sent an

25 E-mail.

```
 1   any other time where you were notified that a hearing
 2   officer's contract was not being renewed by ODR?
 3                MS. FOERSTER:  I'm going to object.  Asked
 4   and answered.  She indicated she has no recollection one
 5   way or the other whether PDE has been notified.
 6                MS. BARNETT:  I asked whether she had been
 7   notified, not PDE.
 8                THE WITNESS:  I have no recollection.
 9                MS. BARNETT:  I have no further questions.
10                MS. O'DONNELL:  No questions.
11                MR. RUSSELL:  No questions.
12                MS. FOERSTER:  I actually have a couple
13   little questions.
14   BY MS. FOERSTER:
15        Q    Ms. Castelbuono, you testified you are deputy
16   secretary for elementary and secondary ed at the
17   Department of Education.  Do you have an idea as to how
18   many people report to you under your deputate?
19        A    Hundreds, I don't know the exact number.
20        Q    Explain to me a little bit how your deputate
21   is structured.  For example, are there other offices
22   under your deputate?
23        A    Yes, I have six bureaus reporting to me.  The
24   Bureau of Special Education is one of them; the Bureau of
25   Teaching and Learning Support; the Bureau of Community
```

```
 1   and Student Services; the Bureau of Career and Vocational
 2   -- Career and Technical Education; the Bureau of
 3   Accountability and Assessment; and the Bureau of
 4   Educational Technology.  And then I also have a school
 5   services unit that reports to me in the Scranton State
 6   School for the Deaf.
 7        Q    Do you have any idea how many E-mails you get
 8   in a day, other than too many?
 9        A    Fifty to one hundred.  That's a guess.  It's
10   a lot.
11        Q    In your role as deputy, did you have any
12   input into the Plaintiff's designees or nominees to the
13   Gaskin bureau director's advisory panel?
14        A    Not that I recall.
15        Q    And as deputy, do you have any input into who
16   ODR will contract with to be a due process hearing
17   officer?
18        A    No.
19        Q    Do you have any input into whether or not --
20   any decision-making input as to whether or not ODR will
21   retain a hearing officer?
22        A    No.
23             MS. FOERSTER:  I have no further questions.
24             Are you okay?
25             MS. BARNETT:  Yes.
```

*Stengle v. Office for Dispute Resolution, et al.*
No. 4:CV-06-1913

# EXHIBIT C

**Exhibit C**

1           IN THE UNITED STATES DISTRICT COURT
           FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

2

3   LINDA J. STENGLE,      :CIVIL ACTION NO.: 4:06-CV-01913
          Plaintiff    :

4                       :HON. JOHN E. JONES, III
      vs.                :

5                       :
   OFFICE OF DISPUTE     :

6   RESOLUTION, COMMONWEALTH:
   OF PENNSYLVANIA       :(COMPLAINT FILED SEPT. 27, 2006)

7   DEPARTMENT OF EDUCATION,:
   KERRY VOSS SMITH (in her:

8   individual and official :
   capacity), LINDA O. RHEN:

9   (in her individual     :
   capacity), ABIGAIL      :

10   TIERNEY (in her        :
   individual capacity),   :

11   JOHN TOMMASINI (in his   :
   individual capacity),    :

12   DIANE CASTELBUONO (in    :
   her individual capacity):

13   ERNEST HELLING (in his   :
   individual capacity),    :

14   M. PATRICIA FULLERTON    :
   (in her individual      :

15   capacity) and LANCASTER-:
   LEBANON INTERMEDIATE     :

16   UNIT 13,            :JURY TRIAL DEMANDED
          Defendants    :

17                   _____

18                Oral Deposition of
                LINDA O. RHEN     .

19                  _____

20

21

22       COMPUTERIZED REPORTING SERVICES, INC.
          By:   Holly G. Rhodes, RPR

23             3449 Penn Avenue
         Sinking Spring, PA   19608

24            Phone:   (610) 678-6652

25                             COPY

1

```
 1          A     Okay.

 2          Q     And I will wait until you are finished before

 3    I ask another question.

 4                Another rule is although in day-to-day

 5    conversations, it's normal to use gestures, you can't

 6    rely on gestures in this context because it's ambiguous

 7    for Holly.  So if you nod your head in addition to saying

 8    yes, that's fine.  If it's in lieu of saying yes, then we

 9    will just remind you that a verbal answer is necessary.

10                If you have -- if a question is not clear,

11    please tell me.  If you would like a break at any time,

12    please tell me.

13          A     All right.

14          Q     What is your full name?

15          A     Linda O'Connor Rhen.

16          Q     What is your current position?

17          A     Special assistant to the secretary in the

18    Department of Education.

19          Q     How long have you held this position?

20          A     Since December 2006.

21          Q     What position did you hold immediately prior

22    to this position?

23          A     Director of the Bureau of Special Education.

24          Q     Also with PDE?

25          A     Correct, Department of Education, yes.
```

```
 1   Commonwealth.

 2        Q      Was the number you testified to approximately

 3   255,000?

 4        A      I can't recall the specific number.

 5             MS. FOERSTER:  I want to state an objection

 6   on the record.  I'm not instructing the witness not to

 7   answer.  But I want to make it clear that Defendants will

 8   be objecting on relevancy as to any questions regarding

 9   the Gaskin settlement.  This litigation will not serve as

10   a fishing expedition for future litigation relevant to

11   Gaskin.  I'm not instructing her not to answer yet, but

12   that will eventually be the case.

13   BY MS. BARNETT:

14        Q      Would you look at Rhen 48, please?  Do you

15   recognize it?

16        A      It's an E-mail from Kerry Smith sent to me

17   and others.

18        Q      Do you know the name of the I solicitor she

19   was referring to?

20        A      I know the names of the individuals who

21   worked as solicitor.

22        Q      Who were they?

23        A      There were lots of people in the practice.  I

24   can't say that I can say the exact individual who was

25   serving in that capacity at that time to advise her.  It
```

```
 1    would not have been -- I mean, I would have had no reason
 2    to know that.
 3              Q    Do you know the person or firm to whom she
 4    was referring in this E-mail?
 5              A    Hartman, Underhill & Brubaker.  They have
 6    been I 13 solicitor.
 7              Q    Before receiving this E-mail, did you have
 8    other communications with Ms. Smith about the nonrenewal
 9    of Mrs. Stengle's contract?
10                   MS. FOERSTER:  Listen to the question.  Do
11    you need it read back?
12                   THE WITNESS:  Do you want to say it again?
13    Say the question again, please.
14    BY MS. BARNETT:
15              Q    Do you want me to change it or repeat it?
16    Whatever you would like, I will do.
17              A    Just repeat it.
18                   MS. BARNETT:  Read it back, please.
19                   (Whereupon, the Reporter read back the
20                   referred-to testimony.)
21                   THE WITNESS:  There are other communications
22    as identified in these E-mails, but I can't say whether
23    they were before or after this specifically.
24    BY MS. BARNETT:
25              Q    Did -- do you recall any conversations with
```

21

Ms. Smith in which Ms. Smith indicated she was thinking

about whether to renew or not renew Mrs. Stengle's

contract beginning July 1, '06?

      A     Say again, please.

      Q     Do you recall any conversations between at

least yourself and Ms. Smith, meaning there could have

been others present, in which Ms. Smith said that she was

considering whether to renew or not renew Mrs. Stengle's

contract as of July 1, 2006?

      A     I don't remember.

      Q     Do you recall Ms. Smith making any comments

about the pros and cons of renewing Mrs. Stengle's

contract for '06/'07?

      A     No, I don't remember, no.

      Q     Do you recall her making any comments about

renewing Mrs. Stengle's contract at any time?

      A     I don't remember any comments.

      Q     What, if anything, did you do in light of

receiving the E-mail we have been discussing, the May 30,

2006 E-mail, which Ms. Smith sent to you and others at

12:09 p.m.?

      A     What did I do?

      Q     Yes, ma'am.

      A     I don't remember.

      Q     Would you look at Rhen 68, please? I'd like

```
 1   identification of panel members and the first panel
 2   meeting.
 3        Q    Did you have an opportunity to review the
 4   list of the Gaskin Advisory Panel members nominated by
 5   the Plaintiffs before the nomination was put forth?
 6        A    Not that I recall, no.  That would be
 7   inappropriate.  I mean, the department was notified of
 8   the individuals that the Plaintiffs named to the panel.
 9   I mean, that was their choice as to who they would name.
10   No, we had no involvement in that, that I am aware of.
11             MS. FOERSTER:  There is no other question,
12   sorry.
13   BY MS. BARNETT:
14        Q    Would you look at Rhen 72, please?
15        A    Question 9?
16        Q    The -- yes, ma'am, the answer to Question 9.
17   At the end of the Answer 9, you refer to the decision of
18   Co-Defendant Smith and ODR to not reappoint Plaintiff.
19             How do you know who made the decision?
20        A    Okay.  Can you ask the question again?
21        Q    Yes, ma'am.  You referred to in your answer
22   the decision of Co-Defendant Smith and ODR to not
23   reappoint Plaintiff, okay?  Did someone tell you who made
24   the decision not to reappoint Mrs. Stengle?
25        A    Did someone tell me?
```

```
 1        Q     For example, did Ms. Smith say to you it was
 2   her decision?
 3        A     I think it's understood that it was her
 4   decision.
 5        Q     Understood from what, from the letter?
 6        A     Understood that the ODR operates -- conducts
 7   its own operation and would make its own decisions.
 8        Q     So are you saying this is an assumption you
 9   made?
10             MS. FOERSTER:  It's an understanding she
11   had.  I object to the characterization of her testimony.
12   She testified it was an understanding that she had.
13   BY MS. BARNETT:
14        Q     That understanding was based on how the
15   agency operates?
16             MS. O'DONNELL:  Object to the form.
17             MS. FOERSTER:  Join.
18             MS. BARNETT:  Can she answer or not?
19             MS. FOERSTER:  I'm just clarifying which --
20   I'm sorry, my objection is just clarifying which agency,
21   when you said, it's the way the agency operates.
22             MS. BARNETT:  ODR.
23             MS. FOERSTER:  So the way ODR operates?
24             MS. BARNETT:  Yes.
25             THE WITNESS:  It's my understanding that in
```

```
 1   the ODR operation, they would make their own decisions
 2   regarding appointment and contracts of hearing officers.
 3   BY MS. BARNETT:
 4        Q    I'd like you to look at a document marked
 5   Fullerton 16; a new stack.
 6             MS. FOERSTER:  I'm sorry, Fullerton 14?
 7             MS. BARNETT:  16.
 8             MS. O'DONNELL:  For ease of reference, it has
 9   an Exhibit A on it.
10             THE WITNESS:  Did you say 14 or 16?
11             MS. FOERSTER:  She wanted 16, that's my
12   fault.  Right there.
13   BY MS. BARNETT:
14        Q    Do you recognize it?
15        A    I am not recognizing it off the bat.  But I
16   am reviewing it and I see my name on it, so I must have
17   been copied on it.
18        Q    Can you tell me who Patricia Hozella is or
19   was at that time?
20        A    She was a division chief in the Bureau of
21   Special Education.  Oh, wait.  At that time?  Or was
22   she?  She had left the department.  I am trying to think
23   of the dates.  I think she was still in the department at
24   that time.  She was a division chief for the western
25   region of the compliance area in the Department of
```

28

```
 1    Bureau of Special Education.  Her division was
 2    responsible for the pre-school early intervention
 3    program.
 4          Q     Would you turn to Fullerton 0032, please?
 5          A     Which number?
 6          Q     32, please.
 7          A     No. 32, okay.
 8          Q     If you look at 29 at the top of that page, do
 9    you recall receiving that E-mail?
10          A     I do.
11          Q     Did you do anything as a result of receiving
12    that E-mail?
13          A     I don't recall specifically, no.
14          Q     Do you recall whether you agreed with
15    Ms. Brinkley's characterization that the comment on the
16    blog is, quote/unquote, Inaccurate and negatively
17    portrays PDE, unquote?
18          A     Say it again.
19          Q     Do you recall whether you shared
20    Mrs. Brinkley's view as expressed in Fullerton 29, that
21    the comment from the blog which is repeated on that
22    E-mail is quote, Really inaccurate and negatively
23    portrays PDE, unquote?
24          A     I agree that it sheds a negative view or a
25    negative opinion.
```

```
 1          A     I don't recall that, no.

 2          Q     Would you look at Fullerton 54 and 55,

 3    please?  Do you recognize this page?

 4          A     Yes.

 5          Q     Would you describe what it is?

 6          A     It's an E-mail from Diane Castelbuono to two

 7    individuals who worked for the department; one was the

 8    director of the press office, La-Verna Fountain; and Adam

 9    Schott was in charge of the legislative liaison.  And

10    it's kind of typical of something that would be sent to

11    alert people in press and legislative of an issue that

12    could be viewed as sensitive, so that they have a

13    heads-up.  If they get calls, they would know how to

14    respond to them or have some background information.

15          Q     Was the substance of Fullerton 55, meaning

16    the larger of the two E-mails on this page, was that

17    provided by you to Ms. Castelbuono?

18          A     Diane Castelbuono clearly wrote the E-mail.

19          Q     I know it came from her.

20          A     Uh-huh.

21          Q     But, were you the person who provided her

22    with the information reflected in this E-mail?

23          A     I think it's fair to say I would have

24    provided her some.  She also would have received some

25    from counsel in the department.  Others, you know, I
```

35

```
 1                    Do you recall whether any conversation was
 2   held?
 3        A    I don't recall the specific conversation.
 4        Q    Do you recall whether you thought that a
 5   conversation should be held?
 6        A    Again, when we were notified of the
 7   individuals who would be on the panel and that there were
 8   two hearing officers on the list, the question and
 9   concern that came up is: Would it be appropriate to have
10   a hearing officer or hearing officers on the panel?  And
11   our main concern was that we were handling everything
12   appropriately in the settlement agreement and wanted to
13   make sure we were doing the right thing.
14        Q    Am I correct you concluded it was not a
15   problem?
16                    MS. FOERSTER:  Object to the form.  It lacks
17   any foundation.
18                    THE WITNESS:  I don't understand if I am
19   supposed to answer.
20                    MS. FOERSTER:  I'm sorry, you may answer if
21   you are able.
22                    THE WITNESS:  Say it again.
23   BY MS. BARNETT:
24        Q    Am I correct that you concluded that it was
25   not a problem for a hearing officer to serve on the
```

40

```
 1          A    Okay.

 2          Q    Do you recall whether any projects which PDE

 3    gave to the Gaskin Advisory Panel involved three- to

 4    five-year-olds?

 5          A    What do you mean?  What is a project?  I'm

 6    not sure.

 7               MS. FOERSTER:  She'll explain it to you.

 8    BY MS. BARNETT:

 9          Q    I may have to give you an example.

10          A    Okay.

11          Q    Do you recall any request that the Gaskin

12    Advisory Panel reviewed policies affecting three- to

13    five-year-olds?

14          A    Do I recall the Gaskin Panel reviewing

15    policies that affect three- to five-year-olds?

16          Q    Being asked by PDE.

17          A    To review policies for three- to

18    five-year-olds?  No, I don't.

19          Q    Do you recall who would be able to provide a

20    list of projects as I have just used the word, which were

21    assigned to Gaskin Advisory Panel committees?  Do you

22    know whether there was a central list kept?

23          A    The role of the panel was to advise the

24    department and for the department to share information on

25    the activities it was doing related to the settlement
```

55

1  agreement.

2          So in terms of projects, are you referring to

3  things that, in other words, were being done as a result

4  of the settlement agreement?  Is that what you mean?

5          Q    As part of the work.

6          A    There was a work plan developed, which I

7  believe -- it's been a while since I have been working

8  with it -- that I had I think -- we went through the

9  settlement agreement and identified and, I believe, it

10  was 53, it could be 54 or 52, but it was like 53 items

11  that the department was responsible for doing that were

12  in the settlement agreement.

13          Otherwise, we would have been -- we kind of

14  had to have a listing of exactly what was expected to do

15  and then the plan was updated periodically to indicate

16  what things were completed; or if they weren't completed,

17  what stage they were in.  So that was ongoing.

18          Q    Was there similar tracking of the committees

19  on the Gaskin Advisory Panel, the work they are to be

20  doing?

21          A    Of things that were assigned to the various

22  committees?

23          Q    Yes, ma'am.

24          A    I guess that would be in the Minutes.  I am

25  just trying to think back on the detail of it.  I haven't

1          A     Mr. Stengle had contacted me being concerned

2    that his wife's contract wasn't being renewed and was

3    asking me to do something regarding that.

4          Q     Did you have an ability to do anything

5    regarding that?

6          A     It was not my decision to -- I was not in any

7    decision-making role on ODR contracts, so it was not

8    appropriate for me to be involved with it.

9          Q     Did you communicate that sentiment to

10   Mr. Stengle in any way?

11         A     I believe that I did, yeah.

12         Q     Did he follow up with you in any other

13   medium, perhaps a telephone call or an in-person

14   conversation or something else, regarding his --

15         A     Yeah, I believe I heard from him more than

16   once about this.  I don't know if it was other E-mails or

17   phone calls.  I had communication with him regarding

18   other issues, you know, you mentioned, like interface on

19   other programmatic issues.  So I do believe there was

20   either another E-mail or a phone call requesting that I

21   make some intervention in this process or do something

22   or --

23         Q     Did you feel comfortable with these questions

24   of Mr. Stengle to ask you to intervene in some way?

25         A     No.

60