# *Stengle v. Office for Dispute Resolution, et al.*
## No. 4:CV-06-1913

# EXHIBIT I

**Exhibit I**

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 2
   LINDA J. STENGLE,        : CIVIL ACTION NO.:
 3      Plaintiff  : 4:06-CV-01913
 4   vs.           : HON. JOHN E. JONES, III
 5  OFFICE FOR DISPUTE
    RESOLUTION, COMMONWEALTH OF : (COMPLAINT FILED SEPT. 27,
 6  PENNSYLVANIA DEPARTMENT OF  : 2006)
    EDUCATION, KERRY VOSS SMITH :
 7  (in her individual and
    official capacity), LINDA O. :
 8  RHEN (in her individual     :
    capacity), ABIGAIL TIERNEY  :
 9  (in her individual capacity),:
    JOHN TOMMASINI (in his
10  individual capacity), DIANE  :
    CASTELBUONO (in her         :
11  individual capacity),
    ERNEST HELLING (in his      :
12  individual capacity), M.
    PATRICIA FULLERTON (in her   :
13  individual capacity) and
    LANCASTER-LEBANON           :
14  INTERMEDIATE UNIT 13,
         Defendants   : JURY TRIAL DEMANDED
15
16             Oral Deposition of
                KERRY VOSS SMITH
17
18
19     Date:  Wednesday, September 3, 2008
20     Time:  9:51 a.m.
21     Place:  Marshall, Dennehey, Warner,
                Coleman & Goggin
                4200 Crums Mill Road, Suite B
22              Harrisburg, PA  17112
23
          COMPUTERIZED REPORTING SERVICES, INC.
24          By:  Roxanne Weaver, RPR, CRR
                  3449 Penn Avenue
25              Sinking Spring, PA  19608
                Phone: (610) 678-6652
```

**Page 2**

```
 1  APPEARANCES:
 2
 3          Jana R. Barnett, Esq.
            1238 Cleveland Avenue
 4          Wyomissing, PA  19610
                For the Plaintiff
 5
 6
            Office of Attorney General
 7          By:  Sarah C. Yerger, Esq.
            Litigation Section
 8          Strawberry Square
            Harrisburg, PA  17120
 9              For the Defendants Commonwealth of
                Pennsylvania Department of
10              Education, Linda O. Rhen, Abigail
                Tierney, John Tommasini, Diane
11              Castelbuono, Ernest Helling, and
                M. Patricia Fullerton
12
13          Stock and Leader
14          By:  Stephen S. Russell, Esq.
                 Brooke E.D. Say, Esq.
15          Susquehanna Commerce Center East
            Suite 600
16          221 West Philadelphia Street
            York, PA  17401-2994
17
                and
18
            Marshall, Dennehey, Warner, Coleman & Goggin
19          By:  Sharon M. O'Donnell, Esq.
            4200 Crums Mill Road
20          Suite B
            Harrisburg, PA  17112
21              For the Defendants Office of
                Dispute Resolution, Kerry Voss
22              Smith, and Lancaster-Lebanon
                Intermediate Unit 13
23
    ALSO PRESENT:
24
            Linda J. Stengle
25          Gina L. Brillhart
            Dr. Brian Barnhart
```

**Page 3**

```
 1                    I N D E X
 2
    Witness          Examined by        Page
 3
 4  Kerry Voss Smith    Ms. Barnett        4
 5                      Ms. Yerger          115
                        Ms. Barnett   146
 6                      Mr. Russell   155
```

**Page 4**

```
 1                 P R O C E E D I N G S
 2        (It is hereby stipulated by and between
 3        counsel that all objections except as
 4        to the form of the question be
 5        reserved until the time of trial.)
 6                  KERRY VOSS SMITH
 7  was called as a witness and, having been duly sworn by
 8  the Reporter-Notary Public, was examined and testified as
 9  follows:
10  BY MS. BARNETT:
11     Q    Good morning.
12     A    Good morning.
13     Q    What is your legal name?
14     A    Kerry Voss Smith, but I prefer Kerry Smith.
15     Q    What would you like me to call you today?
16     A    Ms. Smith.
17     Q    Where are you employed?
18     A    IU16.
19     Q    What is your title there?
20     A    I'm the director of the Office for Dispute
21  Resolution.
22     Q    How long have you held that position?
23     A    Since either August or September of 2002.
24     Q    Has your position always been with IU16?
25     A    No.  And let me correct my answer already.  I
```

1 was hired as a due process director in 2002. In 2005 I
2 became the director.
3    Q   Do you remember the month in 2005 when you
4 became the director?
5    A   It was early. January, February.
6    Q   Have your duties as director been
7 substantially the same since you took the position?
8    A   No, because I was hired as the due process
9 director, and there was a mediation director, as well.
10    Q   I apologize. Have your duties as director
11 been substantially the same since the beginning of 2005?
12    A   For the most part, yes.
13    Q   Would you describe those duties.
14    A   I oversee all aspects of the office, which
15 includes a federally mandated due process system,
16 mediation, plus we also do voluntary dispute resolution
17 activities like IEP facilitation and dispute resolution
18 skills training, communication training, things of that
19 sort.
20    Q   Have you been employed by IU16 since 2002?
21    A   No.
22    Q   For what period of time have you been
23 employed by IU16?
24    A   October 1st, 2007.
25    Q   By whom were you employed before October 1st,

1 2007?
2    A   IU13.
3    Q   Does ODR have any employees of its own?
4    A   ODR is not an entity. It is an office. So
5 the employees are IU employees.
6    Q   In fiscal year 2005-2006, can you estimate
7 how many of IU13's employees were assigned to ODR?
8    A   How many IU13 employees? Accepting this as
9 an estimate and a guess, I would say about half.
10    Q   What is the number?
11    A   There are about 16 total.
12    Q   Do you recall how you became aware that Linda
13 Stengle had been appointed to the Gaskin Advisory Panel?
14    A   I don't remember. I know it wasn't from her.
15    Q   Would you look at Fullerton 85, please.
16    A   Okay.
17    Q   Does that refresh your recollection about how
18 you learned that Linda had been appointed to the Gaskin
19 Advisory Panel?
20    A   It does not. I reviewed this before this
21 deposition. It did not refresh my memory.
22    Q   What else did you review before this
23 deposition?
24    A   I skimmed the deposition transcripts. This
25 morning I looked briefly at some discovery, and I skimmed

1 the blog. I skimmed a summary I did of the case
2 manager's notes regarding Ms. Stengle's cases in '04,
3 '05, and moving forward. Off the top of my head, that's
4 what I recall.
5    Q   Has your summary of the case manager's notes
6 been produced?
7    A   Yes.
8         MS. O'DONNELL: Yes.
9 BY MS. BARNETT:
10    Q   Was the version of the blog which you
11 reviewed a version which you personally downloaded?
12    A   No. I think it might have been printed out
13 yesterday. It was handed out yesterday.
14    Q   Did you speak with Linda Rhen on or about
15 November 21st, 2005, about Linda Stengle's appointment to
16 the Gaskin Advisory Panel?
17    A   I think you were referring me to Fullerton 85
18 before, and I told you that did not refresh my
19 recollection.
20    Q   But the question was different. The question
21 was whether that's how you learned that Mrs. Stengle had
22 been appointed, and this question is whether you had the
23 conference call with Linda Rhen which is referred to in
24 that e-mail.
25    A   Right. Fullerton 85 refers to a conference

1 call. I don't recall.
2    Q   Would you look at Rhen 10, please.
3    A   Again, Counsel, this did not refresh my
4 recollection. I do not remember this phone call. It's
5 almost three years ago.
6    Q   Would you look at Rhen 11, please. Do you
7 recall the conversation with Abigail Tierney which is
8 described in the e-mail on Rhen 11?
9    A   I don't.
10    Q   Do you recall writing this e-mail?
11    A   No.
12    Q   Can you explain why you would have copied
13 Abigail Tierney, Ernie Helling, and Cindy Judy on this
14 e-mail?
15    A   Because when I left the Department of
16 Education in 2002, Ernie Helling and I had a discussion
17 and we had an agreement that I would not be in contact
18 with people at the department who are basically
19 represented by counsel, meaning Ernie and Abby, without
20 including him. Including them. Excuse me. One or both.
21    Q   Would you look at Rhen 14, please. Do you
22 recall the meeting which is referred to in Jill
23 Dietrich's e-mail to you dated January 3, 2006?
24    A   I don't. I do not remember talking to them
25 about this issue.

| | | |
|---|---|---|
| 1 | Q | Was she a school district attorney? |
| 2 | A | She was a hearing officer. |
| 3 | Q | Do you know pdrumheiser? |
| 4 | A | I've heard the name. |
| 5 | Q | Do you know for whom that person worked? |
| 6 | A | I think he was a parent attorney. |
| 7 | Q | Do you know afaust? |
| 8 | A | Andrew Faust. |
| 9 | Q | Was he a school district attorney at that |
| 10 | time? | |
| 11 | A | I assume so. |
| 12 | Q | After you reviewed Linda Stengle's blog, did |
| 13 | you discuss her blog with anyone? | |
| 14 | A | I sought legal counsel about it. |
| 15 | Q | Was that Mr. Frankhouser? |
| 16 | A | It was Mr. Frankhouser, yes. I would have |
| 17 | spoken to Ed Titterton, Attorney Ed Titterton. | |
| 18 | Q | Was Mr. Titterton retained to provide legal |
| 19 | services to ODR? | |
| 20 | A | He is now. |
| 21 | Q | At that time? |
| 22 | A | At that time he was providing consulting |
| 23 | services. | |
| 24 | Q | At that time did you believe that you had an |
| 25 | attorney-client relationship with Ed Titterton? | |

| | | |
|---|---|---|
| 1 | | was serving a dual role as both advocating and being an |
| 2 | | impartial hearing officer. |
| 3 | Q | Do you agree with Mrs. Stengle that it is |
| 4 | necessary to analyze LRE whenever FAPE is raised? | |
| 5 | A | Sure. |
| 6 | Q | In roughly February of 2006, do you recall |
| 7 | discussing Linda Stengle's blog with anyone other than | |
| 8 | Mr. Frankhouser and Mr. Titterton? | |
| 9 | A | I believe it may have been discussed with |
| 10 | Mr. Helling and Ms. Tierney. | |
| 11 | Q | Why do you believe that? |
| 12 | A | Because we were involved in litigation of |
| 13 | another matter, LG, and there was a lot of communication | |
| 14 | as a result of that lawsuit. Ms. Stengle was not a party | |
| 15 | to that lawsuit, but was the hearing officer involved in | |
| 16 | the underlying case. | |
| 17 | Q | Would you look at Tierney 12, please. |
| 18 | A | Yes. |
| 19 | Q | Do you recall suggesting to John Tommasini, |
| 20 | Ernie Helling, and Abigail Tierney on February 15, 2006, | |
| 21 | that you all schedule a brief meeting concerning Linda | |
| 22 | Stengle? | |
| 23 | A | I do. |
| 24 | Q | Was the meeting held? |
| 25 | A | It was. |

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | Please tell me the substance of your |
| 3 | discussions with Ed Titterton at that time concerning | |
| 4 | Linda Stengle's blog. | |
| 5 | A | I don't have a specific recollection. I |
| 6 | talked to Ed all the time. I'm sure I brought it to his | |
| 7 | attention, and I know that he expressed concern about | |
| 8 | it. | |
| 9 | Q | Did he say whether he had read her blog? |
| 10 | A | I don't believe he would express concern |
| 11 | without having looked at the blog. | |
| 12 | Q | Do you recall anything else that you and |
| 13 | Mr. Titterton discussed regarding Linda Stengle's blog at | |
| 14 | that time? | |
| 15 | A | No. Just general concerns about her |
| 16 | impartiality and the blog. | |
| 17 | Q | Would you please tell me everything you |
| 18 | recall about the general concerns expressed at that time. | |
| 19 | A | Hearing officers are required to be |
| 20 | impartial. It is a topic that we discussed at every | |
| 21 | single hearing officer training in one form or another. | |
| 22 | I was very concerned that an impartial hearing officer | |
| 23 | was advocating issues of LRE which were issues that | |
| 24 | appeared before her in virtually every case she had | |
| 25 | according to what her testimony was yesterday. So she | |

| | | |
|---|---|---|
| 1 | Q | Do you recall when it was held? |
| 2 | A | When? |
| 3 | Q | Yes, ma'am. |
| 4 | A | No. |
| 5 | Q | Do you recall who attended? |
| 6 | A | John Tommasini, Ernie Helling, Abby Tierney, |
| 7 | me. Ed Titterton was on the phone. | |
| 8 | Q | Was everyone other than Ed Titterton together |
| 9 | for the meeting, or in the same room? | |
| 10 | A | In the same room, yes. |
| 11 | Q | Do you know when the meeting was held? |
| 12 | A | No. |
| 13 | | MS. O'DONNELL: Object to the form. She |
| 14 | answered that she didn't remember. | |
| 15 | BY MS. BARNETT: | |
| 16 | Q | Do you recall making any notes of the |
| 17 | meeting? | |
| 18 | A | No. |
| 19 | Q | Do you recall seeing anyone else make notes |
| 20 | of the meeting? | |
| 21 | A | I don't. |
| 22 | Q | Would you tell me as much as you recall of |
| 23 | what was said at that meeting. | |
| 24 | A | Well, let me tee it up for you. I talked to |
| 25 | Ed Titterton and said basically what is in this e-mail. | |

1  And I said, is this something in your opinion,
2  Mr. Titterton, I should bring to the attention of the
3  department, and he said yes. And so I moved forward with
4  scheduling that meeting, which is why he was on the
5  telephone. It was purely an informational meeting. I
6  told them there were a lot of issues that were arising,
7  and I remember Mr. Helling said to me, what are you
8  asking us to do, and I said, I'm not asking you to do
9  anything, just purely informational.
10      Q    Do you recall what information you conveyed
11  during the meeting?
12      A    Well, they already knew about the lawsuit,
13  the LG lawsuit where she was the hearing officer. They
14  knew that she was on the Gaskin Advisory Panel. The
15  recent lawsuit against ODR, I'm not sure what that's
16  referring to. And I assume the blog.
17      Q    Do you know what prompted you to ask Ed
18  Titterton whether you should bring some or all of these
19  issues to the attention of PDE?
20      A    Ed Titterton is someone who has been in the
21  special education field for thirty-some years. He's
22  highly respected. I highly respect his opinion. We talk
23  frequently. And I asked him his opinion.
24      Q    In Tierney 13, you described Marci Romberg's
25  husband as, quote, someone who is not a parent attorney,

1  unquote.
2      A    Wait a minute. Okay.
3      Q    At that time, did Karl Romberg work for Fox
4  Rothschild?
5      A    I believe so, but I'm not certain.
6      Q    At that time, was Karl Romberg a school
7  district attorney?
8      A    It's Romberger. School district attorney,
9  yes.
10      Q    Did you -- Looking at your second paragraph,
11  did you hire Rosemary Mullaly in part because she was the
12  parent of a child with disabilities?
13      A    I did.
14      Q    Did you hire Joy Fleming in part because she
15  was the parent of a child with disabilities?
16      A    In part, yes.
17      Q    Did you hire Joseph Merhaut in part because
18  he was the parent of a child with disabilities?
19      A    Yes.
20      Q    Did you hire Peg Drayden in part because she
21  was the parent of a child with disabilities?
22      A    Yes.
23      Q    Why was their being parents of children with
24  disabilities one of the reasons why you hired these
25  people?

1      A    Because as Ms. Stengle said yesterday, the
2  hearing officers -- She didn't qualify the time frame,
3  but the hearing officers were mostly educators. She was
4  absolutely right. When I came in 2002, there were about
5  27 hearing officers. Almost every single one of them was
6  an educator or a psychologist. I believed, and I believe
7  the advisory panel felt the same, that there should be
8  more diversity in the hearing officer pool, not only with
9  backgrounds, but also age, gender, and ethnicity. And I
10  set out purposely to have the hearing officer pool more
11  accurately reflect the constituencies which they served.
12      Q    For which law firm did you work?
13      A    Do you want me to go through all the name
14  changes?
15      Q    Is it currently in existence?
16      A    No.
17      Q    What was its last name?
18      A    Marshall Smith & Haddick.
19      Q    What kind of practice did you have there?
20      A    Civil litigation defense.
21      Q    When did you leave that firm?
22      A    The end of '99.
23      Q    Where did you go from there?
24      A    From January until about June or July, I
25  worked on a project through Dickinson School of Law which

1  was Securities and Exchange Commission filings, believe
2  it or not. And then in August or September of 2000, I
3  started at the Department of Education.
4      Q    What did you do at PDE?
5      A    Virtually my entire tenure there was spent on
6  the Duane B. versus Chester Upland School District and
7  PDE lawsuit.
8      Q    Was Karl Romberger a hearing officer at some
9  point?
10      A    Prior to my tenure there.
11      Q    Was he a hearing officer during the beginning
12  of your tenure?
13      A    No.
14      Q    Would you look at Tommasini 9, please.
15      A    Okay.
16      Q    Do you recall forwarding to John Tommasini,
17  Ernie Helling, Abigail Tierney, and Ed Titterton Anne
18  Hendricks' e-mail dated April 4, 2006?
19      A    Vaguely.
20      Q    Can you explain why you forwarded Anne
21  Hendricks' e-mail to these people.
22      A    Consistent with what I told you earlier, I
23  talked to Ed Titterton, and he believed that these were
24  issues that I should bring to the attention of the
25  department.

1  THE WITNESS: What is your question?
2  BY MS. BARNETT:
3  Q  Do you recognize that e-mail?
4  A  I guess vaguely.
5  Q  Can you explain why you forwarded Andy
6  Faust's e-mail dated April 3, 2006, to those people?
7  A  I'll tell you why I'm confused. Now wait,
8  I'm sorry, I'm confusing something else. Never mind.
9  Again, keeping the department informed.
10  Q  Would you look at Fullerton 79, please, which
11  is on the same page.
12  A  It's very hard to review. Fullerton 79 looks
13  to be the e-mail from Mr. Faust.
14  Q  Did you look at the e-mail and linked website
15  blog which he alleged were from Linda Stengle?
16  A  I did.
17  Q  Did you conclude that they were from Linda
18  Stengle?
19  A  Are you talking about the share-your-stories
20  portion?
21  Q  Yes.
22  A  I wasn't sure.
23  Q  Did you do anything to determine whether he
24  was correct when he alleged that the e-mail and linked
25  website/blog were, in fact, from Linda Stengle?

1  A  Did I do anything to confirm that they were?
2  Q  Yes.
3  A  I believe I just looked at the blog again.
4  Q  Did you find this language in Linda Stengle's
5  blog?
6  A  No.
7  Q  Did you conclude that Mr. Faust's allegations
8  were false?
9  A  I don't think I pursued the analysis that
10  far. He provided that e-mail. I was already aware of
11  the blog, and the blog was an issue that I was
12  contemplating.
13  Q  Did you notify anyone that you had reviewed
14  Linda Stengle's blog and did not find in her blog the
15  information which Attorney Faust implied was there?
16  A  No. That was not an important issue to me,
17  what Mr. Faust had brought to my attention.
18  Q  It wasn't important, and yet you forwarded it
19  to four attorneys?
20  A  The reference to the share-the-stories
21  portion, that's what I'm talking about.
22  Q  Which portion of his e-mail was important to
23  you?
24  A  The part that says, I guess that you have
25  seen the following e-mail and linked website/blog. So

1  the blog.
2  Q  Mr. Faust wrote in his second sentence,
3  quote, the pitch of this message, the tenor of this
4  website, and the postings thereon are simply intolerable
5  in an individual who must serve as an impartial arbiter
6  of disputes between school entities and parents in
7  special education disputes.
8  Do you agree that the message which he was
9  referring to was not, in fact, written by Linda Stengle?
10  MS. YERGER: I'm going to object to the form
11  of the question, because I think you're -- It's not
12  clear. You're suggesting that it is a reference to
13  below, and I don't think that the e-mail is clear from
14  that. So I'm going to object as to form. But she can
15  answer the question. But it's not clear from the e-mail
16  what you're suggesting in your question.
17  MS. BARNETT: Okay.
18  THE WITNESS: What are you trying to get from
19  me? Repeat your question, please.
20  MS. BARNETT: Would you read it back, please.
21  (Whereupon, the Reporter read back the
22  referred-to question.)
23  THE WITNESS: Let me back up and tell you
24  what was going on at this time.
25  MS. BARNETT: I'm happy to have the --

1  whatever you want to tell me after you answer the
2  question.
3  MS. O'DONNELL: Do you agree or do you know
4  whether or not the web link or the part that starts share
5  your stories is, in fact, lifted from Linda Stengle's
6  blog, I guess is the question.
7  THE WITNESS: I believe it was from some
8  other website.
9  BY MS. BARNETT:
10  Q  When you forwarded Andy Faust's e-mail to
11  four other attorneys, did you believe that the message
12  was from some other -- some website other than Linda
13  Stengle's?
14  A  That's what I was trying to tell you. There
15  was not a lot of analysis that went into the receipt of
16  this e-mail. And I will tell you why. The date is
17  April 3rd. Within days I was hospitalized, very ill.
18  So, you know, the analysis that you're asking me about
19  didn't occur. I was aware of the blog. I read his
20  e-mail. I was aware that he was concerned. It was
21  already an issue that I was considering. So this didn't
22  have a lot of -- I didn't analyze it in detail. I
23  understood what he was saying.
24  Q  Had you had any conversations with Andy Faust
25  about Linda Stengle in 2006?

1    A    I thought it was odd that she was forbidding
2  parties to cite to the Gaskin settlement agreement when I
3  was reading her decisions and she cited it every time. I
4  thought that the reference to counsel abiding by their
5  professional obligations or responsibilities, whatever
6  her language there, was a threat, that she did not view
7  kindly their joint -- their individual request for her
8  recusal. I think it appeared that she was very offended
9  by that.
10    Q    Was it intemperate of her to suggest that she
11  was offended?
12    A    I inferred that she was offended.
13    Q    What was intemperate about what she wrote?
14    A    I just answered your question. She denied
15  their request for recusal and, in my view and I believe
16  Mr. Frankhouser's, made an implied threat about their
17  ethical obligations, which, of course, they were fully
18  entitled to make a request for recusal, particularly in
19  this instance where she had a professional relationship
20  with Ms. Gran.
21    Q    In the conclusion of this letter, you wrote,
22  quote, based upon the above, you have not satisfactorily
23  performed all of your duties as a hearing officer,
24  unquote.
25    A    Okay.

1    Q    Is that a standard which you applied to every
2  hearing officer whose contract was up for renewal?
3    A    Yes.
4    Q    Was every hearing officer whose contract was
5  renewed satisfactorily performing all of his or her
6  duties as a hearing officer?
7    A    Well, I don't want to say no hearing
8  officer. There were some hearing officers that were not,
9  quote, perfect. But the standard was satisfactory. It
10  wasn't perfect.
11    Q    Are you saying that every hearing officer who
12  was offered a contract as of July 1, 2006, was
13  satisfactorily performing all of his or her duties of a
14  hearing officer?
15    A    Yes. I'm just distinguishing between
16  satisfactory and perfect.
17    Q    Why did you give Mrs. Stengle the option to
18  resign?
19    A    Because as I said before, this was a very
20  difficult situation for me for all the reasons I stated
21  before. I liked Ms. Stengle a lot, and I wanted to allow
22  her the opportunity to save face. And I believe that's
23  the phrase she even used yesterday. I very much wanted
24  that.
25    Q    Did word that you had not renewed her

1  contract spread throughout the special education
2  community?
3    A    I didn't tell anybody. My staff were told
4  this was a confidential issue, that they were not to tell
5  anybody. So I don't know how Gina dePietro, or whoever
6  Ms. Stengle testified yesterday told her that they knew
7  about it, I don't know how that occurred. That was not
8  my intent. That was not -- I believe that was not from
9  my office. That was unfortunate that that happened, and
10  I'm sorry about that.
11    Q    You received an e-mail from Andy Faust
12  congratulating you on this feat, didn't you?
13    A    I did, and I was very put off by it.
14    Q    Did you respond to his e-mail?
15    A    I did not. Neither e-mail nor phone call. I
16  did not respond.
17    Q    Did he leave a message when he called?
18    A    No. I'm sorry, I didn't call him. He sent
19  me the e-mail. I didn't respond to the e-mail, nor did I
20  call him.
21    Q    Would you look at Rhen 59. Do you know why
22  ODR faxed Mrs. Stengle's résumé to someone on June 14,
23  2006?
24    A    No.
25    Q    Would you look at Rhen 47, please. Do you

1  recall any other occasion where Linda Rhen asked Jill
2  Dietrich to forward an e-mail to you?
3    A    Not that I recall.
4    Q    Do you agree that Linda Rhen was perfectly
5  capable of sending you e-mails directly?
6    A    Yes.
7    Q    When you searched for e-mails responsive to
8  the request for production of documents, did you search
9  for e-mails between yourself and Jill Dietrich?
10    A    No. I don't believe there are any.
11    Q    Do you agree that the top of Rhen 47 is an
12  e-mail between you and Jill Dietrich?
13    A    I thought that you meant that we communicated
14  back and forth. Yes, I agree that that's from Jill
15  Dietrich.
16    Q    Would you look at Rhen 69, please. I'm
17  directing your attention to the last four lines of answer
18  4 on this page.
19    A    Okay.
20    Q    Do you recall any discussions concerning
21  Linda Stengle's ability to serve as an impartial hearing
22  officer while serving on the Gaskin Advisory Panel with
23  Linda Rhen and/or Jeannine Brinkley, other than what
24  you've already described?
25    A    I believe that this is an error. I barely

1   know Jeannine, and actually the few times that I have
2   seen her at PaTTAN, I'll say hi, how's it going, and that
3   was the extent of it. So our communications have been
4   very limited.
5       Q   Given that statement, does it seem more
6   likely that Pat Fullerton was the one who told you that
7   Linda Stengle allegedly threatened to sue if her contract
8   were not renewed?
9       A   I remember that there was a meeting on IDEA
10   generally. After the meeting there were people standing
11   outside. Pat Fullerton was there and Jeannine Brinkley
12   was there, and we were waiting for the elevators. One or
13   the other of them told me. I don't recall which.
14       Q   Would you look at Rhen 71, please.
15       A   Okay.
16       Q   Would you read the answer to interrogatory 7,
17   and tell me whether you believe that the answer is
18   accurate.
19       A   These are Rhen's?
20       Q   Yes, ma'am.
21       A   That time frame sounds about right. I
22   remember that there were numerous meetings about IDEA,
23   because they were putting together training statewide.
24   Because I was -- because there were a lot of procedural
25   safeguard changes in IDEA 2004, I was invited to those

1   meetings.
2       Q   Do you agree that none of the meetings
3   involved discussions regarding the work of due process
4   hearing officers?
5       A   Right. They were IDEA. We were reviewing
6   statutes.
7       MS. BARNETT: This would be a good time for a
8   break.
9       MS. O'DONNELL: Sure.
10       (Whereupon, at this time a recess was
11       held.)
12   BY MS. BARNETT:
13       Q   Would you look at Fullerton 70. I put them
14   in chronological order, so if we bounce around, it's
15   chronological order by printing date. I'm sorry, I gave
16   you the wrong number. 707. I apologize.
17       MS. O'DONNELL: 707?
18       MS. BARNETT: Yes. I apologize.
19       MS. O'DONNELL: That's at the back of the
20   book here.
21       MS. BARNETT: We're looking at the blog.
22   We're starting with Fullerton 707.
23       MS. O'DONNELL: Okay. 707.
24   BY MS. BARNETT:
25       Q   Fullerton 707 through 713 were all printed on

1   2/3/06. Do you see that in the lower right hand corner?
2       A   Okay.
3       Q   Do you recall reading these blog entries at
4   any time before May 31st, 2006?
5       A   I'm not going to be able to tell you what
6   specific entries I read before May 30th, 2006.
7       Q   Do you recall feeling that any statements
8   contained in Linda Stengle's blog were inaccurate?
9       A   No. My review was not for accuracy. My
10   review was the advocacy aspect of it. That was my
11   concern, not the content.
12       Q   What, if anything, about her blog did you
13   regard as advocacy?
14       A   Ms. Stengle was clearly advocating LRE
15   issues, full inclusion. She was making recommendations
16   to individuals about filing complaints, due process. I
17   think she mentioned the PHRC. She was engaged in
18   discussion back and forth with people on the blog, both
19   on the blog and privately. There was a reference to
20   private communications that took place, I believe with
21   someone named Colleen, maybe, all of which I consider to
22   be advocacy.
23       Q   Did the law require full inclusion in
24   2005-2006?
25       A   Children are to be -- They receive FAPE in

1   the LRE, FAPE in the least restrictive environment. That
2   may be full inclusion, that may not, depending on the
3   child.
4       Q   Did she in your view advocate full inclusion
5   when it was not appropriate for a given child?
6       A   I believe that the tenor throughout was for
7   full inclusion. And that wasn't just my view.
8       Q   Who else shared that view?
9       A   The mother in the LG versus Wissahickon case
10   testified she reviewed Ms. Stengle's blog and did not
11   want her as a hearing officer because she did not believe
12   she could be impartial on the issue of LRE because she
13   read this blog to be full inclusion. This particular
14   mother believed that her child would receive FAPE in
15   something less -- She believed her child needed
16   something less than full inclusion in order to receive
17   FAPE.
18       Q   Did that mother want her child to receive a
19   private education at the school district's expense?
20       A   I don't believe so.
21       Q   From the time that you became director
22   through the present, what time lines come into play once
23   a party notifies ODR that it wants a hearing?
24       A   Well, prior to IDEA 2004, there was a 45-day
25   time frame. IDEA 2004 added a 30-day resolution period

1 department a heads-up, it was in there, although I was
2 very uncomfortable about it.
3 BY MS. BARNETT:
4    Q    Did you express your discomfort to any of the
5 other defendants?
6    A    I didn't, because I was following his advice
7 to keep it in.
8    Q    Would you look at Smith 122, please. In the
9 second line it states, quote, dates of contracts needs to
10 be corrected, if not already, paragraph 2 removed,
11 unquote.
12       What did you mean when you were referring to
13 the dates of contracts?
14    A    There must have been a typo of some kind.
15    Q    Would you look at Smith 123, please.
16       MS. O'DONNELL: I'm sorry, Smith --
17       MS. BARNETT: 123.
18       THE WITNESS: Yes.
19       MS. O'DONNELL: Thank you.
20 BY MS. BARNETT:
21    Q    What did you mean when you wrote, safeguard,
22 quadruple exclamation point?
23    A    Because as I testified earlier, I knew that
24 the Stengles would bring to bear every ounce of political
25 influence they had to cause a lot of difficulty for me in

1 addition to a lawsuit. And my instincts were right.
2    Q    Would you look at Smith 124, please. Have
3 you ever told Cindy Judy to guard something with her life
4 before?
5    A    No.
6    Q    Would you look at Smith 125, please. You
7 wrote, quote, please file this in the safest file
8 possible, so when they try to fire me for sending this
9 letter out, I have proof that the powers that be were
10 aware of it. Thanks. Unquote.
11    A    Right.
12    Q    Who did you mean when you used the word we --
13 when they, I'm sorry, they?
14    A    They could be anybody. I'll say it again. I
15 believed the Stengles would bring to bear every ounce of
16 political influence they had to get me fired. And my
17 instincts were correct.
18    Q    You didn't have anybody in particular in mind
19 when you used the word they try to fire me?
20    A    I did not. It's just a colloquialism.
21    Q    To whom were you referring when you used the
22 phrase, the powers that be?
23    A    That's what I was just responding to. That
24 was just a colloquialism.
25    Q    Who was aware of it at the time that you

1 wrote this e-mail?
2    A    Who was aware of what?
3    Q    As of May 31, 2006, who are the people who
4 were aware that the nonrenewal letter was being sent to
5 Linda Stengle?
6       MS. O'DONNELL: I object to the form, because
7 I think you're confusing the context of her answer. But
8 subject to that objection, to the extent you're able to,
9 you can answer the question.
10       THE WITNESS: What's your question?
11 BY MS. BARNETT:
12    Q    On May 31, 2006, at 3:34 p.m., who -- what
13 are the names of the people who were aware that the
14 nonrenewal letter was being sent to Linda Stengle?
15    A    Well, the people on the e-mail exchange or
16 the e-mail dated May 31st at 3:21. Beyond that, in the
17 department, I wouldn't know.
18    Q    So the people who were aware were Robert
19 Frankhouser?
20    A    Correct.
21    Q    John Tommasini, Ernie Helling?
22    A    Presumably, if they read their e-mail.
23    Q    Abigail Tierney, Cindy Judy?
24    A    Right. People in my office. And I don't
25 know if IU13 knew at that point or not.

1    Q    To whom did you report at the time?
2    A    I don't really report to someone in the
3 traditional sense. In 2006 it probably was Fran
4 Warkomski, who was completing my evaluation.
5    Q    Was Fran aware that the letter was going out?
6    A    I probably let her know.
7    Q    Who in your office knew?
8    A    Well, Cindy would have known and Dixie would
9 have known.
10    Q    Can you think of anyone else who would have
11 known at that time that a nonrenewal letter was being
12 sent to Linda Stengle?
13    A    No.
14       MS. O'DONNELL: Just add a continuing
15 objection to that line of questioning. I believe that
16 the questioning is out of context with the answers.
17 BY MS. BARNETT:
18    Q    Did Linda Rhen also know that the nonrenewal
19 letter was being sent?
20    A    You'd have to ask her.
21    Q    Would you look at Smith 127, please.
22    A    Okay.
23    Q    Do you recall receiving this, the e-mail at
24 the top of this page from Linda Rhen?
25    A    Okay.

1 　　　MS. O'DONNELL: The question is, do you
2 remember receiving the e-mail.
3 　　　THE WITNESS: I do. I don't know who she
4 briefed.
5 BY MS. BARNETT:
6 　　Q　Would you look at Smith 128, please. Did you
7 write this e-mail?
8 　　A　I did.
9 　　Q　Would you look at Smith 129, please. Linda
10 Rhen wrote, quote, thanks, Kerry. Need some time to
11 review internally. Thanks for the courtesy on this,
12 unquote.
13 　　A　Right.
14 　　Q　Do you know with whom she intended to review
15 it internally?
16 　　A　I don't. But she was accurate that it was a
17 courtesy copy.
18 　　Q　Let's look at Smith 130, please. Given that
19 Cindy Judy was in charge of filing your e-mails, why did
20 you find it necessary to send her an e-mail which said,
21 quote, for our files, exclamation mark, unquote?
22 　　A　I tend to have friendly e-mails like that
23 instead of just file this or do this.
24 　　Q　As of May 31st, 2006, do you know how many
25 attorneys had filed motions asking Linda Stengle to

1 recuse herself because of her service on the Gaskin
2 panel?
3 　　A　Mr. Faust told me he was going to. Whether
4 he did or not, I don't know. Anne Hendricks was
5 apparently going to. Judy Gran, Scott Wolpert. Wait,
6 did you say -- I'm sorry, what was your question? Was
7 this being on the Gaskin Advisory Panel or the blog?
8 　　Q　The Gaskin Advisory Panel.
9 　　A　I'm sorry. So scratch that answer. I don't
10 think -- Well, Scott Wolpert and Judy Gran filed those
11 motions for recusal that were brought to my attention.
12 There could be motions that were filed that were not
13 brought to my attention.
14 　　Q　Between the time that Linda Stengle was
15 appointed to the Gaskin panel and her resignation from
16 that panel in June of 2006, there were only two motions
17 that she recuse herself because she was on the Gaskin
18 panel?
19 　　A　There were two motions brought to my
20 attention.
21 　　Q　Do you recall whether Andy Faust was listed
22 in your first Rule 26 disclosure?
23 　　A　I don't know.
24 　　　MS. O'DONNELL: I don't think there's anyone
25 here that represented ODR or Kerry Voss Smith when the

1 first Rule 26 disclosure was published.
2 　　　MR. RUSSELL: I believe that was in December
3 '06 or thereabouts, and that would have been Ellis Katz.
4 　　　MS. BARNETT: I'm close to being done, but I
5 want to take a few minutes to review.
6 　　　MS. O'DONNELL: Sure.
7 　　　(Whereupon, at this time a recess was
8 　　　held.)
9 BY MS. YERGER:
10 　　Q　Good afternoon.
11 　　A　Hello.
12 　　Q　I just want to put on the record, I think you
13 already know, but my name is Sarah Yerger, and I
14 represent the co-defendants in this matter. And they are
15 John Tommasini, Linda Rhen, Pat Fullerton, Abigail
16 Tierney, and Diane Castelbuono, and Ernie Helling. I
17 guess it's six.
18 　　　I want to take you back to this morning and
19 ask you to fill some holes in for me about your previous
20 employment. You talked patches here and there. Can you
21 tell me how you were employed after you got out of law
22 school.
23 　　A　After law school?
24 　　Q　Yes.
25 　　A　I worked at the law offices of Francis E.

1 Marshall. The name changed over the years based upon
2 partners, but basically it was that firm throughout my
3 whole tenure in private practice.
4 　　Q　When was that?
5 　　A　When was I in private practice?
6 　　Q　Yes.
7 　　A　'88 through '99.
8 　　Q　Did you go to law school right after college?
9 　　A　I took three years off.
10 　　Q　What did you do during that period of time?
11 　　A　I worked with adults at Pennhurst State
12 School who were being transitioned out of the institution
13 as a result of some very infamous litigation and placed
14 in residential placements in the community.
15 　　Q　Did you go to college right after high
16 school?
17 　　A　I did.
18 　　Q　During your tenure at -- with Francis E.
19 Marshall, or I know you said it had various names
20 throughout the course of your time, you told us that you
21 did civil litigation defense. What kinds of defense did
22 you do?
23 　　A　Workers' comp, auto, premises liability,
24 product liability, general liability. I had a dog bite
25 case.

1  depositions, I'm a little confused by ODR's role. Is
2  there a mandate? Is there a mission statement, something
3  that would tell us a little bit more about ODR?
4      A    Well, I think it's an idea, basically. The
5  federal government requires states to have mediation and
6  due process systems, and Pennsylvania meets that federal
7  mandate by the Office for Dispute Resolution.
8      Q    Who employs the Office of Dispute Resolution?
9      A    An IU.
10     Q    At the time you were hired in 2002, which IU
11  was it?
12     A    It was IU13.
13     Q    Is that different now?
14     A    It is different now.
15     Q    Who is it?
16     A    IU16.
17     Q    When you were hired on as the due process
18  director, was it simply your experience having worked for
19  a couple of years in education that made you a qualified
20  person to do that director -- due process director
21  position, or are there other experiences other than your
22  work in education?
23     A    Well, I have an older brother with mental
24  retardation, so I've lived my entire life in the
25  disability field. I have a special ed degree from Penn

1  State, worked numerous jobs with kids and adults with
2  disabilities in between summers and college. I had a lot
3  of litigation experience in private practice. I was a
4  partner, so I had supervisory/administrative experience.
5  And I had a very intensive two-year tenure representing
6  the department in a special education lawsuit.
7      Q    Now, ODR is -- You said earlier it's not an
8  agency. It's an office.
9      A    It's an office. And the IU is a public
10  entity that employs the employees.
11     Q    IU is a public entity, and ODR reports to the
12  IU?
13     A    The IU provides the fiscal administration of
14  the program.
15     Q    Is the ODR a separate entity from the IU?
16     A    No. ODR is not an entity.
17     Q    Okay. Who do you report to?
18     A    At this point that's not clear, because we
19  have moved to a one-tier system. So that's actually
20  being discussed, who I should be reporting to.
21     Q    Prior to the change in the system, who did
22  you report to?
23     A    Well, I always have to qualify it by saying
24  it's not a typical report where I go to someone and say,
25  is this okay, do I have your permission. I can tell you

1  I was evaluated this past year by Joe Banks, the year
2  before that, Dr. Scott, the year -- a couple years, Fran
3  Warkomski, and for I think one year, Dr. Rhen.
4      Q    Who were all the individuals that you just
5  mentioned, and who did they work for?
6      A    Dr. Rhen worked for IU13. Fran Warkomski
7  worked for IU13. Dr. Scott worked for IU13. And then
8  Joe Banks is with IU16.
9      Q    Who reports to you?
10     A    My direct reports are Dixie Rider, Suzanne
11  McDougall, and Cindy Judy.
12     Q    Who reports to them?
13     A    All of consult line. Therefore, three people
14  report to Suzanne. She's consult line supervisor. The
15  case managers report to Dixie, as does the secretary and
16  the database person and the web person.
17     Q    Do they have direct reports under them?
18     A    No.
19     Q    Like the case managers?
20     A    They report directly to Dixie.
21     Q    Who do the hearing officers report to?
22     A    They don't report to anyone in the
23  traditional sense. They're impartial due process hearing
24  officers that decide their cases independent of anybody.
25  We administer the process, so we keep track of timeliness

1  issues and administrative kinds of things. But they
2  don't, for example, give me a decision and say, will you
3  review this and make sure it's okay before I send it
4  out. That never happens.
5      Q    So for the purposes of time and attendance,
6  you would address any issues relating to their contract?
7      A    Right. And competency.
8      Q    But with regard to the subject matter of what
9  they do, you don't have an oversight?
10     A    Correct.
11     Q    Let me be clear on what you do have oversight
12  on. It is time and attendance?
13     A    General competency issues, which would
14  include timeliness and, you know, adhering to time lines
15  and federal law and that kind of thing. That's to a
16  large degree what Ed Titterton does for the office.
17     Q    Did Ed Titterton report to you?
18     A    No.
19     Q    What was his role?
20     A    He was an independent contractor. I
21  wouldn't -- I wouldn't say he reports to me. We had a
22  professional equal relationship.
23     Q    Were there any other independent contractors
24  other than Titterton and the hearing officers?
25     A    The mediators, IEP facilitators, court

1 reporters, appeal panel members.

2 Q And again, what was your role with regard to

3 them?

4 A My role is an administrative one, not

5 substantive decision-making.

6 Q Earlier today you mentioned a conversation

7 that you had with Ernie Helling when you left the

8 Department of Education.

9 A Yes.

10 Q Could you elaborate on that. Do you recall

11 mentioning that?

12 A I do.

13 Q Can you elaborate on that conversation.

14 A I was at the department for those two years

15 when I took the job at ODR. Ernie talked to me before I

16 left and explained the importance of separation between

17 the department and ODR. That's when we had the

18 gentlemen's agreement, so to speak, that I wouldn't be

19 contacting people at the department without letting him

20 know, you know. I mean, if it were something very

21 simple, I guess I would. But for anything of substance

22 at all, that either he or Abby would be copied in on it.

23 Q Tell me about the relationship between ODR

24 and the Department of Education. What's your

25 understanding of that relationship?

1 A Well, we meet the federal mandate to have due

2 process and mediation. The dollars that run our program

3 come from the department. The department has to account

4 to the feds as to how that money is used, so there is a

5 fiscal interest that the money is used properly. But I

6 don't report to anyone at the department, nor do they

7 give me my day-to-day assignments or tell me how to run

8 the office, although now that we moved to a one-tier

9 system, that's changed a bit, because it's now a

10 state-level review process only, so general policies and

11 structures are decided by the department.

12 Q Would they get involved in the renewal or

13 nonrenewal of a contract now that there's a one-level

14 system?

15 A Well, the system is changing completely. We

16 are forming a panel that's going to review hearing

17 officer performance and make decisions about renewal or

18 nonrenewal.

19 Q Okay. So I guess the answer to my question

20 is yes, that it will be -- it is a different system?

21 A It is a very different system.

22 Q I want to look at some of the e-mails you

23 looked at earlier today. Do you still have the big

24 notebook?

25 MS. O'DONNELL: They took it and put it in

1 the court reporter's car.

2 (Whereupon, at this time a recess was

3 held.)

4 BY MS. YERGER:

5 Q I'd like you to look at Rhen 10 and 11.

6 A Okay.

7 Q Why would you contact -- It's not clear to

8 me from your testimony earlier, if you didn't report to

9 anyone in PDE, why would you contact Dr. Rhen about this?

10 A I did not report to anyone at PDE. You know,

11 I told you earlier, I don't remember these e-mail

12 exchanges.

13 Q I'm not asking you about the content of the

14 e-mail exchanges. I'm asking you about your -- your

15 reasoning behind sending an e-mail to someone that you

16 don't report to, if you can testify about why you would

17 send an e-mail to someone other than someone you have to

18 report to.

19 A There was -- Even though my office was

20 separate from the Department of Education, there is a

21 relationship. The Department of Education funds this

22 program. You know, for example, I could decide that I

23 want to hire ten hearing officers at $100,000 each. But

24 if I don't have the funding, I can't do that. And

25 because the Department of Education is on the hook for

1 making sure the money is spent correctly, a budget is

2 submitted to them, and they approve that budget. So

3 there's a relationship there.

4 Q So there are e-mails that go, not just about

5 Linda Stengle, but about other issues that --

6 A Absolutely.

7 Q And do you send those e-mails to other people

8 other than Linda Rhen?

9 A Yes.

10 Q Who would that be?

11 A Well, you've seen the names. Abby and Ernie

12 would be the main ones. John Tommasini is now the

13 director, and we communicate about the one-tier system

14 and how the department wants that to be.

15 Q What about political issues? And I mean

16 political with a small P, issues surrounding information

17 that could have an impact on the media or in the

18 community which so many people have referred to as the

19 special ed small community. Are those issues that you

20 would have gone to Education about, as well?

21 A Well, I'm not sure what your question is, so

22 let me see if this answer is responsive. We had an issue

23 with two court reporters who were battling each other as

24 to who should get more work. And they went to their

25 state representatives, and the state representative

1  contacted PDE, who then contacted government relations,
2  and I would get a call. So there are political issues
3  that occur in special education.
4      Q    With the court reporter issue, had you given
5  PDE a heads-up about this battle?
6      A    No. No. I didn't realize that they were as
7  angry with one another as they were.
8      Q    I think you used earlier the term FYI, and
9  you might have even said heads-up, and the record would
10 reflect that, that that was something you chose to do
11 with certain PDE issues; am I correct?
12     A    I believe so. I use FYI a lot.
13     Q    FYI is a heads-up in your mind?
14     A    Not necessarily heads-up. It's information.
15     Q    Tierney 10, I think. Actually, I think you
16 testified earlier that you don't remember sending the
17 e-mail. But my question would actually go to, do you
18 remember why you would have sent the e-mail to Abby,
19 Ernie, and Ed Titterton, not necessarily the subject
20 matter of the e-mail.
21     A    I'm obviously getting very tired, because I'm
22 not even sure what this is referring to now. What is
23 your question?
24     Q    If you turn to the next page, Tierney 11,
25 that might help.

1      A    Okay. Well, as I testified in response to
2  your question a minute or so ago, there was a
3  relationship between my office and PDE. And in this
4  particular situation, while we're sitting around this
5  table, there was definitely crossover. There was a
6  hearing on an impartial hearing officer who was also
7  serving on the Gaskin Advisory Panel, two of them. And
8  so just by virtue of that, there was a connection or a
9  relationship or an issue that we had in common.
10     Q    If you look at Tierney 12 -- Before I ask
11 you about Tierney 12, you testified earlier today that --
12 Actually you talked about Linda Stengle in exemplary
13 terms as being an exemplary hearing officer, and then you
14 said at some point, something changed.
15     A    Yes.
16     Q    Do you know when that point was? Do you
17 recall when that was, or can you pinpoint it?
18     A    It started to change in my estimation '04-'05
19 fiscal year. I was starting to hear comments from the
20 case managers about, oh, she's not responding as quickly
21 as she normally did. They would ask her about a decision
22 and wouldn't get a response. My relationship with her
23 changed, and I wasn't sure why. It was just a very
24 strange transitional time.
25     Q    Was there any sort of communication or

1  confrontation, if you will, between you and Ms. Stengle?
2      A    No. Somewhere in one of the e-mails I said
3  to her, you know, is there a problem, this isn't like
4  you, words to that effect, and got no response.
5      Q    Okay. Did Ms. Stengle ever come to you and
6  indicate that there was any kind of problem?
7      A    No.
8      Q    If you would look back at Tierney 12, you
9  scheduled a meeting with members of PDE and particularly
10 some of my defendants. Did you schedule that meeting so
11 you could figure out how to get rid of Linda Stengle?
12     A    No.
13     Q    Why did you schedule that meeting?
14     A    This was an informational meeting, because as
15 I said to you a minute or so ago, there was overlap. We
16 now had current -- we now had common issues, starting
17 with the LG versus Wissahickon and PDE lawsuits where
18 Ms. Stengle was involved with them, not as a party. Both
19 PDE and ODR, meaning IU13 were sued, so we were in
20 contact about that. I had to make sure that I had
21 impartial due process hearing officers, and I had two
22 hearing officers serving on a Gaskin Advisory Panel.
23          Then eventually, you know, our e-mails
24 didn't -- weren't as friendly as they once were for
25 reasons I wasn't clear about, as I told you a minute

1  ago. Our relationship seemed to change for reasons
2  unclear to me. And as I put in here -- And I don't know
3  what it references sitting here now, but I said, taking
4  shots at ODR through these e-mails.
5      Q    When was the Wissahickon case?
6      A    It was filed and then dismissed and then
7  refiled, so it was a span of years. Maybe '03-'04, I
8  mean. And it only just resolved recently because of some
9  lack of diligence on the part of plaintiff's counsel.
10     Q    It's been mentioned multiple times that
11 Ms. Stengle was involved with it, although not a party.
12 What was her involvement?
13     A    She was a hearing officer in the underlying
14 case and had had the case a couple of times, and the
15 parent objected to having her as the hearing officer. I
16 had mentioned earlier that the mother in that case
17 testified that she believed Ms. Stengle was not an
18 impartial hearing officer based upon her blog. And it
19 became a big issue with the parent complaining about
20 Ms. Stengle being the hearing officer.
21     Q    So I think you testified that you had
22 the Wissahickon case, you had the Gaskin involvement. At
23 the point that you -- In February 2006, February 15th,
24 2006, were you aware of the blog?
25     A    I think I was aware of it sometime in

1 February of 2006.
2 Q Tommasini 9. I'm trying to get a time line
3 in my head, and the e-mails jump around a bit.
4 Approximately when did you see a change in the
5 relationship? Around the time of the February 2006
6 e-mail?
7 A No. Much earlier.
8 Q Were there other things that occurred with
9 regard to Ms. Stengle that you thought were unusual?
10 A As I testified to earlier, I viewed
11 Ms. Stengle as -- Frankly, she was one of my favorites.
12 I liked her and respected her personally. I respected
13 her work. She was really good at communicating with the
14 case managers. You know, she wrote solid decisions. You
15 know, I knew that she had the reputation as being
16 biased. I was aware of that. But I believed that she
17 was a good hearing officer. And those things -- The one
18 thing that really jumps out in my mind was the number of
19 decisions that were late and what I described somewhere
20 in these documents as a laissez faire attitude which to
21 this day I cannot reconcile in my mind between the woman
22 who I believed to be a very strong advocate for children
23 with disabilities, and I do believe she cares deeply
24 about children with disabilities, and developing a
25 laissez faire attitude about her cases and timeliness

1 Why did you do that?
2 A Informational purposes. I obviously had
3 nothing to say about it, or I would have typed an e-mail.
4 Q In your position as director of ODR, did you
5 have the ability to renew contracts?
6 A Yes.
7 Q Did you have the ability to terminate
8 contracts?
9 A I had the sole ability to renew or terminate.
10 Q What do you mean by sole ability?
11 A There was no one else that had the unenviable
12 task of deciding whether or not to renew or terminate a
13 contract but me.
14 Q In your position as director --
15 A Yes.
16 Q -- did you ever have to not renew -- did you
17 ever not renew a contract before Ms. --
18 A Yes.
19 Q Who?
20 A Four educators/psychologists. Dennis Fair,
21 Carol Welch. I think her first name was Carol. Carol
22 Redfern, Andy Kline, and the two parent hearing officers
23 would be Dennis McAndrews and Ms. Stengle.
24 Q And with the nonrenewal of those contracts,
25 did you have discussion with anyone in PDE about the

1 issues.
2 Q Did you -- When this change in behavior
3 started, you said you sent an e-mail to her asking --
4 soliciting from her if there was a problem.
5 A Right.
6 Q Did you discuss it with anyone else?
7 A Whether or not there was a problem?
8 Q No, a change.
9 A Well, Dixie Rider and the case managers were
10 seeing it.
11 Q So there was a discussion with Dixie Rider as
12 the late decisions or change in her quality of her
13 decisions occurred?
14 A Sure.
15 Q What about with Ed Titterton?
16 A I'm sure we talked about it.
17 Q Did you have similar discussions with anyone
18 in PDE?
19 A No. The discussions were in-house.
20 Q In Tommasini 9 --
21 A Tommasini 9?
22 Q Yes, which is dated April 2006. You
23 forwarded Anne Hendricks' e-mail to Tommasini, Helling,
24 Tierney, and Titterton. You didn't put any message on
25 it. You just marked it confidential and forwarded it.

1 nonrenewal?
2 A The only nonrenewal that I talked about, and
3 it was after the fact, was Dennis McAndrews. And John
4 Tommasini, I ran into him somewhere, and he said, hey, I
5 understand that you didn't renew Dennis McAndrews'
6 contract. He's a very bright attorney, you know, and he
7 said very positive things about Mr. McAndrews. And I
8 said, I agree with you completely, very bright attorney.
9 I said, I don't think it's proper for a parent attorney
10 or a school district attorney to be a hearing officer.
11 And he said, well, I disagree with you and I think you've
12 made the wrong decision, but it's your wrong decision to
13 make.
14 Q Did you send a sort of FYI e-mail about them?
15 A Since this lawsuit was filed and all the
16 voluminous documents that we produced, I saw a letter
17 from Mr. McAndrews asking that I talk -- He asked me to
18 talk to the Department of Education about his capability
19 as a hearing officer, because he wanted to continue in
20 that capacity. That letter did not refresh my
21 recollection whether or not I did, in fact, talk to
22 them. But he did ask me that I do that.
23 Q Would him asking you have made a difference
24 in your decision?
25 A No.

| | | |
|---|---|---|
| 1 | Q | Was it a requirement that you talk to PDE? |
| 2 | A | No. He asked me to do that. |
| 3 | Q | He just asked you? |
| 4 | A | He asked me. |
| 5 | Q | If you look at Fullerton 77, 78, 79 -- |
| 6 | A | Okay. |
| 7 | Q | In Fullerton 78, again, you forwarded |
| 8 | Mr. Faust's e-mail to Tommasini, Helling, Tierney, and |
| 9 | Titterton. Why did you do that? |
| 10 | A | Purely informational purposes. |
| 11 | Q | Did you comment about anything in the |
| 12 | forwarded e-mail? |
| 13 | A | There's nothing in my e-mail. |
| 14 | Q | If you would look at Tierney 22. |
| 15 | A | Okay. |
| 16 | Q | This is the e-mail in which you say that |
| 17 | Ms. Stengle said that if ODR dumps her for being on the |
| 18 | Gaskin panel, she'll sue. |
| 19 | A | Correct. |
| 20 | Q | Why did you forward that particular e-mail to |
| 21 | Tommasini, Helling, Tierney, and Titterton? |
| 22 | A | Well, Mr. Tommasini had sent me and a list of |
| 23 | people an e-mail, Tierney 23. And what that last |
| 24 | sentence says is, I'm reviewing stats, and it's that time |
| 25 | of year I'm reviewing job performance. |

| | | |
|---|---|---|
| 1 | this that references Linda Stengle and her employment? |
| 2 | A | Not that I recall. Mr. -- With all due |
| 3 | respect, Mr. Tommasini could say what he wanted to say |
| 4 | here, but I knew that the decision fell to me alone. And |
| 5 | that is why I sought out legal counsel to assist me. |
| 6 | Q | So are you telling me that nothing that |
| 7 | Tommasini or any of the PDE defendants, for that matter, |
| 8 | nothing that they did or said would have had an effect on |
| 9 | the decision-making that you were going through whether |
| 10 | to renew or not? |
| 11 | A | Right, because I knew the decision was mine |
| 12 | and mine alone. And I would add that, you know, people |
| 13 | weren't knocking down my door telling me what to do in |
| 14 | this case. People were not getting involved. |
| 15 | Q | Can I direct you to Tierney 53. |
| 16 | A | Okay. |
| 17 | Q | Similar to the question I just asked you |
| 18 | about Mr. Tommasini, in Ms. Tierney's e-mail, she |
| 19 | references, I think we could successfully defend against |
| 20 | that and we simply refuse to renew. What effect did that |
| 21 | have on your decision-making? |
| 22 | A | It had no effect on my decision-making, which |
| 23 | is why I sought out legal counsel to assist me in the -- |
| 24 | this situation. |
| 25 | Q | Had you sought legal counsel prior to that? |

| | | |
|---|---|---|
| 1 | Q | There's been suggestion by Ms. Stengle - and |
| 2 | I don't know if you were in the room yesterday when she |
| 3 | made the suggestion - that -- and actually, it's the |
| 4 | foundation of the lawsuit, that PDE controls ODR. |
| 5 | A | Right. I'm aware that that is her position. |
| 6 | Q | What information would you have -- Would you |
| 7 | have any information about any level of control that PDE |
| 8 | has over ODR? |
| 9 | A | The relationship is one of fiscal. And |
| 10 | you're talking about pre-one-tier system? |
| 11 | Q | Yes. |
| 12 | A | Okay, pre-one-tier system. There are -- |
| 13 | There's a fiscal relationship between PDE and ODR, and I |
| 14 | provide a fiscal update to the bureau director every |
| 15 | quarter on how the money is being spent, what money is |
| 16 | left in the budget, that kind of thing. I will give them |
| 17 | highlights of activity. I may say, you know, we have |
| 18 | created a training on communications, you know, we did a |
| 19 | presentation, that kind of thing. But there's nothing -- |
| 20 | It's very skeletal. |
| 21 | Q | If you look at Tierney 23, Tommasini makes a |
| 22 | comment about I'm not sure how much longer we can ignore |
| 23 | her activities. You testified this morning that you |
| 24 | don't know what he meant. Were there any other e-mails |
| 25 | or conversations that you had with Tommasini other than |

| | | |
|---|---|---|
| 1 | A | No. But remember that the time frame, again, |
| 2 | this is when I was very ill, and that's about a week |
| 3 | before I was hospitalized. So I didn't really turn my |
| 4 | sights to this issue until I was feeling better, because |
| 5 | I was feeling horrible. |
| 6 | Q | What was the date of your illness, of the |
| 7 | hospitalization? |
| 8 | A | The OSEP visit was April 7th, I believe, and |
| 9 | I was hospitalized, so several days in that time frame. |
| 10 | Q | You had not talked to Mr. Frankhouser prior |
| 11 | to the April 5th e-mail? |
| 12 | A | No, again, because of my illness. My focus |
| 13 | was on getting better. |
| 14 | Q | Okay. When Abigail said, I think we could |
| 15 | successfully defend against that, what was your |
| 16 | understanding of her we? |
| 17 | A | I don't know why she said that. The contract |
| 18 | with the hearing officer was between the IU and ODR, |
| 19 | although ODR is not an entity, between the hearing |
| 20 | officer and IU13. That's where the relationship was |
| 21 | going to be and now IU13 sued for not renewing the |
| 22 | contract, so -- |
| 23 | Q | When she said, I think we could successfully |
| 24 | defend that, you just said it didn't have an effect on |
| 25 | any of your decisions. But could it have had an effect |

1  in your decision to pursue defending it and contacting
2  Mr. Frankhouser? You had not contacted him before that?
3       MS. O'DONNELL: I'm just going to put an
4  objection on the record, because this e-mail refers to
5  she will have to seek an injunction or mandamus requiring
6  us to renew. I think we could successfully defend
7  against that. And I'm not sure if you're asking the
8  witness whether she thought Abby Tierney was saying she
9  could successfully defend against this lawsuit or a
10 potential injunction or mandamus. I'm just not sure that
11 I understand your question.
12      MS. YERGER: I understand. And I'm not
13 trying to get into the actual subject matter. I'm trying
14 to get into Ms. Smith's motivation for why -- her
15 reaction to this e-mail and her motivation for contacting
16 Mr. Frankhouser. What motivated her to make the phone
17 call to Frankhouser?
18 BY MS. YERGER:
19      Q       Something must have triggered you to say, I
20 better seek counsel on this, and I don't know what that
21 is yet.
22      A       This was an issue that I had before me. But
23 because of health concerns, I wasn't able to attend to
24 it. When I got out of the hospital and started feeling
25 better, I resumed thinking about it. And actually, I was

1  walking my dog around the neighborhood thinking, you
2  know, how do I want to proceed here, and I thought, you
3  know, you're an attorney, you get legal advice. When
4  you're grappling with an issue, you get legal advice. So
5  I contacted Mr. Frankhouser.
6       Q       Did you seek out Helling or Fullerton or
7  Abigail Tierney for legal advice?
8       A       I did not.
9       Q       To the best of your knowledge, you never
10 replied to this e-mail?
11      A       Well, I don't recall. And because of the
12 time frame and the illness, it doesn't surprise me if I
13 hadn't, because that's two days or so before I was in the
14 ER.
15      Q       I want to talk about the defendants
16 individually. Abigail Tierney -- And I'm going to ask
17 you questions specific to information regarding -- that
18 you might have communicated to them regarding Linda
19 Stengle.
20          Abigail Tierney, there were a series of your
21 e-mails you were shown earlier today, and some of them we
22 already looked at, in which you cc'd Abigail Tierney.
23 Were there any other communications with Abigail Tierney
24 where the notion of not renewing Linda Stengle's contract
25 was discussed?

1       A       Not that I'm aware of.
2       Q       Were there telephone calls with Abigail
3  Tierney where you discussed not renewing?
4       A       I do not recall telephone calls.
5       Q       Did Abigail Tierney ever suggest to you to
6  not renew the contract?
7       A       She didn't, nor would she. Abby Tierney
8  never told me what to do. We had a professional
9  collegial relationship, but I think there was mutual
10 respect there. I didn't tell her what to do; she didn't
11 tell me what to do.
12      Q       How about Ernie Helling?
13      A       Same answer.
14      Q       How about Pat Fullerton?
15      A       I barely know her, so, you know, I can
16 probably count on one hand the times I've talked to her.
17      Q       In many of the e-mails in which you cc'd
18 Ernie Helling and Abigail Tierney, you didn't cc Pat
19 Fullerton. Do you know why that is?
20      A       I barely know her. The agreement when I left
21 was that I would copy Ernie or Abby. Pat Fullerton
22 wasn't even discussed.
23      Q       Were you aware that Pat Fullerton was working
24 with the Gaskin panel?
25      A       I was aware of that.

1       Q       How about John Tommasini; did he ever tell
2  you that you should not renew Linda Stengle's contract?
3       A       No.
4       Q       Did you have any conversations with him other
5  than the cc'ing on the e-mail that you're aware of?
6       A       No.
7       Q       You never had any telephone calls with John
8  Tommasini?
9       A       He's impossible to get on the phone.
10      Q       Yeah, I know. How about Linda Rhen?
11      A       No.
12      Q       There were a couple e-mails that were
13 referenced earlier where you forwarded e-mails to Linda
14 Rhen with regard to the nonrenewal letter. Did you have
15 any communication with her other than the e-mails?
16      A       She may have called me to say that the Gaskin
17 Advisory Panel paragraph shouldn't be a factor in my
18 decision. They didn't consider it to be a factor and I
19 shouldn't consider that. I then contacted
20 Mr. Frankhouser. And as I testified earlier, I had been
21 uncomfortable about his advice to include that in the
22 first place, and I asked him, you know, if we removed
23 this, does that change your legal analysis, and he said
24 no.
25      Q       Castelbuono, did you have any conversation

1  with her?
2      A    I wouldn't recognize her if she walked past
3  me. Never spoken to her. Never met her.
4      Q    So you had no conversation with her regarding
5  Linda Stengle?
6      A    No.
7      Q    How about e-mails?
8      A    No.
9      Q    How about telephone calls?
10     A    With Castelbuono?
11     Q    Yes.
12     A    No. Never spoken to her. Never met her.
13     Q    The issue of ages 3 to 5 in the Gaskin
14  settlement -- Let me be a little bit more specific with
15  my question. The issue of what ages were included came
16  up in Ms. Stengle's blog. What is the position of ODR or
17  your position about whether ages 3 to 5 should be
18  included in the -- in the class action, or not the class
19  action, but in the class? Should it be 3 to 5 or should
20  it be 3 to 21 or 5 to 21?
21     A    I have no position. I wasn't involved in the
22  Gaskin case. I looked through discovery and I saw that
23  Ms. Stengle says 3 to 21 and Dr. Rhen says 5 to 21. I
24  have never pursued it to determine which is correct.
25     Q    Okay. And would that be in the parameters of

1  your position?
2      A    I don't believe so.
3      Q    Are other hearing officers writing decisions
4  regarding that issue?
5      A    No. We have virtually no -- We have very,
6  very few 3-to-5-year-old cases.
7      Q    Okay.
8      A    I'm not aware of that as an issue.
9      Q    You don't know if any other hearing officers
10  took the position?
11     A    No, I don't know. I don't believe they did,
12  but I'm not aware of anything.
13     Q    Bear with me. I just want to make sure
14  there's nothing -- I think I already asked you this.
15  When did you become aware of her blog?
16     A    I believe it was February of '06.
17     Q    When did the issue happen with regard to the
18  Wolpert-Gran recusal order?
19     A    I believe it was April, May.
20     Q    Of '06?
21     A    Of '06.
22         MS. YERGER: I think that's all I have.
23  BY MS. BARNETT:
24     Q    Did you appoint any new independent
25  contractor hearing officers as of July 1st, 2006?

1      A    I don't have the dates of appointment
2  memorized. I did hire hearing officers. Joe Merhaut,
3  Rosemary Mullaly, Marci Romberger, Peg Drayden, a woman
4  named Vicki Pataski, who never actually started working.
5  She found another job. Lynda Cook, L-y-n-d-a. I don't
6  remember the time frames. But they're in the discovery
7  somewhere.
8      Q    Do you agree that Mrs. Stengle's blog did not
9  exist at the time she presided over the LG EG Wissahickon
10  hearing?
11     A    That's correct. But by the time we were
12  litigating LG, the mother had read the blog and testified
13  that she didn't believe Ms. Stengle could be impartial.
14     Q    Was one of the issues in the LG EG
15  Wissahickon case how Linda Stengle came to be appointed
16  the hearing officer?
17     A    Correct.
18     Q    Was she appointed by ODR?
19     A    Well, she accepted an assignment and became
20  the hearing officer.
21     Q    Was it your position that she did anything
22  inappropriate in accepting that assignment?
23     A    No. And we made it very clear in the
24  litigation that we were not saying Ms. Stengle had done
25  anything wrong in accepting the case. We made it very

1  clear that administratively it should not have been
2  assigned to her.
3      Q    Has that lawsuit been settled?
4      A    It settled for a nuisance value. But because
5  it was a minor settlement, it was before the judge for a
6  long time. I think it's gone through. But there was a
7  long, long delay. The plaintiff's counsel didn't do
8  something he was supposed to do.
9      Q    I'd like you to look at Smith 20 briefly. It
10  begins at Smith 17. Do you agree that answer 7 in the
11  first paragraph states in part, until 2006, Ms. Smith did
12  not have concerns about Stengle's job performance?
13     A    It says that. But my testimony is that
14  fiscal year 2005-2006, we started seeing problems.
15     Q    You told Attorney Yerger about some
16  conversations with Attorney Frankhouser. What other
17  conversations did you have with Attorney Frankhouser?
18     A    Regarding this issue?
19     Q    Yes.
20     A    Well, I met with him, and then we had phone
21  calls back and forth.
22     Q    What did you discuss during the phone calls?
23     A    We discussed the issue of the blog. We
24  discussed the issue of other performance matters. We
25  discussed First Amendment issues. We discussed the

1 interplay between First Amendment issues and serving as
2 an impartial due process hearing officer.
3    Q    Tell me everything you recall about the
4 discussion concerning the blog.
5    A    It was very clear that Mr. Frankhouser
6 believed that she was advocating on the blog.
7    Q    What was the factual basis for his
8 conclusion?
9    A    Well, the blog is filled with references to
10 her advocacy for children with disabilities on issues of
11 LRE and inclusion. It was throughout.
12    Q    Are you telling me why you think Mrs. Stengle
13 was advocating or why Mr. Frankhouser thought she was
14 advocating?
15    A    We both agreed.
16    Q    Do you recall any other part of the
17 discussion of her blog?
18    A    Well, at some point during the course of our
19 back-and-forth discussion, Mr. Frankhouser said something
20 to me that stuck in my mind like a tape recorder, and
21 what he said was, no judge will condone what she is
22 doing.
23    Q    Tell me everything you recall that you
24 discussed with Mr. Frankhouser that in your mind falls
25 within a category of other performance issues.

1    A    Well, Cindy Judy gathered up documents in
2 that cover letter dated, I think, May 16th, around that
3 time frame. He asked for everything that we could gather
4 up for him to review. We did that. I already had
5 concerns about some late decisions. He saw the order
6 from Ms. Stengle and discussed with me the intemperate
7 language issue. We talked about any procedural due
8 process rights she would have as far as whether she would
9 request a meeting before the board.
10    Q    Did you have concerns about Mrs. Stengle's
11 language until Mr. Frankhouser called it intemperate?
12    A    Yes. I didn't use that term.
13    Q    What term did you use?
14    A    I can't tell you what term I used. But he
15 used that term as a legal term or a term of art. I
16 thought it was inappropriate, and that was probably the
17 term that I used, for the reasons I previously testified
18 to.
19    Q    Tell me everything you recall about the First
20 Amendment discussions you had with Mr. Frankhouser.
21    A    Well, we discussed the issue of, you know,
22 obviously, we all have First Amendment rights, and the
23 interplay between First Amendment rights and serving as
24 an impartial due process hearing officer as working for a
25 public entity or contracting with a public entity such as

1 IU13, and we reached the conclusion that Ms. Stengle
2 could not advocate on LRE issues while serving as an
3 impartial due process hearing officer, hearing these very
4 issues that she was advocating about.
5    Q    Did he conclude that she violated any
6 regulations as she was -- violated regulations on
7 impartiality?
8    A    I don't know if we had the discussion in
9 those terms as far as the regulations go. But yes, we
10 believed that that was inconsistent with impartiality as
11 required by IDEA.
12    Q    Does IDEA have regulations regarding
13 impartiality?
14    A    Yes.
15    Q    Did he express the opinion that she violated
16 those regulations?
17    A    I already answered that question.
18    Q    The answer is no?
19        MS. O'DONNELL: Object to the form. Jana,
20 it's been asked and answered. If you don't understand
21 her answer, you can ask for clarification. I realize
22 we're all getting tired, but you're asking the same
23 questions over more than once.
24 BY MS. BARNETT:
25    Q    Did Mr. Frankhouser express the opinion that

1 Mrs. Stengle violated the regulations setting forth
2 standards for assessing impartiality?
3        MS. O'DONNELL: I'm going to object to the
4 form to the extent it's been asked and answered.
5        Clearly Ms. Barnett does not understand your
6 answer. Is there some more succinct way you could --
7        MS. BARNETT: Could she answer yes or no?
8        MS. O'DONNELL: It's not a yes-or-no answer.
9        THE WITNESS: I'm taking your question very
10 literally. And was the word regulation spoken? I don't
11 know. Did we understand that impartiality is in the
12 regulations? Yes, we both understood that.
13 BY MS. BARNETT:
14    Q    Did you provide Mr. Frankhouser with
15 information about how you treated other hearing officers
16 who had issued late decisions?
17    A    I don't recall.
18    Q    Do your transmittal letters accurately
19 reflect all of the documents that you provided
20 Mr. Frankhouser?
21    A    I believe so. I know we also gave him the
22 link to the blog. But that might have been oral. We
23 also gave him a contract. I believe I took that to the
24 first meeting.
25    Q    How many meetings did you have with

| | |
|---|---|
| 1 | Mr. Frankhouser? |
| 2 | A One. |
| 3 | Q Did Mr. Frankhouser express any opinions in |
| 4 | writing? |
| 5 | A There was a memo about procedural safeguards |
| 6 | as far as whether or not there would be a hearing in |
| 7 | front of a board. I don't remember if that was authored |
| 8 | by him or an associate or law clerk. |
| 9 | Q Did he express a written opinion on the First |
| 10 | Amendment issues? |
| 11 | A No. Our communications were oral. |
| 12 | Q Did he express a written opinion on the |
| 13 | impartiality issues? |
| 14 | A No. Our communications were oral. |
| 15 | Q Did he express a written opinion on the |
| 16 | so-called other performance issues? |
| 17 | A No. Our communications were oral. |
| 18 | Q Before Mr. Frankhouser prepared the draft |
| 19 | letter of nonrenewal which cited as one basis for |
| 20 | nonrenewing Mrs. Stengle's service on the Gaskin Advisory |
| 21 | Panel, had you informed him that another hearing officer |
| 22 | also was on the Gaskin Advisory Panel? |
| 23 | A I did. |
| 24 | Q Did he recommend that Peg Drayden's contract |
| 25 | not be renewed because she was on the Gaskin Advisory |

| | |
|---|---|
| 1 | this action was being taken by ODR. |
| 2 | Q Before you and he discussed letting PDE know, |
| 3 | had you informed Linda Rhen, John Tommasini, Ernie |
| 4 | Helling, and/or Abigail Tierney that you were considering |
| 5 | nonrenewing Linda Stengle's contract? |
| 6 | A I don't believe I ever told them that. |
| 7 | Q Did you take notes during any of your |
| 8 | conversations with Mr. Frankhouser? |
| 9 | A No. |
| 10 | Q Did you prepare any writing reflecting your |
| 11 | conversations with Mr. Frankhouser? |
| 12 | A Not that I recall. |
| 13 | Q Did you discuss Mr. Frankhouser's advice with |
| 14 | any person? |
| 15 | A No. |
| 16 | MS. BARNETT: I have no further questions. |
| 17 | Thank you. |
| 18 | MR. RUSSELL: I have a couple, if I may. |
| 19 | MS. O'DONNELL: Sarah, do you have anything? |
| 20 | MS. YERGER: No. |
| 21 | MR. RUSSELL: I'd like to follow up a little |
| 22 | bit on the line of questions you were just asked by |
| 23 | Ms. Barnett. |
| 24 | BY MR. RUSSELL: |
| 25 | Q In your going forward with this matter, I |

| | |
|---|---|
| 1 | Panel? |
| 2 | A He did not. That was not an issue before |
| 3 | him. |
| 4 | Q Did he believe that service on the Gaskin |
| 5 | Advisory Panel alone was sufficient to not -- to justify |
| 6 | the nonrenewal of the hearing officer's contract? |
| 7 | A Well, I know he testified in his deposition |
| 8 | that he believed it was a valid basis to include in the |
| 9 | letter. But I don't remember if we had a discussion as |
| 10 | to whether or not that was -- that could be a sole |
| 11 | issue. Was that your question? |
| 12 | Q Yes. Did he recommend that you not renew the |
| 13 | contract of Peg Drayden? |
| 14 | A No. That was not an issue that we -- No. |
| 15 | Q Can you estimate how many conversations you |
| 16 | had with Mr. Frankhouser concerning Linda Stengle, above |
| 17 | and beyond the meeting that you described? |
| 18 | A This is an estimation. Five, six, seven |
| 19 | calls back and forth. |
| 20 | Q How many different draft nonrenewal letters |
| 21 | did he prepare for you? |
| 22 | A One. I recall there was something else that |
| 23 | we talked about. You asked me to recount all of those |
| 24 | things that I remember talking to him about. I talked to |
| 25 | him about letting the Department of Education know that |

| | |
|---|---|
| 1 | believe you mentioned you were uneasy or hesitant or |
| 2 | maybe even afraid to go through with this decision not to |
| 3 | renew Mrs. Stengle. Is that a fair assessment? |
| 4 | A That's a fair assessment. |
| 5 | Q Was this because of the advice that you had |
| 6 | been given by Mr. Frankhouser, or is this because of the |
| 7 | political threat of the Stengles, as you've mentioned, or |
| 8 | some other reason or all of those reasons? |
| 9 | A I knew in my gut that I would be sued for not |
| 10 | renewing Ms. Stengle's contract. She didn't need to make |
| 11 | that statement to anybody for me to know that I was going |
| 12 | to be sued. I was also concerned about the political |
| 13 | fallout of the situation, as I've testified repeatedly. |
| 14 | I knew that they would bring political pressure to bear |
| 15 | on this situation. |
| 16 | Q Did Mr. Frankhouser's legal advice which he |
| 17 | discussed with you come to any conclusion or lack of |
| 18 | conclusion, if you will, on the issues that were involved |
| 19 | in the nonrenewal of Ms. Stengle that were mentioned in |
| 20 | the letter of June 2nd, 2006? |
| 21 | A I don't understand your question, Steve. |
| 22 | Q Did Mr. Frankhouser give you a clear legal |
| 23 | opinion as to whether the issue involving the nonrenewal |
| 24 | of -- Let me withdraw the question. |
| 25 | Was his advice to you conclusive or |

1  inconclusive on the issues involved in the letter which
2  you ultimately sent to Ms. Stengle?
3  A    Conclusive.
4  Q    And when you sent this letter to Ms. Stengle,
5  were you relying on the advice he had given you?
6  A    Yes.
7  Q    Did any one of the reasons set forth in this
8  letter of June 2006, were any one of the reasons alone
9  enough in your opinion to not renew Ms. Stengle?
10  A    The blog.
11  Q    That in and of itself was enough?
12  A    I believe so, yes.
13  Q    What about the other two?
14  A    The intemperate language standing alone, is
15. that your question?
16  Q    Yes.
17  A    No. The timeliness issue is a little more
18  troublesome to me. I've thought about this a lot. There
19  are other hearing officers who have had problems with
20  timeliness, and when we have a discussion about it, they
21  tell me that there was, you know, a health problem or a
22  family emergency or whatever. In Ms. Stengle's case, she
23  was telling me -- making comments to me to the effect of,
24  well, I didn't know that needed to be timely, I didn't
25  know a federal court remand needed to be handled timely.

1  I didn't believe her because she's a very bright person.
2  But that raised some issue in my mind as to whether or
3  not timeliness could be resolved. But I can't say
4  definitively that it couldn't have been standing alone.
5  Q    Ms. Stengle's membership on the Gaskin panel
6  was not a reason for her nonrenewal; is that correct?
7  A    It was not a reason for her nonrenewal.
8       MR. RUSSELL: I have no more questions.
9       MS. O'DONNELL: I don't have any questions.
10      MS. YERGER: I have no more.
11      MS. BARNETT: Thank you very much.
12      (Whereupon, at 4:41 p.m. the deposition was
13      concluded.)
14
15
16
17
18
19
20
21
22
23
24
25

1                    CERTIFICATE
2       I have read my deposition, and it is true and
3  correct to the best of my knowledge and belief, except
4  for any corrections listed on the enclosed Errata Sheet.
5
6
7
                   KERRY VOSS SMITH
8
9
10
   Witness
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1                    CERTIFICATE
2       I, Roxanne Weaver, the officer before whom
3  the deposition of KERRY VOSS SMITH was taken, do hereby
4  certify that KERRY VOSS SMITH, the witness whose
5  testimony appears in the foregoing deposition, was duly
6  sworn by me on Wednesday, September 3, 2008, and that the
7  transcribed deposition of said witness is a true record
8  of the testimony given by her; that the proceedings here
9  are recorded fully and accurately; that I am neither
10  attorney nor counsel for, nor related to, any of the
11  parties to the action in which this deposition was taken;
12  and further that I am not a relative of any attorney or
13  counsel employed by the parties, nor financially
14  interested in this action.
15
16
17
        Roxanne Weaver, RPR, CRR
18
        COMPUTERIZED REPORTING SERVICES, INC.
19
        Notary Public in and for the
20      Commonwealth of Pennsylvania
21      My Commission expires August 9, 2011.
22
23
24
25

*Stengle v. Office for Dispute Resolution, et al.*
No. 4:CV-06-1913

# EXHIBIT J

## Fullerton, M. Patricia

**From:** Rhen, Linda

**Sent:** Monday, November 21, 2005 8:26 AM

**To:** Fullerton, M. Patricia

**Subject:** RE: FW: Advisory Panel

Fullerton 0093

I understand - thought about stayingoutof it totally, but we will be questioned on this issue by someone, I am sure, and we should feel comfortable that all panel members meet the standard of hte settlement agreement.

-----Original Message-----
**From:** Fullerton, M. Patricia
**Sent:** Monday, November 21, 2005 8:25 AM
**To:** Rhen, Linda
**Cc:** Jeannine Brinkley (E-mail)
**Subject:** RE: FW: Advisory Panel

Fullerton 0094

Linda,

Let me think about how we want to handle this. I don't want us to be perceived as interfering.

Pat

-----Original Message-----
**From:** Rhen, Linda
**Sent:** Monday, November 21, 2005 8:23 AM
**To:** 'Brinkley, Jeannine'; Rhen, Linda
**Cc:** Fullerton, M. Patricia
**Subject:** RE: FW: Advisory Panel

Fullerton 0095

You read my mind on the hearing officer issue,
can you schedule mtg or telephone conference for you, Pat, Kerry and myself
thanks

-----Original Message-----
**From:** Brinkley, Jeannine [mailto:jeannine.brinkley@aiu3.net]
**Sent:** Sunday, November 20, 2005 10:42 PM
**To:** Rhen, Linda
**Cc:** Pat Fullerton
**Subject:** RE: FW: Advisory Panel

Fullerton 0096

Apparently, they didn't let all the people on this list know that their names were being submitted...Tim Knoster didn'tknow.... Do we need to have a conversation with Kerry Smith related to Hearing Officers serving on this advisry panel?

-----Original Message-----
From: Rhen, Linda [mailto:lrhen@state.pa.us]
Sent: Fri Nov 18 17:26:21 2005
To: Fullerton, M. Patricia; Brinkley, Jeannine
Subject: FW: Advisory Panel

Fullerton 0097

Here we go
-----Original Message-----
From: Judygran@aol.com [mailto:Judygran@aol.com]
Sent: Friday, November 18, 2005 5:09 PM
To: gmosley@attorneygeneral.gov; mfullerton@state.pa.us; lrhen@state.pa.us
Cc: bransom@pilcop.com; YMHusic@aol.com; pdrumheiser@epix.net
Subject: Advisory Panel

Fullerton 0098

Dear Gwen, Pat and Linda,

Below you will find the plaintiffs' list of twelve members for the Advisory Panel. The list includes nine parents of children with disabilities who are not employed by PDE nor any school district or other local education agency. It also includes three university professors with recognized expertise in research and practice, as well as several parents who themselves have a background in the field of special education, and a parent whose career is in university-based medical research.

The list is geographically and culturally quite diverse. It includes representatives of the Northwestern, Southwestern, North Central, South Central, Northeastern and Southeastern regions of the state, as well as the two major cities of Philadelphia and Pittsburgh. The continuum from urban to rural communities is well represented. Two of the panelists (16.7%) are from counties classified as "rural," compared to the 16% of Pennsylvania's population that lives in such counties overall. Two of the panelists are African-American; one is Latino (comparative figures for Pennsylvania's population are 10% and 3.2% respectively). The parents include parents of children with a wide range of disabilities, including specific learning disabilities, retardation, physical disabilities, neurological disabilities, behavioral disabilities and autism. Many of the parents have abundant experience advocating for other parents and for children of all disabilities.

If you have any questions, please let me know.

Sincerely,

Judith Gran

Plaintiffs' nominees to the Advisory Panel:

1. Joseph Gaskin, Carlisle, Cumberland County, South Central PA, parent of a daughter with Down Syndrome; extensive volunteer advocacy experience.

2. Michelle McCollin, Slippery Rock, Butler County, Western PA, assistant professor of Special Education and student advisor at Slippery Rock University.

3. Nicole Turman, Windber, Somerset County, Southwestern PA, parent of a son with Cornelia de Lange Syndrome, Senior Advocate for Parents United for Making Progress Together (PUMPT); works with Rural Coalition of Advocates.

4. Emilio Pacheco, Philadelphia, parent of a son with developmental disabilities, advocate at Vision for Equality, Inc.

5. Sallie Lynagh, Orwigsburg, Schuylkill County, Central PA, parent of a son with autism, senior advocate for the Children's Project of Pennsylvania Protection and Advocacy, Inc., extensive experience advocating for children with behavioral and learning needs.

6. Tim Knoster, Lewisburg, Union County, North Central PA, assistant professor in Exceptionality Programs at Bloomsburg University; formerly Director of the Statewide Support Initiative for the Instructional Support System of Pennsylvania (ISSP, the predecessor of PaTTAN) and Program Director of the Interagency Support Project for the ISSP.

7. Gail Walker, Pittsfield, Warren County, Northwestern PA, parent of a son with cortical blindness and acquired brain injury, director of the Mentor Parent Program, a program of support and advocacy for rural parents of children with all disabilities in Northwestern and Western Pennsylvania.

8. Linda Stengle, Boyertown, Berks County, Southeastern PA, parent of a son with Specific Learning Disability and Sensory Integration Dysfunction; Special Education Due Process Hearing Officer.

9. Nancy Wintering, Philadelphia, PA, parent of a son with Pervasive Developmental Disability-Not Otherwise Specified and giftedness. Significant experience in scientific and medical research.

10. Paulette Hunter, Allentown (Northeastern PA), parent of a son with autism.

11. Margaret Drayden, Pittsburgh, parent of a son with dyslexia and ADHD and a daughter with retardation, cerebral palsy and epilepsy; Special Education Due Process Hearing Officer.

Fullerton 0099

12. Diane Bryen, Philadelphia, professor at Temple University and director of University Center for Excellence in Developmental Disabilities, founder of the Pennsylvania Institute on Assistive Technology and the Augmentative Communication and Empowerment Supports program.

Play Games for FREE - **Click Here**

Fullerton 0100

*Stengle v. Office for Dispute Resolution, et al.*
**No. 4:CV-06-1913**

# EXHIBIT K

**Rhen, Linda**

| | |
|---|---|
| **From:** | Smith, Kerry [ksmith@pattan.net] |
| **Sent:** | Tuesday, November 22, 2005 9:32 AM |
| **To:** | Rhen, Linda |
| **Subject:** | RE: Gaskin |

Will call you right now

-----Original Message-----
From: Rhen, Linda [mailto:lrhen@state.pa.us]
Sent: Tuesday, November 22, 2005 9:31 AM
To: Smith, Kerry
Subject: Re: Gaskin

Kerry
Can you call me
--------------------------
Dr. Linda Rhen
Director of Special Education
Pennsylvania Department of Education

Sent from my BlackBerry Wireless Handheld

-----Original Message-----
From: Smith, Kerry <ksmith@pattan.net>
To: Rhen, Linda <lrhen@state.pa.us>; mfullerton@state.pa.us <mfullerton@state.pa.us>
Sent: Tue Nov 22 09:26:07 2005
Subject: FW: Gaskin

I am concerned about this..... See below.

From: LStengle@aol.com [mailto:LStengle@aol.com]
Sent: Monday, November 21, 2005 5:35 PM
To: Smith, Kerry
Cc: egtiii@ucwphilly.rr.com
Subject: Gaskin

Kerry, I have been selected by the plaintiffs to serve as one of 12 representatives to
advise Linda Rhen regarding the implementation of the Gaskin settlement agreement. It
looks very exciting, and I am looking forward to it. Just wanted to let you know.

Linda J. Stengle