IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

LISA J. STENGLE,              :      Civil No.: 06-1913
                              :
         Plaintiff,           :
                              :
    v.                        :
                              :
OFFICE OF DISPUTE             :
RESOLUTION, et al,            :      Judge John E. Jones III
                              :
         Defendants.          :

**MEMORANDUM**

**April 27, 2009**

**THE BACKGROUND OF THIS MEMORANDUM IS AS FOLLOWS:**

Pending before this Court are two Motions for Summary Judgment. (Rec.

Docs. 88, 90). For the reasons that follow, the Motions will be granted.

**<u>PROCEDURAL HISTORY</u>**

On September 27, 2006, Plaintiff Linda Stengle ("Plaintiff" or "Stengle")

initiated the instant action by filing her first Complaint. (Rec. Doc. 1). On October

31, 2006, prior to any responsive pleadings, Plaintiff filed an Amended Complaint.

(Rec. Doc. 12). On March 21, 2007, we issued a Memorandum and Order (Rec.

Doc. 30) granting in part and denying in part a Motion to Dismiss the Amended

Complaint (Rec. Doc. 21) that had been filed by two Defendants to this action, the

Pennsylvania Department of Education ("PDE") and Linda O. Rhen ("Rhen").[1]

On July 13, 2007, this Court granted Plaintiff leave to file a Second Amended Complaint. (Rec. Doc. 41). Plaintiff's Second Amended Complaint named six (6) additional Defendants.[2] On October 10, 2008, a Motion for Summary Judgments was filed by Defendants PDE, Helling, Castlebuono, Fullerton, Tierney, Tommasini, and Rhen (two or more referred to collectively as "PDE Defendants"). (Rec. Doc. 88) (the "PDE Motion"). On the same day, a Motion for Summary Judgment was filed on behalf of Defendants ODR, LLIU, and Smith (two or more referred to collectively as "ODR Defendants"). (Rec. Doc. 90) (the "ODR Motion"). Having been fully briefed, these Motions are ripe for disposition.

---

[1] In addition to PDE and Rhen, Kerry Voss Smith ("Smith") and the Office for Dispute Resolution ("ODR") were also named as a Defendants in Plaintiff's original Complaint.

[2] The additional Defendants named in the Second Amended Complaint are: Abigail Tierney ("Tierney"), John Tommasini ("Tommasini"), Diane Castlebuono ("Castlebuono"), Ernest Helling ("Helling"), Patricia Fullerton ("Fullerton"), and Lancaster-Lebanon Intermediate Unit 13 ("LLIU").

The Second Amended Complaint contains the following counts and allegations: (I) violations of the First and Fourteenth Amendments pursuant to 42 U.S.C. § 1983 ("§ 1983"), asserted against ODR; (II) violations of the First and Fourteenth Amendments pursuant to § 1983, asserted against Smith in her individual capacity; (III) conspiracy to violate First and Fourteenth Amendment rights pursuant to § 1983, asserted against Smith, Tierney, Tommasini, Castlebuono, Helling, Fullerton, and Rhen; (IV) violations of § 504 of the Rehabilitation Act of 1973, asserted against ODR, PDE, LLIU, Smith, and Rhen; (V) violation of Pennsylvania's Whistleblower Law, 43 Pa. C.S. §§ 1422-1428, asserted against ODR and Smith; and (VI) violations of the First and Fourteenth Amendments pursuant to § 1983, asserted against LLIU.

**STANDARD OF REVIEW:**

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Turner v. Schering-Plough Corp., 901 F.2d 335, 340 (3d Cir. 1990). The party moving for summary judgment bears the burden of showing "there is no genuine issue for trial." Young v. Quinlan, 960 F.2d 351, 357 (3d Cir. 1992). Summary judgment should not be granted when there is a disagreement about the facts or the proper inferences that a fact finder could draw from them. See Peterson v. Lehigh Valley Dist. Council, 676 F.2d 81, 84 (3d Cir. 1982).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. See Celotex Corporation v. Catrett, 477 U.S. 317, 323 (1986). This may be met by the moving party pointing out to the court that there is an absence of evidence to support an essential element as to which the non-moving party will bear the burden of proof at trial. See id. at 325.

Rule 56 provides that, where such a motion is made and properly supported, the non-moving party must then show by affidavits, pleadings, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue for trial. See Fed. R. Civ. P. 56(e). The United States Supreme Court has commented that this requirement is tantamount to the non-moving party making a sufficient

showing as to the essential elements of their case that a reasonable jury could find in its favor.  See Celotex, 477 U.S. at 322-23 (1986).

It is important to note that "the non-moving party cannot rely upon conclusory allegations in its pleadings or in memoranda and briefs to establish a genuine issue of material fact."  Pastore v. Bell Tel. Co. of Pa., 24 F.3d 508, 511 (3d Cir. 1994) (citation omitted).  However, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992) (citations omitted).

Still, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). "As to materiality, the substantive law will identify which facts are material."  Id. at 248.  A dispute is considered to be genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving  party."  Id.

**STATEMENT OF MATERIAL FACTS:**

As required by the aforesaid standard of review, our factual recitation herein

is based upon our viewing of the evidence, and drawing of all inferences in the light most favorable to the non-moving party, the Plaintiff.

At all times relevant to the instant action, Plaintiff Stengle was an independent contractor who entered into consecutive yearly contracts[3] to be an ODR special education due process hearing officer with either the LLIU 13 or LLIU 16. (See Rec. Doc. 89 ¶ 9; Rec. Doc. 91 ¶ 7).[4] The ODR is an office and program that is tasked with coordinating and managing the statewide special education dispute resolution system. (See Rec. Doc. 89 ¶ 15; Rec. Doc. 91 ¶ 3).[5] At the time in question, Defendant Smith was the Director of the ODR. Id. 4:19-

---

[3] These contracts ran from approximately July 1, 1998 through June 30, 2006. (Rec. Doc. 89 ¶ 9). The final contract contained a term of July 1, 2005 through June 20, 2006 with Intermediate Unit 13. (Id. ¶ 10). The contract stipulated that continuation thereof was contingent upon Stengle's reappointment as a hearing officer, which was contingent upon the satisfactory performance of all hearing officer duties, as determined by the ODR Director. (Rec. Doc. 91 ¶ 7). Pursuant to that contract, Plaintiff's responsibilities included, inter alia, maintaining impartiality. (Rec. Doc. 89 ¶ 9).

[4] LLIU 13 managed several programs, one of which was ODR. (Rec. Doc. 91 ¶ 2). LLIU 13, as the fiscal agent of ODR, approved the contracting of hearing officers in general, not specific hearing officers in particular. (Id. ¶ 5). The Board of LLIU 13 had no involvement in determining which hearing officers were or were not offered contracts and is never provided the names of those individuals. (Id.).

[5] Since the ODR is a program of the LLIU 13, employees of the ODR are employees of LLIU 13. Smith Dep. 6:4-5, September 3, 2008. LLIU 13, through a contract with PDE, assumed the responsibility for implementing a due process system for special education litigation and for coordinating and managing statewide special education dispute resolution. (See Rec. Doc. 91 ¶ 4).

21.[6]

Although the ODR and PDE are separate entities, they have a fiscal

relationship; namely, a subunit of the latter, known as the "Bureau of Special

Education," is responsible for ensuring that the Pennsylvania Training and

Technical Assistance Network, of which ODR is a part, has the necessary funding

to complete its programs. (Rec. Doc. 89 ¶ 18).[7]   However, the PDE has no further

oversight into ODR. (Id.).  At all relevant times, Defendants Rhen, Tierney,

Tommasini, Castlebuono, Helling, and Fullerton were employees of PDE.[8]

In or about October or November 2005, Plaintiff was appointed to the

Gaskin Advisory Panel (the "Gaskin Panel" or "Panel").[9] (Rec. Doc. 89 ¶ 21).

---

[6] In this capacity, Smith's duties included, inter alia: administering the process, timeliness, competence, and attendance of hearing officers and evaluating the performance of hearing officers and determining whether to renew their contracts. See generally, Smith Dep. 45-46, 123-125.

[7] Although ODR operates through money coming from PDE and PDE must account for how that money is utilized, no one at ODR reports to anyone at the PDE and the PDE does not give assignments to anyone at the ODR. Smith Dep. 124:23-25, 125:1-11.

[8] Rhen was the Director of the Bureau of Special Education for the PDE. Rhen Dep. 5:21-25.  Tierney was Assistant Council with the PDE. Tierney Dep. 5:1-2, May 7, 2008.  Tommasini was the Assistant Director of the Bureau of Special Education. Tommasini Dep. 5:1-2. Castlebuono was the Deputy Secretary for Elementary and Secondary Education at the PDE. Castlebuono Dep. 26:15-19. Helling was acting Chief Counsel of the PDE. Helling Dep. 6:5-9. Fullerton was the Assistant Chief Counsel with the PDE. Fullerton Dep. 5:1-4

[9] Gaskin v. Commonwealth, 389 F. Supp 2d. 628 (E.D. Pa. 2005), was a class action lawsuit filed in the Eastern District of Pennsylvania, which alleged that PDE failed to enforce compliance with the least restrictive environment aspects of the Individuals with Disabilities Education Act, the Rehabilitation Act of 1973, and the Americans with Disabilities Act. (Rec. Doc. 12, ¶ 32).  The parties in Gaskin ultimately reached a settlement agreement, and the Gaskin

Plaintiff was one of two hearing officers appointed to the Panel,[10] which was meant to work with PDE, and specifically the Bureau of Special Education, to implement the Gaskin Settlement Agreement (the "Gaskin Agreement"). (Id. ¶ 22). The first Gaskin Panel meeting was held in mid-December 2006 and was attended by, inter alia, Plaintiff, Defendants Rhen and Fullerton, and two LLIU members. (Id. ¶ 32); Stengle Dep. 160:13-14. At this meeting, Plaintiff expressed her belief that the Gaskin Agreement should be fully implemented, pointed out perceived deficiencies in previous attempts to do so, and expressed concerns about the meeting process

---

Panel was created at the direction of the District Court to implement that agreement, which required all Pennsylvania school districts to "mainstream" their special education students into a least restrictive environment classroom and increase the capacity of school districts to include students with disabilities in regular education classrooms. (Rec. Doc. 89 ¶ 20). It is of note that because Plaintiff had a child who was eligible for special education services, Plaintiff was a class member in the Gaskin litigation. (Rec. Doc. 12, ¶ 33).

[10] The prospect of hearing officers serving on the Gaskin Panel raised concerns among members of the PDE. These misgivings were first articulated in an email conversation involving Jeanie Brinkley, the administrative person assigned to help with the Gaskin Panel, and Defendants Rhen and Fullerton. Rhen stated to Fullerton, "[T]hought about staying out of it totally, but we will be questioned on this issue by someone, I am sure, and we should feel comfortable that all panel members meet the standard of the settlement agreement." (See Rec. Doc. 89 Ex. J, p. 93-100).

Doubts persisted after Plaintiff informed Defendant Smith, the Director of ODR, of her appointment to the Panel. Smith sent an email to Defendant Rhen, and copied Defendants Helling and Tierney as she was told to do when communicating with PDE officials, to inform her that she (Smith) had spoken to Tierney on the issue of hearing officers being appointed to the Panel and afterwards agreed to draft a letter to the hearing officers articulating the concerns. (Rec. Doc. 89 Ex. L, p. 11); See Smith Dep. 8, 125.

itself.[11]  Although there were no verbal displays of displeasure with Plaintiff's comments, Plaintiff asserts that discontent could be inferred from Defendant Rhen's facial expressions (frowning and flushing of the face). (See id. ¶ 35).

In February 2006, Plaintiff started an internet blog in which she regularly discussed special education issues.[12] (Id. ¶ 41).  The purpose of the blog was to "share information about inclusion and the implementation of the Gaskin Settlement Agreement from the perspective of one parent of a class member and to provide a means to share information with other class members." (Rec. Doc. 107 Ex. P, p. 1).[13]  In articulating this information, Stengle relied on her experiences as

_____

[11] Specifically with regard to the Panel procedures, Stengle opined about: (I) the intemperate attitude of the moderator, which she believed impeded discussion; (II) Dr. Rhen's disagreement regarding advisory panels and Rhen's assertion regarding policies governing advisory panels; (III) Rhen's controlling the agenda, which Plaintiff perceived prevented the Panel from fulfilling its obligations under the settlement agreement. (Rec. Doc. 89 ¶ 33). Further, Plaintiff made, inter alia, the following suggestions at the initial Panel meeting: (I) she wanted to table the discussion to adopt Operating Rules and Procedures; (II) she wanted to keep the Policy and Compliance Committee as one entity; (III) she thought it prudent for Advisory Panel to direct specific persons to develop and disseminate a press release regarding the formation and membership of the Advisory Panel; (IV) and she wanted Rhen and the PDE to add a section to its website entitled "Advisory Panel Positions and Recommendations." (See Rec. Doc. 107 ¶ 33).

[12] Before this time, Defendant Smith had noticed a change in Stengle's behavior. (Rec. Doc. 91 ¶ 23).  Additionally, Andrew Faust, an attorney specializing in law related to school district education, noticed that Stengle was "nervous" and "frenetic." Andrew Faust Dep. 89:6-13, August 11, 2008.

[13] In her blog, Plaintiff took positions in favor of least restrictive environment/inclusion and invited commentary on that issue. (Rec. Doc. 107 Ex. P).  According to Plaintiff, "Pennsylvania seemed pretty devoted to this segregation of children on the basis of disability." (Stengle Dep. 98:14-18). Based on her blog entries, Stengle appeared to be a proponent of full inclusion and made recommendations to individuals about filing complaints, due process, and

a hearing officer and in the special education industry, which engendered discussions involving Gaskin issues and other legal issues with which she was confronted in her capacity as a hearing officer. (Rec. Doc. 89 ¶ 43).

In or around the spring of 2006, Defendant Fullerton became a regular reader of Plaintiff's blog. (Id. ¶ 44). Fullerton perceived the blog as "bashing" the PDE and ultimately informed Rhen and Brinkley that the blog addressed Gaskin issues. (Id. ¶ 45-46).[14] On April 13, 2006, Rhen wrote a letter to Plaintiff asking her to correct misinformation on her blog that caused confusion in the education community. (Id. ¶ 47). Concerns about the content of Plaintiff's blog were not limited to personnel inside PDE and ODR. These complaints are too numerous to recount them in their totality; however, we will memorialize several in order to highlight their content and scope.

Anne Hendricks, of the Levin Legal Group, contacted Defendant Smith and stated her opinion that, given Stengle's statements against school districts, Plaintiff was not able to maintain the impartiality required of a hearing officer. (Id. ¶ 50).[15]

_____

private communications. (Id. Ex. P). The Defendants characterize her blog as "advocacy," a position the Plaintiff controverts, claiming that the content of her blog was "free speech." (Compare Rec. Doc. 89 ¶ 48 with Rec. Doc. 107 ¶ 48).

[14] Upon reading the blog, Rhen had the same impression. (Rec. Doc. 89 ¶ 46).

[15] Smith ultimately forwarded Hendricks' email complaint to Defendants Tommasini, Helling and Tierney. (Id. ¶ 51). Tommasini replied that he was unsure how much longer

A parent involved in the litigation of a case that was to go before a hearing officer stated that after review of Plaintiff's blog, she did not want Plaintiff to be the hearing officer in her case because she doubted Plaintiff's ability to maintain impartiality. (Id. ¶ 53). Attorney Faust also emailed Defendant Smith regarding his concerns regarding Stengle's ability to remain impartial. (Id. ¶ Ex. S).[16] Scott Wolpert, a school district attorney, requested Plaintiff's recusal[17] from a case, citing her blog as a reason. (Rec. Doc. 91 ¶ 28(e)). Judy Gran, lead attorney for the Gaskin litigation, requested Stengle's recusal from a case because of her blog and her position on the Gaskin Panel. (Id. ¶ 28(f)). In May 2006, Smith forwarded an email from a child advocate and school district counsel, both of whom were trying to have Stengle recuse herself because of their concerns about her impartiality.

_____

Plaintiff's activities could be ignored in light of her hearing officer's duty to maintain impartiality. (Id. Ex. Q; see Tommasini Dep. 14).

[16] Faust thought that the blog was "lurid" and that the biases reflected therein were inconsistent with someone holding the position of an impartial hearing officer. He emailed these opinions to Smith and requested that Plaintiff's position as a hearing officer be terminated. Faust Dep. 14:1-14.

Smith forwarded this email to Defendants Helling, Tierney, and Tommasini in order to keep them informed. (Rec. Doc. 89 ¶ 55). Plaintiff notes that the email was not forwarded to Defendant Rhen, despite Smith's testimony that she would copy PDE attorneys when communicating with or about their clients.

[17] At the time relevant to the instant action, ODR's Hearing Officer Handbook and the Pennsylvania Special Education Dispute Resolution Manual required hearing officers to recuse themselves when they, inter alia, "had a personal or professional interest that would conflict with hie or her objectivity in the hearing." Sec. Am. Compl. ¶ 58.

(Rec. Doc. 89 ¶ 56).[18]

Faced with numerous emails expressing doubts over Plaintiff's ability to remain impartial in her duties as a hearing officer, Defendant Smith sought legal advice. Smith consulted Ed Titterton ("Titterton"), an attorney who provided consulting services to ODR,[19] and Robert Frankhouser ("Frankhouser"), an attorney from IU-13. (Id. ¶ 58, 60).[20] Smith's specific concerns involved whether it was appropriate for a hearing officer who was required to be impartial to advocate issues of least restrictive environment in a blog when those same issues came before her. (Id. ¶ 59).

Frankhouser was tasked with: (I) determining if Stengle's blog posts were appropriate given her responsibilities as a hearing officer; (II) advising on the

_____

[18] While Stengle declined this invitation to recuse, (Rec. Doc. 89 ¶ 57), she was cognizant that her blog could potentially force her to recuse herself in some instances. For example, Plaintiff acknowledged that if someone with whom she had communicated or interacted on the blog came before her in a hearing, she should and would recuse herself. See Stengle Dep. 430:1-7.

[19] Titterton also contracted with ODR to work with hearing officers on, inter alia, decision-writing and review of hearing officer decisions. See Titterton Dep. 7:10-8:9.

[20] Plaintiff notes that Smith's overtures for legal advice came approximately three months after she became aware of the blog. In that time, Smith forwarded to Defendants Helling, Tierney, and Tommasini emails from school district attorneys complaining that Stengle should be disqualified as a hearing officer in light of her blog activity. (See Rec. Doc. 107 Exs. 9, 10). Within these email exchanges, Defendant Tommasini asserted that he believed Stengle should be removed as a hearing officer. (Id. Ex. 12). Defendant Tierney responded by asking, "When is [Stengle's] contract up for renewal? Procedurally, it will be easier to accomplish if *we* simply refuse to renew . . . . I think we could successfully defend that." (Id. Ex. 13) (Plaintiff emphasizes that Tierney used the word "we," which she claims connotes concerted action).

decision of whether to renew Plaintiff's hearing officer contract; and (III) to advise on how remove Plaintiff from that position. (See id. ¶ 61, 62). Frankhouser's initial impression of the blog can be characterized as one of shock; he was "surprised that a hearing officer who heard due process cases involving districts and parents and disabled kids would engage in that kind of advocacy." Frankhouser Dep. 15:14-21, July 3, 2008.[21] Frankhouser's legal opinion was that Stengle's contract should be "non-renewed." (Rec. Doc. 89 ¶ 64).[22] Defendant Smith ultimately followed Frankhouser's advice when, on June 2, 2006, she sent Plaintiff a letter[23] notifying Plaintiff that her contract as a hearing officer was non-renewed. (Id. Ex. W).[24]

---

[21] Frankhouser's conclusion that Plaintiff was engaged in "advocacy" was based on his perception that "she was quite clear in the voluminous content of her blog how she felt about inclusion, least restrictive environment, . . . school districts in general, and . . . schools districts in particular." Frankhouser Dep. 15:22-25-16:1-3. Smith testified that Frankhouser insinuated that no judge would tolerate Stengle's conduct, referring to her blog activity. Smith Dep. 149:18-22. Smith further claimed that both she and Frankhouser believed Stengle's conduct to be in violation of her duty of impartiality. Id. 151:8-11.

[22] Smith considered Frankhouser's legal advice to be conclusive on the legal issues before him, Smith Dep. 157:3, and Frankhouser realized the import of his opinions, Frankhouser Dep. 21:12-18.

[23] On May 26, 2006, Frankhouser sent Smith a draft of the non-renewal letter that was to be sent to Plaintiff. Frankhouser Dep. 30, 33.

[24] Smith testified that she did not seek legal counsel from Defendants Helling, Fullerton, Tierney or Castlebuono. Smith Dep. 142:6-8; 145:10-12. Smith maintains that the decision to non-renew Plaintiff's contract was hers alone and that any opinions expressed by PDE members were merely reactions to that decision and had no effect on the decision-making process. See Smith Dep. 139-142. However, in an email regarding the letter sent prior to its official dissemination, Smith wrote, "I still don't have approval from Dr. Rhen to send the letter but in

The letter set forth three reasons[25] for the decision to non-renew: (I)

Plaintiff's blog constituted "advocacy ," which ultimately compromised her ability

to serve as an impartial hearing officer; (II) in refusing to recuse herself in one

matter and using intemperate and inappropriate language in denying the recusal

motion; and (III) Plaintiff failed to comply with timeliness requirements in

rendering her opinions.[26] (See id.).  It is noteworthy that, since 2002, Smith has not

renewed the contracts of four additional hearing officers. (Rec. Doc. 91 ¶ 40).[27]

the meantime, please delete the paragraph about her being on the [G]askin [P]anel . . . ." (Rec. Doc. 107, Ex. 25).  Further, Plaintiff notes that in April 2006, Smith was part of the aforementioned email stream in which Tierney stated inquired, " When is her contract up for renewal?  Procedurally, it will be easier to accomplish of *we* simply refuse to renew." (Rec. Doc. 107 ¶ 68).

[25] As we have already alluded, in addition to the three reasons stated in the actual letter sent to Plaintiff, Frankhouser's draft of that letter contained a fourth reason, involving a conflict arising from Plaintiff's dual roles as a hearing officer and Gaskin Panel member, for non-renewing Plaintiff's contract. See Frankhouser Dep. 34:10-20.  Smith was uncomfortable with this reason and removed it after Frankhouser assured her that doing would not effect his legal analysis. Id. 35:5-8.  It appears as though Defendant Rhen and either Defendant Tierney or Defendant Heller also urged Smith to remove the Gaskin Panel reference. (See Rec. Doc. 89 ¶ 75, 76); see Smith Dep. 144:16-24.  Plaintiff maintains that this fact belies Smith's assertion that the opinions of other Defendants had no effect on her decision to non-renew Plaintiff's contract.

[26] Smith maintains that four of Stengle's decisions in the last reporting period prior to her non-renewal were late. Smith Dep. 52-59.  Plaintiff maintains that the timeline did not apply to most of her cases in light of the statute under which the case was initiated. (Rec. Doc. 108, Ex. 37); see ODR's website at www.pattan.net/files/ODR/ODR_IDEA+2004_implem.  Defendant Smith believed that no such exception existed. Smith Dep. 53:9-19. Further, Plaintiff notes that other hearing officers were also late with some of their decisions during that same reporting period; however, those individuals were merely advised not to let it happen again. Smith Dep. 60:4-13.

[27]  Defendant Smith determined not to renew the contracts of two other hearing officers when the appearance of impartiality and neutrality had been compromised by the hearing officers' "extracurricular" activities. Smith Dep. 135-136.

Prior to sending this letter, and on the advice from counsel, Smith informed the other PDE Defendants of the decision to non-renew Stengle's contract. (Rec. Doc. 89, Ex. W; Frankhouser Dep. 38).[28] Defendant Helling replied with an email, stating, "I'm glad you and the IU are doing the right thing. I thought the termination letter was very well done. This may be difficult and I wish you all the best as this matter proceeds." (Rec. Doc. 89 Ex. Y). Additionally, Defendant Castlebuono, issued a letter to PDE personnel apprising them of ODR's decision to non-renew Stengle's contract. (Id. Ex. AA). In this letter, Castlebuono insinuates that although ODR and PDE are separate entities, given Stengle's husband's active involvement in the special education world, the decision to non-renew her contract could precipitate serious political consequences for PDE. (Id.).[29]

## DISCUSSION:

As a preliminary matter we note that the PDE Defendants take issue with the responses Plaintiff has given to their statement of undisputed facts. In particular, PDE Defendants claim that paragraphs to which Plaintiff responded by raising a

---

[28] Smith informed the PDE of Stengle's non-renewal because: (I) the PDE funds her program; (II) the political ramifications in said non-renewal had the potential to be dire; (III) Stengle was a hearing officer appointed to the Gaskin Panel, which was overseen by PDE; (IV) Stengle's involvement in a case which included both ODR and PDE. See Smith Dep. 127:13-130:9.

[29] In fact, Stengle eventually contacted then-Pennsylvania Representative Dennis E. Leh regarding her non-renewal appearing to appeal for his intervention in the matter. (See Rec. Doc. 89 Ex. EE).

hearsay objection should be admitted as true. In the Third Circuit, "hearsay statements can be considered on a motion for summary judgment if they are capable of admission at trial." Shelton v. Univ. of Med. & Dentistry of New Jersey, 223 F.3d 220, 223 (3d Cir. 2000) (citations omitted). The statements at issue involve conversations between individuals who have already been deposed in this case. Accordingly, there is no reason to believe that the declarant will not be able to testify regarding the alleged hearsay statement at trial. Therefore, we elect to consider these statement as we dispose of the instant Motion.

PDE Defendants also take issue with Plaintiff's allegedly improper denials to statements of fact. As they note, it is not the Court's task to wade through improper denials and legal argument in search for a genuine issue of material fact. U.S. v. Hoffecker, 530 F.3d 137, 162 (3d Cir. 2008) (quoting U.S. v. Dunkel, 927 F/2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs"). Accordingly, all denials unaccompanied by a citation to the record shall be deemed admitted.

Further, PDE Defendants argue that improper citations to the record should be discounted and their corresponding statements of facts admitted as true. Although such action is technically within our discretion, we will decline the invitation to do so. The miscitations are not so numerous as to burden the Court

and we can understand how these mistakes can occur when citing to a record as voluminous as the one *sub judice*. Where these miscitations have occurred, the Court has made a good faith effort to locate the proper record evidence in support of denial. If we have found this evidence, we have considered it in our resolution of the instant matter where relevant. If we were unsuccessful in locating the proper evidence after a diligent effort to do so, we have considered the statement of fact corresponding the to miscited evidence admitted.[30]

Having resolved these preliminary matters, we proceed to the substance of this case. To recapitulate, Plaintiff has lodged the following counts and allegations in her Second Amended Complaint: (I) violations of the First and Fourteenth Amendments pursuant § 1983, asserted against ODR; (II) violations of the First and Fourteenth Amendments pursuant to § 1983, asserted against Smith in her individual capacity; (III) conspiracy to violate First and Fourteenth Amendment rights pursuant to § 1983, asserted against Smith, Tierney, Tommasini, Castlebuono, Helling, Fullerton, and Rhen; (IV) violations of § 504 of the Rehabilitation Act of 1973, asserted against ODR, PDE, LLIU, Smith, and Rhen; (V) violation of Pennsylvania's Whistleblower Law, 43 Pa. C.S. §§ 1422-1428,

---

[30] Our deference in this matter should not be taken as a license to carelessly and lackadaisically cite to the record. While we have afforded some courtesy here in the interest of justice, our largesse is not boundless.

asserted against ODR and Smith; and (VI) violations of the First and Fourteenth Amendments pursuant to § 1983, asserted against LLIU. Accordingly, the ODR Motion involves all six counts of the Second Amended Complaint, while the PDE Motion only addresses counts III and IV. We will address these claims *seriatim*.

## A.    THE ODR MOTION[31]

### I.    Count I– First and Fourteenth Amendment Violations Against Defendant ODR

At the outset, we note that Plaintiff appears to utilize the Fourteenth Amendment not as an independent cause of action, but as a mechanism to enforce the First Amendment against state actors. Therefore, our analysis of substantive law shall be confined to Plaintiff's First Amendment claim.

The First Amendment to the United States Constitution states, in pertinent part, "Congress shall make no law . . . abridging the freedom of speech." U.S. CONST. amend I. At bottom, Plaintiff asserts a First Amendment retaliation claim,

---

[31] Defendant Smith was the Director of ODR and, as such, actions taken in her official capacity are imputed to ODR. With regard to LLIU, there is evidence that although LLIU approved the contracting of hearing officers in general, (Rec. Doc. 91 ¶ 5), its Board of Directors had no involvement in determining which hearing officers were or were not offered contracts. (Id.). However, there is also testimony that since the ODR is a program of the LLIU 13, employees of the ODR are employees of LLIU 13. Smith Dep. 6:4-5. Therefore, we believe that there is a material issue of fact as to the relationship between ODR and LLIU. Since we must take the facts in the light most favorable to Plaintiff, for purposes of disposing of the ODR Motion, we will assume that employees of ODR are employees of LLIU. Accordingly, Smith's official actions can also be imputed to LLIU.

essentially claiming that her free speech was abridged in retaliation for operating her blog.  The Third Circuit has announced a three-part test that is to be used in analyzing such claims.  First, "the employee must demonstrate that his/her speech is protected, that is, it [was spoken as a citizen and] addresses a matter of public concern and the 'employee's interest in the speech outweighs' the employer's countervailing interest 'in promoting workplace efficiency and avoiding workplace disruption.'"[32] Reilly v. City of Atlantic City, 532 F.3d 216, 224 (3d Cir. 2008) (quoting Springer v. Henry, 435 F.2d 268, 275 (3d Cir. 2006)).  Second, the employee bears the burden of proving "that his/her speech was 'a substantial or motivating factor' in the retaliatory action against him/her." Reilly, 532 F.3d at 224 (citing Springer, 435 F.2d at 275)).  If satisfied, the burden then shifts to the employer, who must "prove that the 'allegedly retaliatory action would have been taken absent the protected [speech].'" Reilly, 532 F.3d at 224 (citing Springer, 435 F.2d at 275)).  As we shall see, Plaintiff ultimately fails the first prong of this test. See infra p. 26.

ODR Defendants argue that Plaintiff's speech, as contained on her blog, occurred within the ambit of her official duties as an impartial hearing officer.  In

---

[32]  The first prong encapsulates the Pickering Test, enunciated by the Supreme Court of the Untied States in Pickering v. Bd. of Educ., 391 U.S. 563 (1968).  The Pickering analysis applies equally to independent government contractors as it does to government employees. See Bd. of County Commissioners v. Umbehr, 528 U.S. 668 (1995).

supporting this contention, ODR Defendants note that we must examine the "content, form, and context of [the] statement[s], as revealed by the whole record." Hill, 455 F.3d at 243 (quoting Ranking v. MacPherson, 483 U.S. 378, 384 (1987)). Accordingly, ODR Defendants contend that Plaintiff has conceded that: (I) her blog was an extension of her membership on the Gaskin Panel; (II) her blog addressed topics that were before her as a hearing officer; and (III) she relied upon her experience as a hearing officer in writing the blog and addressing special education issues contained therein. However, Plaintiff has adduced evidence supporting her contention that her conduct on the blog was an *ultra vires* act. First, she notes that the "preface" of her blog states, "This journal is intended to share information about inclusion and the implementation of the Gaskin Settlement Agreement *from the perspective of on parent of a class member* and to provide a means to share information with other class members. Interested others are welcome to participate as well." (Rec. Doc. 109, Ex 29) (emphasis added). Further, Plaintiff contends that nowhere in her hearing officer contract was she obliged to publicly express her opinions on inclusion or the Gaskin Agreement.[33]

In light of these contentions, we believe that the Plaintiff has adduced

---

[33] Indeed, in asserting that the maintenance of the blog placed Plaintiff in direct conflict with her duties as a hearing officer, ODR Defendants impliedly concede that Plaintiff's conduct with regard to her blog was outside the scope of her duties as a hearing officer.

evidence from which a reasonable jury could conclude that she was not maintaining her blog in her official capacity as a hearing officer. Merely incorporating knowledge gleaned from her experience as a hearing officer into an independently created, maintained, and operated blog does not necessarily render her actions within the scope of her official duties. We believe Plaintiff has satisfied her burden in this regard and we will therefore proceed with the First Amendment analysis.

ODR Defendants concede that Plaintiff's speech was a matter of public concern, (Rec. Doc. 94 p. 10), and so we consider whether Plaintiff's interest in her speech outweighs ODR's interest in promoting workplace efficiency and avoiding workplace disruption. In the case *sub judice*, the Plaintiff's interest is obviously in exercising her right to free speech. The government's interest is in ensuring that impartial due process is afforded those seeking resolution of special education issues.

It is clearly established law that "[m]aintaining the appearance of impartiality of the judiciary is an interest of vital importance." Kirchgessner v. Wilentz, 884 F. Supp. 901, 912 (D.N.J. 1995) (citing U.S. Civil Serv. Comm'n v. Nat'l Assoc. of Letter Carriers, 413 U.S. 548, 564 (1973). In Civil Serv. Comm'n, the Supreme Court of the United States stated, "[I]t is not only important that the

Government and its employees in fact avoid practicing political justice, but *it is also crucial that they appear to the public to be avoiding it, if confidence in the system of representative Government is not to be eroded to a disastrous extent*." Civil Serv. Comm'n, 413 U.S. at 565 (emphasis added) (addressing issues of impartiality in the executive branch). As a colleague in our Circuit has noted, "[W]hen weighing the competing interests between a public employer's need to have wide discretion in running an efficient operation and the speech and associational rights of its employees, the judiciary has greater concerns of maintaining its impartiality both in appearance and in fact than other branches of government." Kirchgessner, 884 F. Supp at 912 (Lechner, J.).

Although the aforementioned sentiments were made in regard to Article III judges, "the role of the [administrative law judge], the impartial officer designated to hear a case, is similar to that of an Article III judge." Tennessee Student Assist. Corp. v. Hood, 541 U.S. 440, 457 (2004) (quoting Federal Maritime Comm'n v. South Carolina State Ports Auth., 535 U.S. 743, 758 (2002)). Further, our Circuit has recognized that the role of a federal hearing officer or an administrative law judge is "functionally comparable" to that of an Article III judge. See Figueroa v. Blackburn, 208 F.3d 435, 441 (quoting Butz v. Economou, 438 U.S. 478, 513 (1978)). We believe that the analogy drawn in Butz and adopted in Figueroa

applies with equal force to the instant matter.[34]  Accordingly, we can easily

conclude that the maintenance of Plaintiff's impartiality, and appearance thereof,

was crucial to the effective operation of the hearing officer system.  However, this

conclusion does not end our inquiry, as we must balance this crucial government

interest against Plaintiff's interest in exercising her free speech rights.

The Free Speech Clause of the First Amendment is a pillar of our American

system of governance.  It is the vehicle through which dissenting, minority

opinions challenge the status quo.  The Free Speech Clause affords the public the

opportunity to assess the merits of the dissenting opinion, to examine the

majoritarian view in light thereof, and to adapt, revise, or refine the status quo

accordingly.  This, in turn, produces societal progress, as it ensures that antiquated

ideas and beliefs fade from the popular consciousness.  However, the right to free

speech is not absolute, as there are times when countervailing interests outweigh it.

We are cognizant that the Supreme Court has recently articulated on such instance;

"[s]o long as employees are speaking as citizens about matters of public concern,

they must face only those speech restrictions that are necessary for their employers

to operate efficiently and effectively." Garcetti v. Ceballos, 547 U.S. 410, 418

_____

[34] Much like Article III judges, Plaintiff was required to: (I) maintain impartiality; (II) preside over hearings; (III) render decisions; and (IV) memorialize those decisions in written form. (See Rec. Doc. 109, Ex. 23 (Hearing Officer Contract 2005-06)).

(2006).

Cognizant of this precedent, Plaintiff contends that her conduct did not prevent the ODR from operating efficiently and effectively. Plaintiff notes that the ODR Defendants base their disruption argument on two claims: (I) Plaintiff's refusal to recuse herself in a single case; and (II) numerous complaints involving concerns about Plaintiff's impartiality. Plaintiff proceeds to claim that the case in which she refused to recuse herself was appealed on numerous grounds, only one of which was her ostensible bias. Accordingly, she asserts that her blogging activity did not produce additional work for the ODR because the case would have been appealed even if her blog did not exist. Plaintiff further contends that a multitude of the "numerous complaints" regarding her alleged bias were either mistakenly lodged against her or were lodged because the complainant wanted the hearing officer to contravene the law and knew that Plaintiff would not do so.[35]

Put bluntly, Plaintiff's arguments miss the mark. The Supreme Court has stated that in order to pass constitutional muster, restrictions on free speech must

---

[35] Specifically, Plaintiff asserts that one of the complaints received by Defendant Smith concerned a different blog and that another complaint addressed the decision of a previous hearing officer. (Rec. Doc. 109 p. 16). Further, Plaintiff contends, "Ms. Smith received a complaint from a parent who apparently hoped that the hearing officer would not follow the law regarding inclusion, and concluded that Mrs. Stengle would not render a decision consistent with her goals."(Id.). Accordingly, Plaintiff concludes that her blogging activity did not vitiate that effectiveness or efficiency of the ODR.

be "directed at speech that has *some potential* to affect the entities' operations."

Garcetti, 547 U.S. at 421 (emphasis added). Accordingly, the government need not

point to *actual* disruptiveness in order for its conduct to be rendered constitutional.

See id. Plaintiff's contentions only address *actual* incidents of alleged

disruptiveness, meaning that even if we accept her views concerning these

incidents, it would not necessarily render ODR Defendants' conduct

unconstitutional. In order to do so, Plaintiff would be obliged to show that the

conduct in question, her blogging activities, had no *potential* to disrupt government

operations. The facts of this case belie this possibility.

Regardless of whether Stengle's blog activity qualified as "advocacy," her

conduct in that regard had the potential to raise questions as to her impartiality and

indeed did just that. Plaintiff acknowledges that two attorneys, Andrew Faust of

Sweet Stevens and Anne Hendricks of Levin Legal Group, stated that they

intended to file formal recusal motions because they questioned Plaintiff's ability

to be impartial in light of her blog entries. (See Rec. Doc. 109 p. 15). While those

attorneys never filed the contemplated motions, that fact does not alter the essential

inference to be drawn from this factual array. Again, actual disruptiveness need

not occur; ODR Defendants need only target *potential* disruptiveness. From these

facts, one can readily infer that Plaintiff's blog had the potential to induce recusal

motions from those who came before her in her hearing officer capacity.  If such a motion were to be filed, either one of two things could happen.  Plaintiff could recuse herself, or she could elect to deny the motion and hear the case to its conclusion.  In either instance, governmental efficiency would be adversely affected.

If Plaintiff denied the motion and retained the case, the losing party could appeal the decision on due process grounds, alleging that it was denied an impartial adjudication of its rights.  See Everett v. Marcase, 426 F. Supp. 397, 401 (standing for the proposition that a hearing officer's lack of impartiality gives rise to a due process claim).  This would entail additional governmental resources being dedicated to the appeal, which would clog dockets and ultimately reduce governmental efficiency.  On the other hand, if Plaintiff chose to grant the motion and recuse herself, the case would be transferred to another hearing officer, which would not only serve to delay  resolution of the case, but also to clog the docket of the newly assigned hearing officer, thereby reducing his or her ability to efficiently dispose of his or her load.  Accordingly, it is easy to see that an increased number of recusal motions would severely hamper the government's ability to efficiently and effectively resolve special education issues.  Since Plaintiff's blog had the potential to induce such motions, and since the blog was easily accessible to

anyone with an internet connection, it is our determination that said blog posed a legitimate threat to the efficient operation of the due process system at issue. Accordingly, we conclude that Plaintiff's free speech rights could be constitutionally abridged under the extant circumstances, and she has thus not suffered a deprivation of those rights as afforded under the First Amendment. Consequently, we will grant the ODR Motion to this extent.

## II. Count II– First and Fourteenth Amendment Violations Against Defendant Smith (individually)

The above analysis applies equally to Plaintiff's free speech claim against Defendant Smith. Simply stated, Plaintiff did not suffer a deprivation of her First Amendment rights. Even if she had, we believe that the doctrine of qualified immunity would protect Defendant Smith.

Qualified immunity protects government officials performing discretionary functions so long as their conduct does not violate established constitutional rights of which a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The Plaintiff must adduce specific allegations or evidence as to the allegedly violative conduct of Smith in order to avoid the vesting of qualified immunity. See Good v. Dauphin Soc. Servs., 891 F.2d 1087, 1092, 1096-97 (3d Cir. 1990). Essentially, we must determine whether there was a constitutional

violation and whether there was good reason for Smith to know her actions were unconstitutional. <u>Wilkie v. Robbins</u>, 127 S.Ct. 2588, 2617 (2007) (citing <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001)); <u>see also</u> <u>Pearson v. Callahan</u>, ____ S.Ct. _____, 2009 WL 128768 (2009) (modifying <u>Saucier</u> to the extent that courts need not first determine whether facts alleged or shown by plaintiff make out violation of constitutional right).

As recounted above, First Amendment retaliation cases require courts to engage in the three part balancing test articulated in <u>Reilly</u> and <u>Springer</u>. As such, there is no "bright-line" rule in this particular area of law. Even if Defendant Smith's actions were unconstitutional, which we believe they were not, absent such a rule, she had no way of knowing they were unconstitutional. To the contrary, we believe that given the importance of hearing officer impartiality and the threat to Plaintiff's impartiality posed by Plaintiff's blog, Smith reasonably believed that her actions were constitutional, insofar as they preserved the impartiality of the due process system at issue in this case. Plaintiff has provided no case law challenging anything that undergirds this conclusion. Consequently, even if Plaintiff had suffered an unconstitutional abridgment of her First Amendment rights, which again we firmly believe she did not, Defendant Smith would be cloaked with qualified immunity as to that claim. Accordingly, the ODR Motion will be granted

to this extent, as it relates to Defendant Smith.

### III.    Count III–Conspiracy to Violate the First and Fourteenth Amendments Against Defendant Smith

Plaintiff's conspiracy claim, as contained in Count III of the Second Amended Complaint, is based in 42 U.S.C. § 1983, not 42 U.S.C. § 1985. In order to maintain a § 1983 conspiracy claim, Plaintiff "must plead with particularity the 'circumstances' of the alleged wrong doing in order to place the defendants on notice of the precise misconduct with which they are charged. Only allegations of conspiracy which are particularized, such as those addressing (1) the period of the conspiracy, (2) the object of the conspiracy, and (3) certain actions of the alleged conspirators taken to achieve that purpose, will be deemed sufficient." Labalokie v. Capital Area Intermediate Unit, 926 F. Supp. 503, 508-09 (M.D. Pa. 1996) (citations omitted).  However, before addressing these issues, as a threshold matter in all § 1983 claims, Plaintiff must aver that Defendant Smith deprived her of her constitutional rights while acting under color of state law. See Carter v. City of Philadelphia, 989 F.2d 117, 119 (3d Cir. 1993).  We have already concluded that Plaintiff's First Amendment rights were not unconstitutionally abridged. Therefore, she cannot maintain a § 1983 claim of conspiracy to violate her First Amendment rights.  Accordingly, we will grant the ODR Motion in this regard as it

relates to Defendant Smith.

## IV. Count IV–Rehabilitation Act Violations Against Defendants ODR, LLIU, and Smith

§ 504 of the Rehabilitation Act ("RA") bars "both federal agencies and private entities that receive federal funding from discriminating on the basis of disability . . . ." <u>Freed v. CONRAIL</u>, 201 F.3d 188, 191 (3d Cir. 2000). Plaintiff's Rehabilitation Act claim, as memorialized in Count IV of the Second Amended Complaint, is a retaliation claim. The anti-retaliation provision of the RA states, in relevant part, "No recipient or other person [of Federal financial assistance] shall intimidate, threaten, coerce, or discriminate against any individual . . . because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this part." 34 C.F.R. § 100.7(e). Essentially, Plaintiff's claim seems to be that her hearing officer contract was non-renewed as a result of her criticism of the ODR's failure to fully implement the Gaskin Settlement (specifically involving concerns over least restrictive environment and inclusion), which was manifested in her blog and through her statements at the initial Gaskin Panel meeting in December 2006.

Retaliation claims under § 504 of the RA and the American with Disabilities Act are analyzed identically. <u>See</u> <u>Derrick F. V. Red Lion Sch. Dist.</u>, 586 F. Supp.

2d, 282, 300 (M.D. Pa. 2008) (Rambo, J.). Accordingly, the instant claim is subject to the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), although both parties appear to have ignored the applicability of this case to the instant matter. Under the McDonnell schema, the initial burden is on the plaintiff to satisfy the elements of a prima facie case of retaliation. Shaner v. Synthes, 204 F.3d 494, 499 (3d Cir. 2000). In doing this, the plaintiff must show: "(1) that she engaged in protected activity, and the retaliator knew of the involvement; (2) adverse action was taken by the defendant either during or after the protected activity that was sufficient to deter a person of ordinary firmness from engaging in protected activity; and (3) a causal connection between the protected activity and the adverse action." Id. at 499. If a plaintiff establishes her prima facie case, the burden of production shifts to the defendant to advance a legitimate, non-retaliatory reason for the adverse action. Id. at 500. If the defendant is successful in this endeavor, the burden of production shifts back to the plaintiff to identify sufficient evidence for a fact finder to conclude that the defendant's legitimate, non-retaliatory reason is pretextual. Id. at 501. However, the "defendant may defeat the claim of retaliation by showing that it would have taken the same action even if the plaintiff had not engaged in the protected activity." Lauren W. *ex rel.* Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir.

2007).

    As Plaintiff notes, the RA was ratified in order to, <u>inter alia</u>, "achieve equality of opportunity, *full inclusion*, and integration in society, employment, independent living, and economic and social self-sufficiency, for [disabled] individuals." 29 U.S.C. § 701 (emphasis added). In spite of this, ODR Defendants urge that Stengle's criticisms of the incomplete implementation of the Gaskin Agreement, which addressed issues of inclusion, was not a "protected activity" because it did not constitute "advocacy."

    We find this contention both ironic and inconsistent, since ODR Defendants based their argument for dismissal of Plaintiff's First Amendment claim on the assertion that these statements *did* in fact constitute advocacy. Regardless, within the employment context, "making complaints to management [and] writing critical letters to customers" are acceptable forms of advocacy. <u>Isler v. Keystone Sch. Dist.</u>, 2008 WL 3540603 (W.D. Pa. 2008) (quoting <u>Sumner v. U.S. Postal Serv.</u>, 899 F.2d 203, 209 (2nd Cir 1990)). We believe that Plaintiff's "pointing out of problems" with the implementation of § 504 and the Gaskin Settlement at the first Gaskin Panel training session is similar to "complaining to management," since LLIU members were present at that session. Further, we consider her blog activity analogous to "writing critical letters to customers" since the blog was read by those

who had special interests in special education (*i.e.*, the "customers" of the ODR and LLIU). "A plaintiff alleging a claim of retaliation need not demonstrate that the conduct he or she opposed was actually a violation of the law, so long as he or she possessed a reasonable, good faith belief that the underlying actions of the employer actually violated the law." <u>Isler</u> at * 9 (citing <u>Aman v. Cort Rental Furniture Corp.</u>, 85 F.3d 1074, 1085 (3d Cir. 1996) (discussing a prima facie case of discrimination under Title VII, which, as seen in <u>Derrick F.</u>, 586 F. Supp. 2d at 299, requires the same showing as a prima facie case of discrimination under the RA)). There is nothing in the record to case doubt upon Plaintiff's candor in expressing her concerns.

Accordingly, we are of the opinion that Stengle was in fact engaged in "protected activity." We believe that the ODR Defendants were aware of this activity because: (I) LLIU employees were present at the initial Gaskin Panel training session;[36] and (II) Defendant Smith, who ran the ODR, was unequivocally aware of the statements contained in Plaintiff's blog. Consequently, Plaintiff has established the first prong of her prima facie case.

As for the second prong, Plaintiff has established that after her criticism, her

---

[36] From their presence a reasonable person can logically infer that they heard Plaintiff's criticisms. The LLIU can be imbued with such knowledge as the employer.

contract as a hearing officer was non-renewed.  Further, we believe that the threat of such action is certainly sufficient to dissuade a reasonable person from engaging in criticism. However, in order to conclude that Plaintiff has established the second prong of her prima facie case, we must find that the ODR Defendants played a role in the adverse action.  Defendant Smith has admitted that she was the individual who determined that Plaintiff's contract as a hearing officer would be non-renewed.  Smith was an employee of ODR and LLIU 13.[37]  Therefore, Plaintiff has satisfied the second prong of her prima facie case, meaning that we will proceed to the third prong.

"To establish the requisite causal connection a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the alleged retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link. In the absence of that evidence the plaintiff must show that from the 'evidence gleaned from the record as a whole' the trier of fact should infer causation." Lauren W., 480 F.3d at 267 (internal citations and quotations omitted).  Plaintiff has adduced a multitude of evidence indicating that Defendant Smith was concerned about the content of her blog and the inferences

---

[37] During her deposition, Smith admitted, "[ODR] is an office. So the employees are IU employees." Smith Dep. 6:4-5.

that could be drawn therefrom.  In fact, Plaintiff's blog activities were cited as one

of the reasons for her non-renewal.  Accordingly, in light of this explicit statement,

we conclude that Plaintiff has satisfied the third prong of her prima facie and has

therefore carried her burden with regard thereto.[38]  This, then, shifts the burden of

production to ODR Defendants.

ODR Defendants have articulated non-discriminatory reasons for Plaintiff's

non-renewal.  First and foremost, ODR Defendants claims that Plaintiff was not

non-renewed because of the mere fact that she maintained a blog or even because

she criticized or "bashed" the ODR on that blog; rather, they claim that she was

non-renewed because the content of the blog caused members of the public, some

of whom were parties in cases she heard as hearing officer, to question her

impartiality, which ultimately inhibited the effective administration of the hearing

officer system.  Further, ODR Defendants claim that there are two additional non-

retaliatory  reasons for her non-renewal articulated in her non-renewal letter–(I) her

refusal to recuse herself in one matter and her use of intemperate and inappropriate

language in denying the recusal motion, and; (II) her failure to comply with

timeliness requirements.  This satisfies ODR Defendants' burden and shifts the

---

[38] Again, since for purposes of this Motion we consider Smith an employee fo both ODR and LLIU, her official actions are imputed to them.  Since Smith sent the non-renewal letter to Plaintiff in her capacity of ODR Director, this ostensibly retaliatory conduct is imputed to ODR and LLIU.

onus back to Plaintiff to prove pretext. As we will describe below, Plaintiff has failed to carry this burden.

Simply put, Plaintiff has failed to adduce any evidence that calls into question the legitimacy of ODR Defendants first non-retaliatory reason, the perceived compromise of her impartiality occasioned by her blog. Plaintiff has not produced any evidence from which a reasonable jury could infer that she was non-renewed merely because she maintained the blog or because of the fact that she criticized ODR in it. As aforestated, it was the deleterious effect the blog had on ODR's efficiency, as well as on Plaintiff's need to present herself as an unbiased hearing officer, that ultimately caused her non-renewal. There is absolutely no indication in the record evidence that the concerns regarding her impartiality were subterfuge for retaliatory animus. To the contrary, ODR received innumerable complaints from the public regarding her perceived bias on certain issues, and these perceptions eventually seeped into her work environment, as parties began to file recusal motions to remove her as the hearing officer in certain cases.[39]

It is apparent that Plaintiff felt that she could firewall her blogging activities so that they did not interfere with her duties as an impartial hearing officer, and we

---

[39] In this vein, the records reveals that Plaintiff was certainly aware that her blog was in conflict with her duties as an impartial hearing officer. From this, she could easily infer that her continued maintenance of her blog could jeopardize her employment. We therefore do not believe that her non-renewal could have surprised Plaintiff in the least.

do not question her honest intentions in this regard.  However, while she may have

been able to maintain her impartiality in fact, the public *perception* was that such a

feat was impossible.[40]  And, unfortunately for Plaintiff, as is many times the case,

perception became reality.  No matter how many reassurances she uttered, in the

minds of the public and bar there arose a fundamental conflict between Plaintiff's

blogging activities and her duties as a hearing officer that could not be resolved.[41]

This, as we have noted, presented the ODR with legitimate administrative

problems that carried with them measurable consequences for the effective,

efficient, and legitimate operation of the hearing officer system.  Plaintiff was at

least quasi-judicial, if not fully judicial, in her function, and this fact should have

restrained her from engaging in unbridled blogging regarding issues that

conceivably could have come before her.  Accordingly, it is evident that the

concerns regarding her impartiality were real and palpable and placed the ODR

---

[40] While Plaintiff does not characterize the content of her blog as "advocacy," others *did* regard the blog as such.  This public perception, and the consequences it engendered, are undisputed facts of this case that inform our resolution of the instant Motion.

[41]  Consider if a Pennsylvania Supreme Court Justice created a blog to discuss important legal issues of the day, some of which were involved in cases before the Court.  Problems similar to those in the case *sub judice* would arise in this instance.  Lawyers practicing in front of the Supreme Court would be obligated to read the Justice's blog and identify any biases that would materially affect his ability to remain impartial in a particular case.  If one was located, the lawyer might properly move for recusal of that Justice.  If such a sequence occurred with regularity, not only would the efficiency of the Pennsylvania Supreme Court be adversely effected, but the prudence of retaining the Justice would also be called into question.

Defendants in an untenable situation.  There is nothing in the record evidence calls

this into question, we hold that the Plaintiff has not successfully rebutted ODR

Defendant's non-retaliatory reason for her non-renewal.  We will therefore grant

the ODR Defendants' Motion insofar as it addresses Plaintiff's RA claim.

### v.  COUNT V–Violation of the Pennsylvania Whistleblower Law Asserted Against Defendants ODR and Smith

The germane section of the Pennsylvania Whistleblower Law ("PAWL")

states**,** "No employer may discharge, threaten or otherwise discriminate or retaliate

against an employee regarding the employee's compensation, terms, conditions,

location or privileges of employment because the employee . . . makes a good faith

report . . . to the employer or appropriate authority [of] an instance of wrongdoing

or waste." 43 P.S. § 1423 (1986).  The statute contains a definition section that

addresses words integral to the proper interpretation of the statute.  Among the

words included in the definition section is "employee."  That word is defined as

"[a] person who performs a service for wages or other remuneration under a

contract of hire, written or oral, express or implied, for a public body." Id. § 1422.

The statute proceeds to define an "employer" as "[a] person supervising one or

more employees, including the employee in question; a superior of that supervisor;

or an agent of a public body." Id.  Defendants contend that the Plaintiff cannot

maintain a cause of action under the PAWL because she is not an "employee" as defined by that statute.

Specifically, ODR Defendants contend that Plaintiff qualifies as an "independent contractor," which is a categorization that is not encompassed by the term "employee." To support this, ODR Defendants note that Plaintiff used an IRS Form 1099 to represent this status to the Internal Revenue Service during the years relevant to this lawsuit. Additionally, ODR Defendants note that Plaintiff has admitted to her status as an independent contractor her Undisputed Statement of Material Facts appurtenant to the ODR Motion. (Compare Rec. Doc. 91 ¶ 7 with Rec. Doc. 108 ¶ 7). Accordingly, we too will consider Plaintiff's status as that of an independent contractor.

With this established, ODR Defendants point to persuasive authority from the Eastern District of Pennsylvania in support of the proposition that independent contractors do not fall under the purview of "employees" for purposes of the PAWL. In Rankin v. City of Philadelphia, Judge Brody concluded that there is a viable interpretation of the PAWL under which "the 'contract of hire' language [in the definition of "employee"] . . . serves to exclude [from that definition] volunteers, independent contractors, and others who might otherwise seek to bring an action under the Whistleblower Law." Rankin v. City of Philadelphia, 963 F.

Supp. 463, 470 (E.D. Pa.1997).  Plaintiff's only response to this contention is to claim that ODR Defendants position is a misinterpretation of the case law.  Based upon the above-quoted language, it is clear to us that ODR Defendants have not misapprehended the essence of <u>Rankin</u>; rather, it is the Plaintiff who distorts its holding.[42]

Judge Brody's holding and reasoning are based on a meticulous semantic analysis of the PAWL.  After a careful reading of <u>Rankin</u> and a thorough reflection upon the PAWL, we see nothing in the case *sub judice* that casts doubt upon Judge Brody's methodology or conclusions.  Further, the Plaintiff has failed to provide us with any viable reason for discounting the dictates established in <u>Rankin</u> within the context of the case at bar.  Accordingly, we find <u>Rankin</u> to be persuasive in our resolution of the instant matter.  Consequently, we conclude that because Stengle qualifies as an "independent contractor," a designation that precludes her from being an "employee," as that term is defined in the PAWL, she cannot satisfy the

---

[42] As ODR Defendants note, Stengle most likely reaches her conclusion because Judge Brody ultimately determined that the plaintiff in <u>Rankin</u> could proceed with a PAWL claim. However, this determination was made based on Judge Brody's finding that the plaintiff was under a contract of hire with an independent contractor (a nursing home) that was an agent of the city of Philadelphia.  Since the city was a "public body," the nursing home, as an agent thereof, was an "employer," and since the plaintiff was under a contract of hire with the nursing home, the plaintiff was an "employee."  In short, Judge Brody did in fact conclude that Rankin was an employee and contrasted this term with the concept of an independent contractor.  Plaintiff simply misinterprets the reasoning of Judge Brody.

definitional requirements necessary for maintaining a viable PAWL claim.

Therefore, we will grant the ODR Motion to this extent.

### VI. Count VI–Violation of the First and Fourteenth Amendments Against  Defendant LLIU

We have already concluded that Plaintiff did not suffer an unconstitutional abridgment of her Free Speech rights.  Accordingly, on this basis we will grant the ODR Motion to this extent as it relates to Defendant LLIU.

### B. THE PDE MOTION

### I. Count III–Conspiracy to Violation the First and Fourteenth Amendments Against Defendants Tierney, Tommasini, Castlebuono, Helling, and Rhen

As we have explained above, Plaintiff's conspiracy claim is made pursuant to § 1983.  Accordingly, there must be an underlying constitutional violation in order for the PDE Defendants to be held liable for conspiracy.  Since we have concluded that there was no violation of Plaintiff's Free Speech rights, PDE Defendants cannot be held liable for conspiracy to violate same.  Consequently, we will grant the PDE Motion to this extent.

### II. Count IV–Rehabilitation Act Violations Against Defendants PDE and Rhen (individually)

As we have stated above, Plaintiff has not adduced any evidence that indicates the non-retaliatory reason for her non-renewal, her perceived impartiality, was a pretext for retaliatory animus. Accordingly, even if Plaintiff could establish a prima facie case of retaliation against Defendants PDE and Rhen, she cannot maintain her RA claim because she cannot rebut the non-retaliatory reason for her non-renewal, as required by the burden shifting scheme announced in McDonnell Douglas. Therefore, we will grant the PDE Motion to this extent.

## CONCLUSION:

To reiterate, this Court fully recognizes the cherished right of free speech, as well as the commendable goals of the RA. But these cannot wash away the bona fide concerns that arise when a judicial officer elects to disseminate her opinions in cyberspace with little or no restraint. Because of her position, Plaintiff's attempts to qualify her stances as solely her own were entirely ineffectual. With particular jobs come certain precise responsibilities. In Plaintiff's case, one of these included avoiding even the appearance of bias via extra-judicial comments. Plaintiff's deep concerns about the special education issues and the resulting creation of her blog ultimately caused her to face a dilemma that she alone created. The choices she freely made thereafter led to her non-renewal, and as aforestated we do not find any of the Defendants' conduct actionable under the circumstances.

For the foregoing reasons, we will grant both the ODR Motion (Rec. Doc.

90) and PDE Motion (Rec. Doc. 88) in their entireties. An appropriate Order will

enter.